Nos. 23-4354 and 23-4356

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

MARCO ANTONIO CARRALERO, et al.,
PLAINTIFFS-APPELLEES,

v.

ROB BONTA, in his official capacity as
Attorney General of California,
DEFENDANT-APPELLANT.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
No. 8:23-cv-1798, Hon. Cormac J. Carney

**BRIEF FOR THE DISTRICT OF COLUMBIA, ILLINOIS, CONNECTICUT, DELAWARE, HAWAI'I, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WASHINGTON, AND THE NORTHERN MARIANA ISLANDS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL**

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

RUSSELL C. BOGUE
Assistant Attorney General

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

KWAME RAOUL
Attorney General for the State of
Illinois

JANE ELINOR NOTZ
Solicitor General

SARAH A. HUNGER
Deputy Solicitor General

Office of the Attorney General for the
State of Illinois
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
sarah.hunger@ilag.gov

—————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

—————————

RENO MAY, et al.,
PLAINTIFFS-APPELLEES,

V.

ROB BONTA, in his official capacity as
Attorney General of California,
DEFENDANT-APPELLANT.

—————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
No. 8:23-cv-1696, Hon. Cormac J. Carney

—————————

## TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI CURIAE .....................................1

SUMMARY OF ARGUMENT .................................................................................2

ARGUMENT ...........................................................................................................4

I.    The Second Amendment Allows States To Implement Reasonable
      Firearm Regulations To Promote Gun Safety And Protect Against Gun
      Violence .........................................................................................................4

II.   Consistent With Regulations Adopted By Other States, California's
      Designation Of "Sensitive Places" Protects Uniquely Vulnerable
      Locations And Populations ...........................................................................8

      A.    Firearms pose special risks in dense and crowded places....................9

      B.    Restricting firearms in sensitive places protects vulnerable
            populations .........................................................................................14

      C.    Sensitive-place designations help to protect the exercise of other
            constitutional rights ...........................................................................16

III.  California's Private-Property Provision Reflects A Reasoned Policy
      Decision About How Best To Protect Public Safety And The Rights Of
      Property Owners ..........................................................................................20

CONCLUSION ......................................................................................................28

# TABLE OF AUTHORITIES

## *Cases*

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) ........................................ 13, 15

*Blum v. Yaretsky*, 457 U.S. 991 (1982) .................................................... 22

*DiGiacinto v. Rector & Visitors of George Mason Univ.*,
    704 S.E.2d 365 (Va. 2011) ............................................ 15

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................... 1, 4, 5, 6, 7, 8, 17

*GeorgiaCarry.Org, Inc. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012) ............................................ 21, 22

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ........................................ 8

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .................................... 2, 5, 6, 7

*Medtronic Inc. v. Lohr*, 518 U.S. 470 (1996) ........................................ 5

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ........................................ 1, 4, 5, 6, 7, 8, 9, 17

*Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009) .................................... 15

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019) .............................. 8, 15, 17

*United States v. Morrison*, 529 U.S. 598 (2000) ...................................... 5

*Voisine v. United States*, 579 U.S. 686 (2016) ........................................ 8

## *Statutes and Regulations*

Ala. Code § 13A-11-61.2 .......................................... 13

Ark. Code Ann. § 5-73-306 .................................... 19

Cal. Code Regs. tit. 14, § 4313 .................................. 13

Cal. Penal Code § 26230 .......................................... 2, 22

Colo. Rev. Stat. § 18-9-118 ..................................................... 13

D.C. Code § 7-2509.07 ..................................................... 13, 19

D.C. Code § 22-4502.01 ..................................................... 15

Del. Code Ann. tit. 11, § 1457 ..................................................... 15

Ga. Code Ann. § 16-11-127 ..................................................... 19

Ga. Code Ann. § 16-11-127.1 ..................................................... 16

Haw. Rev. Stat. § 134-9.1 ..................................................... 13

430 Ill. Comp. Stat. 66/65 ..................................................... 13, 16, 26, 27

80 Ind. Admin. Code 11-2-2 ..................................................... 13

Kan. Stat. Ann. § 75-7c24 ..................................................... 27

Kan Stat. Ann. § 75-7c10 ..................................................... 27

La. Rev. Stat. § 40:1379.3 ..................................................... 13, 19

Me. Stat. tit. 17-A, § 402 ..................................................... 26

Mich. Comp. Laws Ann. § 28.425o ..................................................... 16, 19

Minn. Stat. § 97A.091 ..................................................... 13

Miss. Code Ann. § 45-9-101 ..................................................... 19

Miss. Code Ann. § 45-9-171 ..................................................... 19

Mo. Rev. Stat. § 571.107 ..................................................... 16, 19

N.C. Gen Stat. § 14-277.2 ..................................................... 13

N.D. Cent. Code § 62.1-02-05 ..................................................... 16, 19

N.M. Stat. Ann. § 29-19-8 ..................................................... 16

N.Y. Penal Code § 265.01-e ................................................ 13, 16, 17, 19

Neb. Rev. Stat. § 28-1202.01 ........................................... 17, 19, 26

Ohio Rev. Code § 2923.126 .................................................... 19

18 Pa. Cons. Stat. Ann. § 912 ............................................... 16

S.C. Code. Ann. § 23-31-215 ........................................ 16, 19, 25

Tex. Penal Code § 46.03 ..................................................... 13, 16

Tex. Penal Code § 30.05 ................................................... 26, 27

Tex. Penal Code § 30.06 ................................................... 26, 27

Tex. Penal Code § 30.07 ................................................... 26, 27

Va. Code Ann. § 18.2-308.01 ................................................. 26

Vt. Stat. Ann. tit. 10, § 5201 ............................................... 26

Vt. Stat. Ann. tit. 13, § 4023 ............................................... 16

W. Va. Code Ann. § 61-7-11a ................................................ 16

Wash. Rev. Code Ann. § 9.41.300 ............................................ 17

Wyo. Stat. Ann. § 6-8-104 ................................................... 16

*Other*

Ian Ayres & Spurthi Jonnalagadda *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183 (Winter 2020) ........................... 23, 24, 26

Randy E. Barnett, *The Sound of Silence: Default Rules and Contractual Consent*, 78 Va. L. Rev. 821 (1992) ............................ 23

Jennifer Bisram, *Thousands Pack St. Patrick's Cathedral for Christmas Eve Mass*, CBS News (Dec. 25, 2022) ........................................ 10

iv

Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139 (2021) ............................................................ 12, 17, 18

Valerie Bonk, *Shooting on Metro Red Line Train Causes Service Delays*, WTOP News (Dec. 15, 2020) ............................................................ 12

*Brooklyn Subway Shooting: Police Search for Gunman in Attack on Brooklyn Subway*, N.Y. Times (Apr. 15, 2022) ................................................ 10

Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727 (2018) .................................................... 11

Veronica Canales, *Man Arrested After Firing Round that Ricocheted Off L'Enfant Plaza Station Platform, Striking Woman*, WTOP News (Sept. 2, 2022) ............................................................ 10

Faith Cmtys. Today, *Twenty Years of Congregational Change: The 2020 Faith Communities Today Overview* (2021) .................................................... 14

FBI, *Uniform Crime Reporting Statistics: Their Proper Use* (May 2017) ........... 20

Robert R.M. Gershon, *Public Transportation: Advantages and Challenges*, 82 J. Urb. Health 7 (2005) ............................................................ 12, 13

Carina Bentata Gryting & Mark Frassetto, Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. Rev. E. Supp. I.-60 (2022) .................................................... 9

David Hemenway *et al.*, *Gun Use in the United States: Results from Two National Surveys*, 6 Inj. Prevention 263 (2000) ................................................ 11

*House of Worship Shootings*, VOA News (last visited Jan. 25, 2024) ................... 18

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) ........................................................ 9

Carlie Porterfield, *10 Injured in Stampede at New York's Barclays Center Amid Shooting Scare, Police Say*, Forbes (May 29, 2022) ............................... 10

*Private Schools in the United States: A Statistical Profile, 1993-1994— Catholic Parochial Schools*, Nat'l Ctr. Educ. Stat. ........................................... 19

Secure Cmty. Network, *Firearms and the Faithful* (Jan. 2020) ............................ 18

Sophie Reardon, *2 Arrested in "Targeted Shooting" Outside Pittsburgh Church During Funeral*, CBS News (Oct. 28, 2022) ....................................... 10

Maxim G.M. Samon, *Protecting Religious Liberties?  Security Concerns at Places of Worship in Chicago*, 117 Geoforum 144 (2020) .............................. 18

Heather A. Turner *et al.*, *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881 (2019) ..................................................... 14

*Violent Extremism and Terrorism: Examining the Threat to Houses of Worship and Public Spaces: Hearing Before S. Comm. On Homeland Sec. & Gov't Affs.*, 117th Cong. (March 16, 2022) ........................................... 18

## INTRODUCTION AND INTEREST OF AMICI CURIAE

Amici the District of Columbia, Illinois, Connecticut, Delaware, Hawai'i, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and the Northern Mariana Islands (collectively, "Amici States") submit this brief in support of defendant-appellant pursuant to Federal Rule of Appellate Procedure 29(a)(2).

As independent sovereigns, Amici States have a responsibility to ensure the health, safety, and welfare of their communities. That responsibility includes protecting their residents from the harmful effects of gun violence and promoting the safe use of firearms. Amici States have historically fulfilled this responsibility by implementing reasonable measures to regulate firearms, including by imposing location-based restrictions on carrying guns and setting presumptions for carrying firearms on private property. Such regulation does not conflict with the Second Amendment. As the Supreme Court has consistently recognized, the Second Amendment does not encompass the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008)), but rather leaves states with the flexibility they need to protect their communities.

1

Indeed, the Second Amendment permits states to enact a variety of regulations to combat the misuse of firearms, making possible "solutions to social problems that suit local needs and values." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010). This flexibility is an essential element of our federalist system, and it ensures that firearm regulations appropriately and effectively address the specific concerns in each locality. Although Amici States have taken different approaches to regulating firearms, they share an interest in addressing gun violence in ways that are tailored to the needs of their residents. Amici States seek to maintain their authority to address firearm-related issues through legislation that is consistent with historical tradition and responsive to the unique circumstances in their communities.

## SUMMARY OF ARGUMENT

In 2023, following the Supreme Court's opinion in *Bruen*, California enacted comprehensive legislation reforming its public-carry regime. As part of that legislative enactment, which is referred to as "Senate Bill 2," California identified a list of locations in which carrying firearms is prohibited. *See* Cal. Penal Code § 26230(a)(1)-(25) ("sensitive-place restrictions"). The bill also set a default rule that restricts carrying in privately owned commercial establishments open to the public unless the owner "clearly and conspicuously" consents. *See id.* § 26230(a)(26) ("private-property rule").

2

Shortly after Senate Bill 2 passed, plaintiffs in each of the now-consolidated cases sought preliminary injunctive relief that, collectively, would enjoin enforcement of most of the sensitive-place restrictions and the private-property rule. *See* ER 4, 6. The challenged provisions include restrictions on carrying firearms on public transportation, at public gatherings and special events, and in healthcare facilities, nursing homes, playgrounds and private youth centers, parks and athletic facilities, casinos, stadiums and arenas, places where liquor is sold for consumption on the premises, public libraries, amusement parks, zoos, museums, places of worship, and financial institutions. *See* ER 4, 6, 13-14, 56-57. Plaintiffs also challenged the designation of parking areas adjacent to all of the sensitive places identified by Senate Bill 2, including the sensitive places that are not being challenged in this action, such as local government buildings, preschools, childcare facilities, airports, and nuclear facilities. *See* ER 14, 57. The district court granted plaintiffs' motions in full and entered an order enjoining the California Attorney General from enforcing the challenged provisions. *See* ER 4, 6, 10, 53.

Amici States agree with California that the challenged provisions fit squarely within a long tradition of constitutionally acceptable regulations designed to meet states' responsibility to protect their residents and should not be enjoined. To start, the sensitive places challenged by plaintiffs are consistent with the types of locations that other states have designated as sensitive—designations that limit firearm

3

possession in crowded places, around vulnerable populations, and where individuals are exercising other constitutionally protected rights. As in other States, California's sensitive-place designations protect the public from the heightened risk of gun violence in such locations.

Amici States further agree that Senate Bill 2's private-property rule does not burden anyone's Second Amendment rights. Instead, it *protects* property owners' rights by allowing them to make an informed decision about whether and how firearms are brought on their property, and it does so by setting an easily altered presumption. This approach also accords with laws adopted by other states. Although state measures vary in form, they collectively demonstrate that setting presumptions for the carrying of firearms onto private property is well within states' traditional regulatory role.

## ARGUMENT

## I. The Second Amendment Allows States To Implement Reasonable Firearm Regulations To Promote Gun Safety And Protect Against Gun Violence.

Since the Founding, states have enacted restrictions on who may bear arms, where arms may be brought, and the manner in which arms may be carried. *See Bruen*, 142 S. Ct. at 2145; *Heller*, 554 U.S. at 626-27. Senate Bill 2 is one in a long line of state regulations designed to make gun possession and use safer for the public, and it is a lawful exercise of California's regulatory powers.

4

States have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotation marks omitted). Enacting measures to promote public safety—particularly those that are tailored to local circumstances—falls squarely within the reasonable exercise of states' police powers. Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000).

The Supreme Court has repeatedly affirmed states' authority in this area, even as it has defined the scope and import of the rights conferred by the Second Amendment. In each of its major Second Amendment opinions—*Heller*, 554 U.S. 570, *McDonald*, 561 U.S. 742, and *Bruen*, 142 S. Ct. 2111—the Court expressly acknowledged the important role states play in setting their own local policies to minimize the risk of gun violence, consistent with our Nation's historical tradition.

In *Heller*, the Court made clear that the right to keep and bear arms is "not unlimited." 554 U.S. at 626. Although states may not ban the possession of handguns by responsible, law-abiding individuals or impose similarly severe burdens, they still possess "a variety of tools" to combat the problem of gun violence in a way that is responsive to the needs of their communities. *Id.* at 636. States may,

for example, implement measures prohibiting certain groups of people from possessing firearms, and they may "forbid[] the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626-27.

The Court reiterated this point in *McDonald*, emphasizing that the Second Amendment "by no means eliminates" a state's "ability to devise solutions to social problems that suit local needs and values." 561 U.S. at 785; *see id.* at 802 (Scalia, J., concurring) ("No fundamental right—not even the First Amendment—is absolute."). Recognizing that "conditions and problems differ from locality to locality," *id.* at 783, the Court made clear that "state and local experimentation with reasonable firearms regulations" could and should continue "under the Second Amendment," *id*. at 785 (brackets and internal quotation marks omitted).

*Bruen* reaffirmed these principles. There, the Court explicitly stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of provisions "designed to ensure only that those bearing arms . . . are, in fact, 'law-abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). And, building on *Heller*, the Court "assume[d] it settled" that prohibiting firearms in certain sensitive locations—including "schools and government buildings," "legislative assemblies, polling places, and courthouses," and analogous "new" sensitive locations—is constitutional. *Id*. at 2133. As the Court emphasized, the Second Amendment should not be understood to protect the "'right to keep and

carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Id*. at 2128 (quoting *Heller*, 554 U.S. at 626-27).

These decisions make clear that states retain wide power to enact laws to protect their residents. Those laws need not be uniform: states are free to select "solutions to social problems that suit local needs and values," ensuring that firearm regulations appropriately and effectively address the specific circumstances in each state. *McDonald*, 561 U.S. at 785. In other words, the Second Amendment is not a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133. On the contrary, states are permitted to enact a wide range of firearm regulations. *See id.* at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 636)).

Nor must these state laws be frozen in time. In *Bruen*, for example, the Court instructed courts to "use analogies" to long-recognized sensitive places—such as schools and government buildings—to "determine [whether] modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." 142 S. Ct. at 2133-34; *see Heller*, 554 U.S. at 627 n.26 (noting that a list of "presumptively lawful regulatory measures," including restrictions on firearms in schools and government buildings, contains only "examples" and is not "exhaustive").

In short, although the Supreme Court has defined the outer bounds of permissible regulations, it did not "abrogate" states' "core responsibility" of "[p]roviding for the safety of citizens within their borders." *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017) (en banc) (Wilkinson, J., concurring) (quoting *Heller*, 554 U.S. at 635), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. States retain not only the freedom, but also the fundamental responsibility, to implement reasonable measures designed to respond to the needs of their communities and to protect their residents from the harms associated with gun violence.

## II. Consistent With Regulations Adopted By Other States, California's Designation Of "Sensitive Places" Protects Uniquely Vulnerable Locations And Populations.

The right to "bear" firearms in public has long been understood to permit restrictions on bearing arms in "sensitive places." *Heller*, 554 U.S. at 626; *see Bruen*, 142 S. Ct. at 2133 (reaffirming that in sensitive places, "arms carrying [can] be prohibited consistent with the Second Amendment"). "[B]ans on firearm possession" in sensitive places are justified "because of the people found there or the activities that take place there." *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (internal quotation marks omitted). Such "narrow restrictions neither prohibit nor broadly frustrate any individual from generally exercising his right to bear arms." *Voisine v. United States*, 579 U.S. 686, 714 (2016) (Thomas, J., dissenting). "[S]ensitive places" are thus "in effect exempt . . . from the Second

Amendment." *Bruen*, 142 S. Ct. at 2133-34; *see* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 215 (2018) ("[T]he sensitive places doctrine is an exception to the general right to bear arms.").

California's designation of various locations as sensitive places—including healthcare facilities, nursing homes, public transportation, public gatherings, stadiums and arenas, parks, playgrounds and private youth centers, and places of worship—is a constitutional response to the heightened risk associated with the presence of firearms in such locations. Without the power to institute such restrictions, California and other states would be left unable effectively to prevent gun violence in crowded places, around vulnerable populations, or where individuals are exercising other constitutionally protected rights, putting the public at risk.

## A. Firearms pose special risks in dense and crowded places.

Designating areas as sensitive places helps to preserve order and diminish the risk of panic in crowded spaces. *See* Carina Bentata Gryting & Mark Frassetto, *NYRSPA v. Bruen and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. Rev. E. Supp. I.-60, I.-68 (2022) ("The number of potential targets" and "the increased risk of conflict all seem to be relevant in the historical determination that an area constitutes a sensitive place"). Governments may therefore choose to restrict the use of firearms in places

where dense crowds create risks to health and safety, such as in parks, bars, museums, and casinos, at large sporting or entertainment events, or on public transportation. Likewise, religious services frequently involve large, crowded gatherings, especially around holidays, baptisms, weddings, funerals, and other communal events. *See, e.g.*, Jennifer Bisram, *Thousands Pack St. Patrick's Cathedral for Christmas Eve Mass*, CBS News (Dec. 25, 2022).[1] In such busy locations, firearm use is likely to end in tragedy—not only for the innocent bystanders who may be shot, but also for others who may be crushed or trampled by a panicked crowd. *See, e.g.*, Veronica Canales, *Man Arrested After Firing Round that Ricocheted Off L'Enfant Plaza Station Platform, Striking Woman*, WTOP News (Sept. 2, 2022);[2] *Brooklyn Subway Shooting: Police Search for Gunman in Attack on Brooklyn Subway*, N.Y. Times (Apr. 15, 2022) (describing how ten people were hit by gunfire and another thirteen were injured from smoke inhalation, falls, or panic attacks);[3] Carlie Porterfield, *10 Injured in Stampede at New York's Barclays Center Amid Shooting Scare, Police Say*, Forbes (May 29, 2022);[4] Sophie Reardon, *2 Arrested in "Targeted Shooting" Outside Pittsburgh Church During Funeral*, CBS

---

[1]  *Available at* https://tinyurl.com/9cu6x4yz.

[2]  *Available at* http://tinyurl.com/44debpv9.

[3]  *Available at* http://tinyurl.com/4tdteru9.

[4]  *Available at* https://tinyurl.com/2xeuc7fj.

News (Oct. 28, 2022) (describing individual who was injured while trying to escape the scene of a church shooting).[5]

These dangers are heightened in locations where crowds can become volatile because of the presence of alcohol. When individuals consume alcohol—which impairs both judgment and dexterity—the risk of either accidental or intentional use of firearms increases. *See* David Hemenway *et al.*, *Gun Use in the United States: Results from Two National Surveys*, 6 Inj. Prevention 263, 266 (2000) ("Regular citizens with guns, who are sometimes tired, angry, drunk or afraid, and who are not trained in dispute resolution or when it is proper to use a firearm, have many opportunities for inappropriate gun use.").[6]  Physical jostling and emotional frustration are also not uncommon in spaces where liquor is sold for consumption. The presence of firearms would only make these situations more dangerous.  Further, given the "weapons effect," wherein the presence of a weapon intended to shoot human targets primes individuals to think and act more aggressively, allowing firearms in these spaces invites violence. *See* Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727, 730-31 (2018).

---

[5]    *Available at* https://tinyurl.com/5434vek3.

[6]    *Available at* https://tinyurl.com/3vnx7uc7.

Firearms can also inhibit the safe and effective operation of locations where large numbers of people gather. The discharge of a firearm in or near a public-transit center, public gathering, park, stadium, or financial institution could cause a disruptive and inconvenient shut-down. *See, e.g.*, Valerie Bonk, *Shooting on Metro Red Line Train Causes Service Delays*, WTOP News (Dec. 15, 2020).[7] For public transportation, this cost falls particularly hard on groups that depend disproportionately on such services for daily life—such as the elderly, disabled, low-income, and young adults. *See* Robert R.M. Gershon, *Public Transportation: Advantages and Challenges*, 82 J. Urb. Health 7, 7 (2005). And even the perceived risk of gun violence could cause repercussions, as individuals may be discouraged from visiting crowded or confined locations where they know others may be armed. *See* Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139, 141 (2021) ("Gun laws protect people's freedom and confidence to participate in every domain of our shared life, from attending school to shopping, going to concerts, gathering for prayer, voting, assembling in peaceable debate, counting electoral votes, and participating in the inauguration of a President.").

---

[7]     *Available at* http://tinyurl.com/258bvhx4.

Recognizing these dangers, many states, like California, have chosen to limit carrying firearms in dense or crowded places. For instance, some limit open or concealed carry of firearms in public-transit facilities or vehicles. *See* Colo. Rev. Stat. § 18-9-118 (facilities); D.C. Code § 7-2509.07(a)(6) (vehicles); Haw. Rev. Stat. § 134-9.1(a)(13) (facilities and vehicles); N.Y. Penal Law § 265.01-e(2)(n) (same), 430 Ill. Comp. Stat. 66/65(a)(8) (same). Other states limit firearms in public and state parks. *See, e.g.*, Cal. Code Regs. tit. 14, § 4313(a); Minn. Stat. § 97A.091, subd.1(1); N.Y. Penal Law § 265.01-e(2)(d). And still other states limit firearms at locations like stadiums and arenas that host large gatherings and events. *See, e.g.*, Ala. Code § 13A-11-61.2(a)(5), (6) (school and professional athletic events); 80 Ind. Admin. Code 11-2-2(b) (fairgrounds); La. Rev. Stat. § 40:1379.3(N)(9) (parades); N.C. Gen Stat. § 14-277.2(a) (parades, funeral processions, and picket lines); Tex. Penal Code § 46.03(a)(4), (13) (racetracks and amusement parks). By limiting the unique dangers of firearm violence in crowded gathering spots, these laws help to support "the inclusion and community participation of all" members of the public. Gershon, *supra* at 7; *see Antonyuk v. Chiumento*, 89 F.4th 271, 360, 366-67 (2d Cir. 2023) (recognizing a "well-established, representative, and longstanding tradition of regulating firearms in places that . . . tend to be crowded" and a "consistent and representative tradition of regulating access to firearms by people . . . who are intoxicated").

13

**B.     Restricting firearms in sensitive places protects vulnerable populations.**

California's restrictions on carrying firearms in sensitive places also help to protect particularly vulnerable populations, like children, the ill, and the elderly. For instance, many religious congregations host youth services or religious education classes, attracting large groups of children. Worship services tend also to be intergenerational, with high attendance rates among the elderly. *See* Faith Cmtys. Today, *Twenty Years of Congregational Change: The 2020 Faith Communities Today Overview* 17 (2021) (on average, 33% of surveyed congregations were over age 65).[8] Such individuals cannot easily defend themselves or escape a violent attack, should one occur. And even if they are not physically harmed by firearms, exposure to such violence can cause psychological harm. *See* Heather A. Turner *et al.*, *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881, 888 (2019) (indirect exposure to gun violence, including witnessing violence or hearing gunshots, can be traumatic to children).[9]

Many other locations designated as sensitive in Senate Bill 2 are gathering sites for vulnerable populations. Families regularly visit their elderly relatives in nursing homes; hospitals are full of the sick and frail of all ages; and children

---

[8]     *Available at* https://tinyurl.com/yc3d3rtd.

[9]     *Available at* https://tinyurl.com/3esj8mmz.

14

frequent parks, playgrounds, youth centers, museums, and zoos. Treating such locations as sensitive ensures that those least able to protect themselves will not be exposed to gun violence.

Both federal and state courts have recognized that the regular presence of children, the sick, the elderly, and other vulnerable people in a particular location is a strong indication that it is properly deemed sensitive for Second Amendment purposes. *See, e.g.*, *Antonyuk*, 89 F.4th at 341 (finding a historical "tradition of prohibiting firearms in locations congregated by vulnerable populations"); *Class*, 930 F.3d at 465 (D.C. Cir. 2019) (places are designated as sensitive "because of the people found there" (internal quotation marks omitted)); *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370 (Va. 2011) ("GMU is a 'sensitive place'" because it "is a school" with many students "under the age of 18," including "elementary and high school students" in the summer); *Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010) ("The [Supreme] Court listed schools and government buildings as examples [of sensitive places], presumably because possessing firearms in such places risks harm to great numbers of defenseless people (e.g., children).").

Indeed, many states exclude firearms from places that welcome vulnerable segments of the population. For instance, some states bar firearms in and around schools, *see, e.g.*, Del. Code Ann. tit. 11, § 1457(a), (b)(1)-(2); D.C. Code

§ 22-4502.01(a); 18 Pa. Cons. Stat. Ann. § 912(b); Wyo. Stat. Ann. § 6-8-104(t)(ix), and at school functions, *see, e.g.*, Ga. Code Ann. § 16-11-127.1(b)(1); N.D. Cent. Code § 62.1-02-05(1); W. Va. Code Ann. § 61-7-11a(b)(1). States also prohibit weapons in daycare centers and preschools, *see, e.g.*, Mich. Comp. Laws Ann. § 28.425o(1)(b); N.M. Stat. Ann. § 29-19-8(C); S.C. Code Ann. § 23-31-215(M)(6), and other sites frequented by children, *see, e.g.*, 430 Ill. Comp. Stat. 66/65(a)(12) (public playgrounds); N.Y. Penal Law § 265.01-e(2)(d) (same). Additionally, many states—like California—prohibit firearms at hospitals, nursing homes, or other healthcare facilities. *See, e.g.*, 430 Ill. Comp. Stat. 66/65(a)(7) (hospitals, mental-health facilities, nursing homes); Mo. Rev. Stat. § 571.107(17) (hospitals); Tex. Penal Code § 46.03(a)(11) (hospitals and nursing homes); Vt. Stat. Ann. tit. 13 § 4023(a) (hospitals). And as described in more detail below, many jurisdictions restrict firearms in places of worship. *See infra* pp. 17-19. Like California, these states have acted to protect vulnerable populations by designating the spaces where they congregate as sensitive places where carrying firearms is prohibited.

**C. Sensitive-place designations help to protect the exercise of other constitutional rights.**

States also frequently designate locations as sensitive places to protect the exercise of other constitutional rights. The Supreme Court has recognized that areas in which constitutionally protected activities occur—such as courthouses, polling places, and legislative assemblies—are quintessential examples of sensitive places.

16

*See Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626-27. Firearms may be prohibited in these locations because of the risk that violence could threaten key government functions. Similar concerns justify the prohibition on firearms in parking areas near sensitive places. The D.C. Circuit, for example, held that a parking lot near the Capitol could be designated a sensitive place because it enabled staffers to travel safely to and from their work at the national legislature. *See Class*, 930 F.3d at 464 (D.C. Cir. 2019).

States have similarly designated as sensitive places events involving political speech, like political rallies and protests. *See, e.g.*, Neb. Rev. Stat. § 28-1202.01(3) (restricting firearms at political rallies and fundraisers); Wash. Rev. Code Ann. § 9.41.300(2) (restricting firearms at protests or demonstrations). The same reasoning applies to areas like parks, libraries, and recreation centers in which individuals may engage in speech and political activity. *See, e.g.*, N.Y. Penal Law § 265.01-e(2)(d) (restricting firearms at libraries and public parks). Not only are these locations often targets of violence, but the mere presence of firearms (and the implicit threat they communicate) could chill individuals' peaceful exercise of their speech rights. *See* Blocher & Siegel, *supra* at 141.

Likewise, Senate Bill 2's designation of places of worship as sensitive places protects the exercise of religious rights and mirrors protections in other states. Locations like churches, synagogues, and mosques are the heart of many people's

religious exercise. They are also increasingly targets of gun violence. *See House of Worship Shootings*, VOA News (last visited Jan. 25, 2024);[10] *Violent Extremism and Terrorism: Examining the Threat to Houses of Worship and Public Spaces: Hearing Before S. Comm. On Homeland Sec. & Gov't Affs.*, 117th Cong. 1 (March 16, 2022) (statement of Ryan T. Young, Exec. Assistant Dir. of FBI) ("[T]hreats to members of faith-based communities across the United States [and] houses of worship . . . have been rising in recent years"). [11] Such violence may dissuade people from attending religious services and otherwise exercising their First Amendment rights. *See* Maxim G.M. Samon, *Protecting Religious Liberties? Security Concerns at Places of Worship in Chicago*, 117 Geoforum 144, 150 (2020) (exploring how security concerns after high-profile attacks on places of worship have increased religious congregations' feelings of vulnerability to attack);[12] Blocher & Siegel, *supra* at 141 ("Gun laws protect people's freedom and confidence to participate in every domain of our shared life," including "gathering for prayer.").

Arming congregants in these spaces—when these individuals often lack expert training and may panic under pressure—could exacerbate an emergency and threaten the safety of other worshippers. *See* Secure Cmty. Network, *Firearms and*

---

[10]    *Available at* https://tinyurl.com/yn9xhyua.

[11]    *Available at* https://tinyurl.com/2umsprvy.

[12]    *Available at* https://tinyurl.com/2wnsb2wr.

*the Faithful* 17 (Jan. 2020) (armed congregants could have "added to the chaos" during a synagogue shooting).[13]  Governments may thus reasonably conclude that the protection of places of worship from gun violence is best left to law enforcement and other trained individuals.  *See, e.g.*, N.Y. Penal Code § 265.01-e(3)(a)-(e) (exempting law enforcement, peace officers, and security guards from sensitive place restrictions).

In light of these concerns, a number of jurisdictions have designated places of worship as sensitive places.  For instance, like California, Nebraska prohibits concealed carry permitholders from carrying handguns into places of worship.  *See* Neb. Rev. Stat. § 28-1202.01(3).  And ten other states and the District of Columbia similarly forbid people from carrying firearms in places of worship without first obtaining formal approval from the governing body or religious authority.  *See* Ark. Code Ann. § 5-73-306(15); D.C. Code § 7-2509.07(b)(2); Ga. Code Ann. § 16-11-127(b)(4); La. Rev. Stat. § 40:1379.3(N)(8); Mich. Comp. Laws § 28.425o(1)(e); Miss. Code Ann. §§ 45-9-101(13), 45-9-171(2)(a); Mo. Rev. Stat. § 571.107.1(14); N.D. Cent. Code § 62.1-02-05(1)(b), (2)(m); N.Y. Penal Law § 265.01-e(2)(c); Ohio Rev. Code § 2923.126(B)(6); S.C. Code. Ann. § 23-31-215(M)(8).[14]

---

[13]    *Available at* https://tinyurl.com/2p8ccd33.

[14]    In addition, many places of worship may effectively be sensitive places even in jurisdictions that have not specifically designated them as such because places of worship are often attached to parochial schools or childcare sites.  *See, e.g.*, *Private*

* * *

The fact that the list of locations designated as sensitive may differ from state to state reflects both the need to tailor such designations to the specific characteristics of each community and a shared concern with minimizing the risk of gun violence. *See* FBI, *Uniform Crime Reporting Statistics: Their Proper Use* (May 2017) (noting that a wide variety of factors "affect the volume and type of crime occurring from place to place," including population density, the size of the youth population, poverty level, job availability, modes of transportation, climate, and cultural characteristics).[15]  While firearms restrictions vary based on local conditions and needs, they collectively demonstrate that California's law is precisely the kind of regulation that states have traditionally adopted to address the particular concerns associated with carrying firearms in sensitive places.

## III. California's Private-Property Provision Reflects A Reasoned Policy Decision About How Best To Protect Public Safety And The Rights Of Property Owners.

Senate Bill 2's private-property provision, which prohibits carrying arms on private commercial property open to the public without clear and conspicuous permission posted by the operator of the property, is also constitutionally valid.  For

---

*Schools in the United States: A Statistical Profile, 1993-1994—Catholic Parochial Schools*, Nat'l Ctr. Educ. Stat. (indicating that 60% of Catholic schools were affiliated with specific parishes), https://tinyurl.com/5h22knjc.

[15]     *Available at* https://tinyurl.com/2s3k6dxh.

one thing, the provision does not implicate the Second Amendment at all—it is simply a default provision that property owners can rebut with express permission. Moreover, this rule aligns with the preferences of Californians, reflects the national consensus on such default rules, and preserves the interest of property owners in protecting public safety and preventing gun violence on their property. Finally, it fits comfortably within the longstanding practice of states across the country, which have set similar presumptions for carrying firearms on private property.

*First*, the private-property provision does not implicate Second Amendment rights because it merely sets a default rule. The Second Amendment does not confer a right to carry firearms on another person's private property without their consent. *See GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012) (noting that the Second Amendment "does not include protection for a right to carry a firearm [on private property] against the owner's wishes"), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Rather, when the Amendment was adopted, it incorporated longstanding principles of "property law, tort law, and criminal law" that recognized a private property owner's right to determine who may enter and whether they may be armed. *Id.* In light of these underlying principles, the Second Amendment was never understood to extend to private property on which the owner wished to exclude firearms. California's private-property provision, which affirms

property owners' decisions about whether to allow carrying on their property, thus does not interfere with any Second Amendment rights.

Instead, California's law merely regulates how property owners communicate their consent and clarifies the inference that can be drawn from a property owner's silence, setting a constitutionally permissible default rule. *See GeorgiaCarry.Org, Inc.*, 687 F.3d at 1264 ("Quite simply, there is no constitutional infirmity when a private property owner exercises his, her, or its . . . right to control who may enter, and whether that invited guest can be armed, and the State vindicates that right."). Indeed, property owners in California may communicate authorization simply by posting signage "clearly and conspicuously" at the entrance to their property. Cal. Penal Code § 26230(a)(26). This approach protects property owners' freedom to make their own decisions about whether to allow firearms on their grounds and ensures they have the information they need to make an informed choice. It neither predetermines whether firearms will be barred on private property nor impairs the right to carry a firearm for self-defense. Accordingly, the private-property provision falls outside the ambit of the Second Amendment. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("[C]onstitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.").

The district court's conclusion to the contrary is based on the flawed view that the private-property provision amounts to the state's unilateral exercise of a private property owner's "right to forbid concealed carry on their property." ER 43, 86. But this reasoning misunderstands the operation of default rules. Default rules "govern parties in the absence of some explicit contrary agreement or altering action." Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, 183 (Winter 2020). Because individuals can change or opt out of defaults like the challenged provision, it is "unrealistic" to view them "as being 'imposed upon' the parties." Randy E. Barnett, *The Sound of Silence: Default Rules and Contractual Consent*, 78 Va. L. Rev. 821, 865 (1992). Rather, "one's silence in the face of default rules that one can change constitutes consent to the application of" rules like California's. *Id.* at 906.

*Second*, property owners prefer a default rule that bars firearms on their property absent explicit permission. In one poll of California residents, over 63 percent rejected the notion that customers should be allowed to bring guns into businesses. Ayres & Jonnalagadda, *supra* at A7 tbl.A4. The rule also aligns with the national consensus on default rules governing the carry of firearms on private property. In a national survey, a majority of respondents expressed support for a "no carry" default rule for residences, places of employment, and retail establishments. *See id.* at 188. Given these preferences, the private-property provision is an efficient

policy choice, minimizing transaction costs by eliminating the need for most property owners to contract around the default (while leaving others free to allow firearms on their property if they wish). *Id*. at 183.

Indeed, many property owners have good reason to prefer the default rule set by California. Numerous privately owned locations have characteristics that make the presence of firearms more dangerous, similar to traditional "sensitive places." Property owners may share the concerns that motivate states to restrict firearms in such locations. *See supra* Section II. For instance, many places covered by the private-property provision, such as shopping malls and grocery stores, are crowded and confined spaces in which the presence of firearms poses a particular risk to public health and safety. In addition, a variety of places, including stores and fast-food restaurants, are frequented by vulnerable populations like children, whom property owners may want to protect. And some private spaces may also be the site of constitutionally protected activity, which a property owner might fear will be disrupted by the presence of firearms. For example, political meetings and conventions often take place at business conference centers. Given these concerns, a property owner could reasonably determine that allowing firearms would be too dangerous or otherwise undesirable.

Thus, even though privately owned spaces may not be designated as sensitive places per se, private property owners may share the same concerns that motivate

24

states to restrict firearms in those locations. Property owners may also have important reasons of their own to want to restrict firearms on their property. Setting a default rule that bars firearms on private property without the property owners' express permission respects the preferences of the majority of owners without precluding others from making a different decision, and in doing so fosters clarity for members of the public. It is a sensible and efficient measure that does not interfere with the rights of property owners to decide whether to exclude, or to allow, firearms on their property.

*Third*, like California, other states have adopted similar presumptions for carrying firearms on private property. While the default rules in different locations vary based on local needs and conditions, California's choice fits squarely within the longstanding tradition permitting states to regulate how and when private property owners exercise their right to exclude firearms.

Some states have enacted laws that, like California's, provide that individuals may not carry a firearm onto another person's property without that person's express permission. For example, as indicated earlier, some states have established a default rule that firearms may not be carried on private property that serves as a place of worship without explicit permission from the governing body. *See infra* p. 19. South Carolina has established a similar presumption for hospitals. *See* S.C. Code Ann. § 23-31-215(M)(9).

25

Other states have flipped the presumption. Nebraska, for instance, allows a permitholder to carry a concealed handgun "anywhere in Nebraska," excepting private property on which "the person, persons, entity, or entities in control of the place or premises or employer in control of the place or premises has prohibited the carrying of concealed handguns into or onto the place or premises." Neb. Rev. Stat. § 28-1202.01(2). That rule mirrors the approaches of Illinois, Texas, and Virginia. *See* 430 Ill. Comp. Stat. 66/65(a-10) (explaining that the owner of private real property may prohibit the carrying of concealed firearms on the property); Tex. Penal Code §§ 30.05(c), 30.06, 30.07 (criminalizing the open or concealed carry of a handgun on the property of another if the licensee does not have the owner's consent and has received notice that carry is forbidden); Va. Code Ann. § 18.2-308.01(C) (noting that a concealed handgun permit does not authorize possession of a handgun "in places where such possession . . . is prohibited by the owner of private property").

Similarly, states have created default rules for firearm-related activities on private property. For example, 25 states require that hunters obtain permission before entering private property. Ayres & Jonnalagadda, *supra* at 184. And again, other states have chosen the inverse default. Vermont, for example, requires that a property owner who wishes to ban hunting post signs around their property line. Vt. Stat. Ann. tit. 10, § 5201; *see* Me. Stat. tit. 17-A, § 402 (requiring that a property

owner who wants to exclude individuals indicate that access is prohibited, either in general or for a specific activity like hunting).

In addition to setting default rules for carrying firearms on private property, several states have adopted detailed requirements regulating how a private property owner should communicate whether she allows firearms on her property. Texas, for example, requires that a notice prohibiting the carry of firearms use certain language, be posted conspicuously in both English and Spanish, and use print in contrasting colors with block letters at least one inch in height. Tex. Penal Code § 30.05(c), 30.06(c)(3)(B), 30.07(c)(3)(B). Kansas similarly regulates "the location, content, size and other characteristics" of signs barring firearms on private property, Kan. Stat. Ann. §§ 75-7c24, 75-7c10, as does Illinois, *see* 430 Ill. Comp. Stat. 66/65(d) (requiring that signs prohibiting firearms be conspicuously posted at building's entrance, meet design requirements established by state police, and be four by six inches in size).

In short, California's private-property provision reflects the legislature's reasoned policy determination about how best to set the default rule for carrying firearms on private property and how property owners should communicate their decision about whether to exclude such weapons. Although this provision is not identical to provisions adopted by other states, it is similarly informed by and tailored to local conditions and the needs of residents. The law therefore fits

comfortably within both the longstanding practice of other states and the bounds of

the Second Amendment.

## CONCLUSION

The Court should reverse the decision below.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for
the District of Columbia

KWAME RAOUL
Attorney General for the State of
Illinois

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General

JANE ELINOR NOTZ
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

SARAH A. HUNGER
Deputy Solicitor General

RUSSELL C. BOGUE
Assistant Attorney General

Office of the Attorney General for the
State of Illinois

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
sarah.hunger@ilag.gov

January 2024

28

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
King Jr. Boulevard
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 N. Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
Richard J. Hughes
Justice Complex
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

MICHELLE A. HENRY
*Attorney General*
*Commonwealth of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

EDWARD E. MANIBUSAN
*Attorney General*
*Commonwealth of the*
*Northern Mariana Islands*
Caller Box 10007, Capitol Hill
Saipan, MP 96950

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated         .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                  **Date**
*(use "s/[typed name]" to sign electronically-filed documents)*