Nos. 23-4354 and 23-4356 (consol.)

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
———————————————

RENO MAY, ET AL.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as Attorney General
of the State of California,

*Defendant-Appellant*.
———————————————

On Appeal from the United States District Court
for the Central District of California (No. 8:23-cv-01696-CJC-ADSx)
(Hon. Cormac J. Carney)
———————————————

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF
DEFENDANT-APPELLANT AND REVERSAL**
———————————————

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8201
psen@everytown.org

January 26, 2024

(*Additional caption appears on next page*)

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

—————————————————

MARCO ANTONIO CARRALERO, ET AL.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as Attorney General
of the State of California,

*Defendant-Appellant*.

—————————————————

On Appeal from the United States District Court
for the Central District of California (No. 8:23-cv-01696-CJC-ADSx)
(Hon. Cormac J. Carney)

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

ARGUMENT ...................................................................................2

   I.   The Correct Historical Analysis Centers on the Reconstruction Era, Not the Founding Era.........................................................................2

   II.   This Court Should Reject Any Effort to Dismiss the State's Historical Analogues as Insufficiently "Representative"..............................15

   III.   This Court Should Consider Historical Context in Evaluating What Historical Laws Reveal about the Public Understanding of the Right ......21

CONCLUSION ..............................................................................27

# TABLE OF AUTHORITIES

## CASES

*Antonyuk v. Chiumento*,
89 F.4th 271 (2d Cir. 2023) ...........................................................................passim

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ..................................................................................7

*Davenport v. Wash. Educ. Ass'n*,
551 U.S. 177 (2007) ...................................................................................................19

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ..........................................................................................passim

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ...................................................................................................19

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) .....................................................................................5

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ..................................................................................18

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) .....................................................................................5

*Kipke v. Moore*,
No. 1:23-cv-01293, 2023 WL 6381503 (D. Md. Sept. 29, 2023)................passim

*LaFave v. Cnty. of Fairfax*,
No. CL2021-01569, 2023 Va. Cir. LEXIS 203 (Fairfax Cnty. Cir. Ct. June
23, 2023) ......................................................................................................................22

*Lara v. Commissioner Pennsylvania State Police*,
--- F.4th ----, No. 21-1832, 2024 WL 189453 (3d Cir. Jan. 18, 2024)...................7

*McCullen v. Coakley*,
573 U.S. 464 (2014) ...................................................................................................19

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .............................................................................................4, 18

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ...................................................................................................14

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed*,
No. 23-1719 (4th Cir. July 10, 2023) ............................................................6, 21

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72 F.4th 1346
(11th Cir. 2023) ....................................................................................................6

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ..........................................................................................passim

*Shelby Cnty., Ala. v. Holder*,
570 U.S. 529 (2013) ...........................................................................................20

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023) ..............................................................................7

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019) ...........................................................................16

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012) ...............................................................................5

*United States v. Meyer*,
No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023) ......................11

*We the Patriots, Inc. v. Lujan Grisham*,
Dkt. 27, No. 1:23-cv-00773, 2023 WL 6622042 (D.N.M. Oct. 11, 2023),
*appeal docketed*, No. 23-2166 (10th Cir. Oct. 20, 2023) .......................................22

*We the Patriots, Inc. v. Lujan Grisham*,
No. 1:23-cv-00771, 2023 WL 6622042 (D.N.M. Oct. 11, 2023), *appeal docketed*,
No. 23-2166 (10th Cir. Oct. 20, 2023) ................................................................7

## HISTORICAL REGULATIONS

An Act to Amend the Charter of the City of Knoxville, Tenn., 1911 Tenn. Priv.
Acts 1431 ............................................................................................................16

Del. Const. of 1776, art. 28 ...................................................................................16

## OTHER AUTHORITIES

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ......................11

iv

Allan Greer, *Commons and Enclosure in the Colonization of North America*, 2 Am. Hist. Rev. 365 (2012) ................................................................................................24

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) ....................................................................12, 17

*Bulletin of the Park and Outdoor Art Association* 3 (1901), *available at* https://bit.ly/3NPLSae ................................................................................................24

Cynthia S. Brenwall, *The Central Park: Original Designs for New York's Greatest Treasure* (2019) ........................................................................................................23

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ................................................................................12

David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* (1988) ..........................................................................................22

Dorceta E. Taylor, *The Environment and the People in American Cities, 1600s-1900s: Disorder, Inequality, and Social Change* 228 (2009) ............................................24

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022) ......9

Everytown Center for the Defense of Gun Safety, *Parks Restrictions*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/parks-restrictions/ ................................................................................3, 22, 27

Everytown Center for the Defense of Gun Safety, *Restrictions on Carrying in Sensitive Places or While Intoxicated*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places-and-carrying-while-intoxicated-restrictions/ ............................................................................................................3

Everytown Center for the Defense of Gun Safety, *Sensitive Places*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places/ ........................................................................................3

Frederick Law Olmsted, *The Justifying Value of a Public Park* (1881) ..........................25

James McPherson, *Revisionist Historians*, Persps. on Hist. (Sept. 1, 2003), https://www.historians.org/research-and-publications/perspectives-on-history/september-2003/revisionist-historians ................................................20

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ........................................................8, 9

v

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (now published at 97 Ind. L.J. 1439), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ...............11, 12

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ....................................................................................................10

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ...............................................................................9

Nadav Shoked, *Property Law's Search for A Public*, 97 Wash. U.L. Rev. 1517 (2020) .......................................................................................................................24

National Park Service, *Firearms Regulations in the National Parks 1897-1936* (2008), *available at* https://perma.cc/5SRK-VYXZ..................................................26, 27

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ......................................................................9

Stephen T. Mather, *Progress in the Development of the National Parks* (U.S. Dep't of Interior 1916)...................................................................................................26

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) .....................................8

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 U.S. Nov. 3, 2021)...................................................................................................8

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund; hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman used an assault weapon to murder twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The provisions of California's Senate Bill 2 ("SB 2") the district court enjoined are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), for the reasons defendant-appellant ("the State") sets out in its brief. *See* Dkt. 17.1 ("State Br."). Everytown submits this amicus brief to expand on three points. *First*, in applying

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with this Nation's historical tradition of firearm regulation," 597 U.S. at 17—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is neither a starting-line nor a cutoff; under *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), both earlier and later history are also relevant. *Second*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation. *Third*, *Bruen*'s inquiry requires consideration not just of historical laws but also of the historical context within which states and localities chose to legislate (or not to legislate)—a point we illustrate with the historical context surrounding the regulation of firearms in parks.

## ARGUMENT

### I. The Correct Historical Analysis Centers on the Reconstruction Era, Not the Founding Era

After *Bruen*, this Court must first decide "whether the plain text of the Second Amendment protects" a person's "proposed course of conduct." *Bruen*, 597 U.S. at 32. If so, the burden shifts to the government to show its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

Here, if the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on the Reconstruction Era—the years surrounding 1868, when the Fourteenth

Amendment was ratified and made the Second Amendment applicable to the states—not the founding era. To be clear, this Court need not resolve the question of which time period is more relevant to its inquiry to reverse the decision below. In *Bruen*, the Supreme Court recognized "an ongoing scholarly debate" on the question but ultimately did "not address this issue" because, there, the "public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same." 597 U.S. at 37-38. Here, too, as the State has shown, the historical tradition—from the founding era, to the 19th century, through Reconstruction, and into the 20th century—consistently demonstrates the constitutionality of the State's restrictions. *See* State Br. 21-50.[2] Accordingly, this Court need not resolve the issue of the correct time period. Nevertheless, if this Court wishes to resolve it to guide district courts in future cases, it should hold that the inquiry centers on 1868.[3]

---

[2] *See also, e.g.*, *Sensitive Places*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places/ (citing, excerpting, and linking to a selection of historical sensitive places laws); *Restrictions on Carrying in Sensitive Places or While Intoxicated*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places-and-carrying-while-intoxicated-restrictions/ (same, for additional restrictions on guns in other sensitive places); *Parks Restrictions*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/parks-restrictions/ (same, for restrictions on guns in parks). All links were last visited January 26, 2024.

[3] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the State's

To begin with, in a case challenging the constitutionality of a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? The Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; after all, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, 597 U.S. at 37. Thus, because the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right at that time should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect. And that, in turn, would violate the originalist mandate of *Heller* and *Bruen*: "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35; emphasis added in *Bruen*).

Insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010) (plurality opinion); *id.* at 826-38 (Thomas,

---

evidence), it should rely on 19th- and 20th-century history to clarify that meaning. *See infra* pp. 12-14.

J., concurring in part and concurring in the judgment). As the Second Circuit explained, "[i]t would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk v. Chiumento*, 89 F.4th 271, 305 (2d Cir. 2023). That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ; *accord United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified).").[4]

The Second Circuit recently held that, because the case before it challenged "a state law, the prevailing understanding of the right to bear arms

---

[4] These courts reached this conclusion at the first, historical step of the pre-*Bruen* Second Amendment framework used by lower federal courts and their step-one analyses remain, as a general matter, good law. *Bruen* removed the second step (means-end scrutiny) of the pre-*Bruen* framework from the analysis, but explained that "[s]tep one of [the prior framework] is broadly consistent with *Heller*." 597 U.S. at 19.

in 1868 and 1791 are both focal points of our analysis." *Antonyuk*, 89 F.4th at 304. A panel of the Eleventh Circuit similarly held that, in cases involving state laws, where the understanding of the right to keep and bear arms differs between the founding and Reconstruction eras, "the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023). Although that panel opinion has now been vacated for rehearing en banc, its analysis of the relevant time period remains consistent with originalist principles. *See Antonyuk*, 89 F.4th at 305 (following *Bondi*). As the panel explained:

> This is necessarily so if we are to be faithful to the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." As with statutes, when a conflict arises between an earlier version of a constitutional provision (here, the Second Amendment) and a later one (here, the Fourteenth Amendment and the understanding of the right to keep and bear arms that it incorporates), "the later-enacted [provision] controls to the extent it conflicts with the earlier-enacted [provision]." … The opposite rule would be illogical.

*Bondi*, 61 F.4th at 1323-24 (alterations in original) (citations omitted). Other courts have agreed. *See Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, 2023 WL 4373260, at *8 (D. Md. July 6, 2023) (concluding that "historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not

more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *Kipke v. Moore*, No. 1:23-cv-01293, 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023) (agreeing with *Maryland Shall Issue*); *We the Patriots, Inc. v. Lujan Grisham*, No. 1:23-cv-00771, 2023 WL 6622042, at *8 (D.N.M. Oct. 11, 2023) (agreeing with *Bondi* and *Maryland Shall Issue* that "that historical sources from … 1868 are more probative of the scope of the Second Amendment's right to bear arms than those from the Founding Era"), *appeal docketed*, No. 23-2166 (10th Cir. Oct. 20, 2023). And these decisions are consistent this Court's post-*Bruen* jurisprudence, which has relied on Reconstruction-era evidence to uphold modern-day restrictions. State Br. 32 (citing *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023); *Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023)).[5]

The conclusion that the 1868 understanding of the Second Amendment right should apply in a case against a state is far from a radical one. Indeed, it was

---

[5] The Third Circuit recently took a different approach in *Lara v. Commissioner Pennsylvania State Police*, --- F.4th ----, No. 21-1832, 2024 WL 189453 (3d Cir. Jan. 18, 2024), holding that 1791 is the more relevant date in a case challenging Pennsylvania's age restriction on carrying firearms. *Id.* at *8-10. The court based its conclusion on the "general assumption" in several Supreme Court cases cited by *Bruen*, *see* 597 U.S. at 38, not on originalist principles. *See id.* at *7-8. But those cases did not address the significance of the Fourteenth Amendment's ratification for the question of which time period is most relevant to the historical inquiry and cannot have resolved the question that *Bruen* expressly left open. *See Bruen*, 597 U.S. at 37-38; *infra* p. 10.

the position former Solicitor General Paul Clement took as counsel for the NRA's

New York affiliate during oral argument in *Bruen*:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?

> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

It is also the position of leading originalist scholars. *See, e.g.*, Josh Blackman &

Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in

2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. &

Pub. Pol'y 1, 52 (2010) ("1868 is … the proper temporal location for applying a

whole host of rights to the states, including the right that had earlier been codified

as the Second Amendment …. Interpreting the right to keep and bear arms as

instantiated by the Fourteenth Amendment—based on the original public meaning

in 1791—thus yields an inaccurate analysis." (footnote omitted)); Steven G.

Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the

Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American

History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008) (asserting that

8

"[Akhil] Amar is exactly right" that 1868 meaning controls); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"); Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").[6] In sum, originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.

A question raised by that conclusion (though one not directly presented in this case) is what the temporal focus should be in cases challenging *federal* laws. If the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced

---

[6] To be clear, we do not suggest that each of these scholars also believe that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the federal government. Professors Blackman and Shapiro, for example, maintained (pre-*Bruen*) that 1868 is the correct focus for cases against a state and 1791 is correct for cases against the federal government. *See* Blackman & Shapiro, 8 Geo. J.L. & Pub. Pol'y at 51. As discussed below, because *Bruen* subsequently rejected the possibility of different standards for the state and federal governments, originalists must choose one period or the other, and the weight of authority and analysis favors 1868. *See infra* pp. 9-12.

to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. 597 U.S. at 37 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted only that prior decisions had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. If the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and it pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id*. at 37-38. The Court

10

then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)); *see also, e.g.*, *United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice Thomas, writing for the majority in *Bruen*, signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[7] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new

---

[7] *See* Amar, *The Bill of Rights*, *supra*, at xiv (noting that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]").

1868 meanings." Lash, manuscript, at 2; *see Bruen*, 597 U.S. at 38. On this view, too, 1868 meanings bind both the states and the federal government.

The 1868 view is also consistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive places restrictions. *See* State Br. 32. There, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, 597 U.S. at 30 (emphasis added)—an incomprehensible statement if the Court believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[8]

Further, while any historical inquiry this Court conducts should focus on the period around 1868, that date is neither a starting-line nor a cutoff. *Heller* and *Bruen* both examined history preceding even 1791, *see Heller*, 554 U.S. at 592-93; *Bruen*, 597 U.S. at 34-35, 44-50, and *Heller* instructs that "examination of a variety of legal

---

[8] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 597 U.S. at 20 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 597 U.S. at 36, 66 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up) (quoting decision quoting James Madison). Thus, regardless of which period (founding or Reconstruction) this Court determines to be the most relevant, it should look to "practice" thereafter to "settle" the meaning of the right and demonstrate that California's challenged provisions are constitutional. *See* State Br. 12.

Looking to 19th-century and later evidence can also help contextualize earlier legislative inaction, even if this Court were to conclude that 1791 is the correct focus for historical analysis. For instance, if a regulation passed in the decades around Reconstruction—*within the lifetimes* of some who were alive at the founding—did not raise a constitutional challenge at the time of its passage, and there is no separate historical evidence showing that the regulation would have raised constitutional concern in the decades prior, then it can be inferred that the

13

regulation comports with the founding-era public understanding of the right. In other words, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era or later public understanding of the right (as demonstrated through a regulatory tradition or other historical materials from that period) also reflects the founding-era understanding. Here, 19th-century and later laws are convincing evidence of how the right was understood not only when those laws were passed, but also in earlier decades. *See* State Br. 21-22, 29-35, 37-38, 43, 49, 55. Plaintiffs have provided no reason to believe that the understanding of the right underwent some startling transformation between 1791 and 1868 (or 1900). *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) ("Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness."); *Antonyuk*, 89 F.4th at 304 (finding it "implausible" that "public understanding would promptly dissipate whenever [one] era gave way to another").[9]

The district court, for its part, recognized that the public understanding following a right's enactment or ratification is a "critical tool of constitutional

---

[9] Such a presumption also reflects and reinforces the Supreme Court's position that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S at 37. For the Supreme Court—which emphasized the importance of original public understanding—to take this position, it must have presumed, at least as a general matter, that

interpretation." 1-ER-18 (quoting *Bruen*, 597 U.S. at 20). Yet the court incorrectly deemed Reconstruction-era evidence only "secondarily" important to founding-era sources without meaningfully addressing which time period is more relevant. *See* 1-ER-18 (internal quotation marks omitted); *see also* 1-ER-29, 39 (apparently discounting 19th-century sources in part because of their timing).

If this Court reaches this question, it should train any historical inquiry on the period around 1868, and, regardless of whether it concludes 1791 or 1868 is more relevant, it should consider Reconstruction-era evidence and the "regular course of practice" in the decades that followed to "settle" the meaning of the right as one that allows for restrictions like those challenged here.

## II. This Court Should Reject Any Effort to Dismiss the State's Historical Analogues as Insufficiently "Representative"

In its ruling, the district court correctly recognized that *Bruen* determined that some locations are sensitive places "even though there are few laws evidencing a history and tradition of prohibiting firearms in those places." 1-ER-19. Nonetheless, the court determined that some of the State's historical laws were insufficiently representative of a national tradition because they were too few or covered small populations. 1-ER-34, 39. That was erroneous, given the robust historical record here. *See* State Br. 21-50. But even if the record were less

---

constitutional rights maintained a consistent meaning between the two points of their adoption, 1791 and 1868.

extensive, the district court's analysis still would have been incorrect because *Bruen*'s discussion of the historical laws justifying sensitive places demonstrates that a small number of laws can establish a tradition and that small-population jurisdictions matter.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.*[10] But the sources the Court cited for the historical record justifying restrictions in

---

[10] The Supreme Court's identification of these locations as sensitive places separately demonstrates why the district court was wrong to the extent it concluded a sensitive place must have government-provided security. *See* 1-ER-40-41. Schools (including their playgrounds and fields) and polling places (which rarely feature guards or metal detectors, to avoid voter intimidation) are sensitive places, even without security. *See, e.g.*, *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) ("Many 'schools' and 'government buildings'—the paradigmatic 'sensitive places' …—are open to the public, without any form of special security or screening."); *Kipke*, 2023 WL 6381503, at *6 ("[B]ecause *Bruen* conclusively named schools … [as] sensitive places, … [the] argument that sensitive places are limited to buildings with comprehensive, state-provided security is baseless."). Further, there is no evidence that these places historically employed heightened screening, and, to the contrary, the historical record includes prohibitions against such security. *See, e.g.*, Del. Const. of 1776, art. 28 (prohibiting militia from mustering on election day or coming within one mile of polling places immediately prior to or following an election); An Act to Amend the Charter of the City of Knoxville, Tenn., 1911 Tenn. Priv. Acts 1431 ("[N]o [Election] officer … shall be in, at, or near any ballot box or voting precinct during any election … armed with pistol, gun, or other deadly weapon[.]").

16

those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, *supra* note 8, at 246; Br. for Indep. Inst. as Amicus Curiae 11-12, *Bruen* (No. 20-843).[11] Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were enacted three years apart, in 1647 and 1650, in a single colony, Maryland. *See* Kopel & Greenlee, *supra* note 8, at 235; Br. for Indep. Inst. as Amicus Curiae 11-12, *Bruen* (No. 20-843). Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. *See* State Br. 11; *Antonyuk*, 89 F.4th at 304 ("comparable historical laws need not proliferate to justify a modern prohibition").[12]

---

[11] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, 597 U.S. at 30.

[12] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 597 U.S. at 46. But that tentative comment should not be given undue weight given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "overwhelming weight of other evidence regarding the right to keep and bear arms" that contradicted historical analogues to New York's proper-cause law. *See id.* at 65-66 (quoting *Heller*, 554 U.S. at 632). Here, there is no such "overwhelming" evidence of a right to carry in any of the locations that SB 2 regulates. And—to be clear—even if there were evidence of a traditional *practice* of carrying in those locations, that would not be enough. *Compare* Kopel & Greenlee, *supra* note 8, at 233 (arguing that Americans historically tolerated arms in legislative assemblies and that it was "common for Congressmen to be armed"), *with Bruen*,

Concluding that a small number of state and local laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. States today may (or may choose not to) "experiment[] with reasonable firearms regulations." *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up). Likewise, states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. *See Antonyuk*, 89 F.4th at 321 (historical decision not to regulate may simply "reflect a lack of political demand") (cleaned up). As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional

---

597 U.S. at 30 (relying on Kopel & Greenlee article in endorsing constitutionality of prohibiting arms in legislative assemblies); *see* State Br. 23-24.

18

permissibility. *Cf., e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (recognizing that Constitution "does not require States to regulate for problems that do not exist" in their jurisdiction); *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."); *Antonyuk*, 89 F.4th at 301 ("Reasoning from historical silence is … risky" because "[l]egislatures past and present have not generally legislated to their constitutional limits."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.[13]

Courts should not reject historical laws merely because they covered a small percentage of the nation's population for at least two further reasons. *First*, as multiple historians have commented, the process of unearthing and understanding

---

[13] Indeed, any such inference would be untenable in light of the Court's statement, in a decision issued the day after *Bruen*—with five of the same Justices in the majority—that "the fact that many States in the late 18th and early 19th century did not criminalize" certain conduct "does not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 217 (2022).

historical laws demands patience and openness to constant reevaluation.[14] Where a state has produced historical laws covering only a small percentage of the nation's population, newly-discoverable historical sources may later yield more examples and increase that percentage. To discard a state's proffered laws for failing to meet some unstated population threshold is to fundamentally misunderstand the gradual and cumulative nature of historical research. *Second*, dismissing the laws of states with smaller populations is in tension with what the Supreme Court has deemed a "historic tradition" and "fundamental principle" of our constitutional bargain: "that all the States enjoy equal sovereignty." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 540, 544 (2013) (citations omitted). If the people of a small state responded to local needs by enacting certain policies, the fact that their neighbors in a larger state chose a different path does not nullify the constitutional agency of the smaller state.

---

[14] *See* 9-ER-1858, 1862-66, 1868-69 (Prof. Zachary Schrag Decl.) (explaining that historical research under *Bruen* requires significant time); James McPherson, *Revisionist Historians*, Persps. on Hist. (Sept. 1, 2003), https://www.historians.org/research-and-publications/perspectives-on-history/september-2003/revisionist-historians ("Interpretations of the past are subject to change in response to new evidence, new questions asked of the evidence, new perspectives gained by the passage of time.").

### III. This Court Should Consider Historical Context in Evaluating What Historical Laws Reveal about the Public Understanding of the Right

In evaluating the historical laws the State has presented, this Court should recognize that context matters. Close historical cousins to a modern regulation will not exist before the societal or technological condition that prompted regulation arose. Accordingly, regulations that emerged alongside or soon after a new condition should carry particular weight, and to the extent that a court seeks additional, older historical analogues, it must accept more distant cousins as sufficient. In *Bruen*'s words, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to history. 597 U.S. at 27.

SB 2's restrictions on firearms in public parks exemplify this point. Scores of historical laws from the mid-19th century through the early 20th century establish that prohibiting firearms in parks is "consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 34; *see* State's Br. 43-44; 10-ER-1966-70 (Prof. Terence Young Decl.); *Antonyuk*, 89 F.4th at 356-63 (rejecting facial challenge to prohibition on firearms in parks based on "well-established and representative" historical record); *Maryland Shall Issue*, 2023 WL 4373260, at *11 (concluding that historical record establishes a tradition of "restricting firearm possession and carrying in public parks"); *Kipke*, 2023 WL 6381503, at *9-10 (same,

21

for Maryland state parks and forests); *We the Patriots, Inc.*, No. 1:23-cv-00773, Dkt. 27 at *18-19 (denying request to preliminary enjoin prohibitions on carrying firearms in parks based on historical record).[15] Given that 1868 is the correct focus for this Court's analysis, these laws establish beyond doubt that prohibiting firearms in parks is constitutional.

But even if the Court were to focus its analysis on an earlier period, it should still give these 19th- and 20th-century laws particular weight, because parks in the modern sense did not begin to emerge until the mid-19th century. *See* 10-ER-1957, 1962-63 (Young Decl.); 7-ER-1414 (Prof. Leah Glaser Decl.); *see also Antonyuk*, 89 F.4th at 359; *LaFave v. Cnty. of Fairfax*, No. CL2021-01569, 2023 Va. Cir. LEXIS 203, at *17 (Fairfax Cnty. Cir. Ct. June 23, 2023); State Br. 43; *see also generally* David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* 1-8 (1988) (describing emergence in 19th century of "new urban landscape," whose proponents urged establishment of public parks to "create[] communal spaces" where "rural scenery might sooth the 'nerves and mind' of visitors," and identifying Central Park as "the first major attempt to achieve" the proponents' goals). Given Central Park's position as the foundational paradigm of this new movement, it is particularly significant that its original 1858 rules, brief enough to appear on a single sheet and "posted in conspicuous locations that would

---

[15] *See also, e.g.*, *Parks Restrictions*, *supra* note 2.

be easily seen by all visitors," Cynthia S. Brenwall, *The Central Park: Original Designs for New York's Greatest Treasure* 26 (2019), forbade "[a]ll persons" to "carry fire-arms":



*Id.* at 27.

Below, Plaintiffs asserted that parks existed at the founding and that an absence of prohibitions on guns in colonial-era greens and commons—Boston Common and similar landscapes in New York City and Savannah—would establish their case. *See Carralero v. Bonta*, No. 8:23-cv-01798, Dkt. 7 at 14-15. The district court did not reach these contentions, but similar arguments have been soundly rejected by other courts. *See, e.g.*, *Antonyuk*, 89 F.4th at 361 (concluding "Boston Common and similar spaces" were unlike modern-day urban parks); *Kipke*, 2023 WL 6381503, at *9 (determining these early green spaces "did not resemble

23

the modern, expansive State and federal park system that the United States has today"). Indeed, Plaintiffs are mistaken on both points.

First, history confirms that early commons and greens were different in kind from modern-day parks. Their core functions were utilitarian—serving, for instance, as sites to grow crops, graze livestock, and harvest firewood and other resources. *See* 10-ER-1957-61 (Young Decl.); Allan Greer, *Commons and Enclosure in the Colonization of North America*, 2 Am. Hist. Rev. 365, 370-73 (2012). Boston Common, for example, was primarily used as shared grazing land during its first two centuries, and was also used for militia assembly and executions. *See, e.g., Antonyuk*, 89 F.4th at 361; *Kipke*, 2023 WL 6381503, at *9; Nadav Shoked, *Property Law's Search for A Public*, 97 Wash. U.L. Rev. 1517, 1556-57 (2020); *Bulletin of the Park and Outdoor Art Association* 3 (1901), *available at* bit.ly/3NPLSae (Common was used for grazing and militia assembly "till a very recent date" and "not until 1859" was it "finally settled" that "Boston Common should be a public park"). By contrast, parks in the modern sense were developed in the 19th century to serve functions centered on "tranquilizing recreation" and natural beauty. Dorceta E. Taylor, *The Environment and the People in American Cities, 1600s-1900s: Disorder, Inequality, and Social Change* 228 (2009) (internal quotation marks omitted); *see* 7-ER-1412 (Glaser Decl.); 10-ER-1963-66 (Young Decl.); *Antonyuk*, 89 F.4th at 359.

Frederick Law Olmsted, Central Park's principal architect and first Commissioner, explained this evolution in 1881: "Twenty-five years ago we had no parks, park-like or otherwise, which might not better have been called something else. … Allow me to use the term *park movement*, with reference to what has thus recently occurred[.]" Olmsted, *The Justifying Value of a Public Park* 7-8 (1881). Olmsted explained that this notion of parks was revolutionary, not simply "an improvement on what we had before, growing out of a general advance of the arts applicable to them." *Id.* at 8. Parks in the modern sense were thus an "unprecedented societal concern[]" in the late 19th and early 20th centuries. *See Bruen*, 597 U.S. at 27; *see also Antonyuk*, 89 F.4th at 359 n.78 ("relative novelty of public parks as institutions … justifies a flexible approach under *Bruen*"). Under *Bruen*, that is reason enough to conclude that the State's historical park regulations amply justify its current restriction, since those regulations appeared as soon as the new societal condition of modern parks emerged.

The second reason why Plaintiffs are mistaken is that even if, contrary to fact, colonial-era greens and commons had been analogous to modern parks, the fact that the historical record has not (yet) yielded a prohibition on carrying firearms in those places proves nothing about whether Bostonians, New Yorkers, or Savannahians historically understood the right to keep and bear arms to foreclose such a prohibition. If public carry in those cities was rare (because of social mores,

25

limited availability of suitable firearms, carry regulations not specific to particular locations, or any other reason), then their inhabitants may have seen no need to enact sensitive-places prohibitions; or they simply may have chosen, for policy reasons, not to regulate (if that is what they chose) to the constitutionally permissible limit. *See supra* pp. 18-19 (federalism requires respect for decisions to legislate, or not, according to local needs).[16]

Finally, Plaintiffs' argument below (which the district court apparently accepted, *see* 1-ER-34) that the State's parks restriction simply covered too large an area—applying to "vast expanses of the great outdoors"—is misplaced. *Carralero*, No. 8:23-cv-01798, Dkt. 7 at 15 (citation omitted). Again, this nation's historical tradition of firearms regulation belies their objection. In 1897, when Yellowstone National Park regulations prohibited firearms,[17] the park covered over *two million* acres.[18] Soon after, regulations prohibited firearms in California's own Yosemite

---

[16] Further, contrary to Plaintiffs' suggestion, *see Carralero*, Dkt. 7 at 14, "the use of the Boston Common for organized and disciplined militia exercises and mustering hardly supports the notion that public recreational parks (to the extent the Common can be so characterized) were considered appropriate places for ordinary citizens to be armed outside the context of such military purposes," *Antonyuk*, 89 F.4th at 361 (emphasis omitted).

[17] *See* National Park Service, *Firearms Regulations in the National Parks 1897-1936* 1 (2008) ("*Firearms Regulations*"), *available at* https://perma.cc/5SRK-VYXZ.

[18] *See* 10-ER-1972 (Young Decl.); Stephen T. Mather, *Progress in the Development of the National Parks* 28 (U.S. Dep't of Interior 1916) (reporting areas of national parks, in square miles, including: 3,348 for Yellowstone; 1,125 for Yosemite; and 1,534 for Glacier).

National Park's over 700,000 acres and in Glacier National Park's almost one million acres.[19] These regulations put beyond doubt that the generations that established national parks did not see any constitutional problem with prohibiting guns in genuinely "vast expanses of the great outdoors."[20]

## CONCLUSION

This Court should reverse the district court's order.

January 26, 2024                     Respectfully submitted,

                                     s/ Priyanka Gupta Sen
                                     Janet Carter
                                     William J. Taylor, Jr.
                                     Priyanka Gupta Sen
                                     Everytown Law
                                     450 Lexington Avenue, P.O. Box 4184
                                     New York, NY 10163

                                     *Counsel for amicus curiae*
                                     *Everytown for Gun Safety*

---

[19] *See Firearms Regulations*, *supra* note 17, at 15 (Yosemite 1902); *id.* at 42 (Glacier 1910); *supra* note 18. These are merely examples. *See also Firearms Regulations* (providing historical restrictions for 19 national parks plus 1936 Service-wide regulations); *Parks Restrictions*, *supra* note 2 (excerpting historical prohibitions on firearms in several state park systems).

[20] Although *Antonyuk* expressed skepticism about applying its rationale to "rural parks," the court recognized that the record had not yet been fully developed at the preliminary injunction stage, *see* 89 F.4th at 362-63, and, in any event, its dictum was based on a much smaller set of historical laws than presented here.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-4354, 23-4356

I am the attorney or self-represented party.

**This brief contains** | 6,978 | **words,** including | 182 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Priyanka Gupta | **Date** | 1/26/24

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*