No. 23-4354, No. 23-4356

IN THE

# United States Court of Appeals for the Ninth Circuit

MARCO ANTONIO CARRALERO, ET AL.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
No. 8:23-cv-01798;
The Honorable Cormac J. Carney, Judge

## BRIEF FOR *AMICUS CURIAE* MARCH FOR OUR LIVES IN SUPPORT OF APPELLANT

Stephanie Yonekura
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
(310) 785-4600
stephanie.yonekura@hoganlovells.com

Rachel M. Bayer
Diala Alqadi
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000

Joshua Schulster
HOGAN LOVELLS US LLP
600 Brickell Avenue, Ste. 2700
Miami, FL 33131
(305) 459-6500

January 26, 2024

Jonathan L. Diesenhaus
Hannah M. Graae
Allisa Newman
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

Elizabeth A. Och
HOGAN LOVELLS US LLP
1601 Wewatta St. Ste. 900
Denver, CO 80202
(303) 899-7300

Alex Ervin
HOGAN LOVELLS US LLP
1735 Market Street, Floor 23
Philadelphia, PA 19103
(267) 675-4600

*Counsel for Amicus Curiae March For Our Lives*

*(Additional caption appears on next page)*

IN THE

# United States Court of Appeals for the Ninth Circuit

RENO MAY, ET AL.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
No. 8:23-cv-01696;
The Honorable Cormac J. Carney, Judge

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1 and Federal Rule of Appellate Procedure 29(a)(4)(A), counsel for *amicus curiae* states that March For Our Lives ("MFOL") is a non-profit, tax-exempt organization that has issued no stock, that MFOL does not have parent corporations, and that no publicly held company has 10% or greater ownership in MFOL.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF *AMICUS CURIAE*.............................................................1

INTRODUCTION ................................................................................2

ARGUMENT ....................................................................................4

    I.    The Supreme Court has Upheld the Authority of Governments to Implement Firearm Restrictions in "Sensitive Places" .............................4

    II.    Sensitive Places are of Critical Importance to Communities and Especially to Young People ........................................................6

    III.    Sensitive Places are Especially Vulnerable to the Threat of Gun Violence ...................................................................................9

    IV.    Experiences of Californians and Other Gun Violence Victims Demonstrate That These Places Are Sensitive In Practice ......................13

        A.    Kari Kueffler ...................................................................13

        B.    Patrick Korellis...............................................................17

        C.    Mary Kay Mace...............................................................20

        D.    Felix Gonzalez ...............................................................22

        E.    Natalie Fall ...................................................................25

CONCLUSION .................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)......................................................................*passim*

*Kipke v. Moore*,
    No. CV GLR-23-1293, 2023 WL 6381503 (D. Md. Sept. 29, 2023) .................6

*Koons v. Platkin*,
    No. 22-7464, 2023 WL 3478604 (D.N.J. May 16, 2023) ...................................8

*May v. Bonta*,
    No. SACV23-01696-CJC(ADSx), 2023 WL 8946212 (C.D. Cal.
    Dec. 20, 2023)........................................................................................3, 11

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022).........................................................................*passim*

*Siegel v. Platkin*,
    653 F. Supp. 3d 136 (D.N.J. 2023)......................................................8

*Warden v. Nickels*,
    697 F. Supp. 2d 1221 (W.D. Wash. 2010) ..........................................6

*We the Patriots USA, Inc. v. Grisham*,
    No. 1:23-cv-00773-DHU-LF, 2023 WL 6377288 (D.N.M. Sept.
    29, 2023) ........................................................................................8

**OTHER AUTHORITIES:**

Am. Psych. Ass'n, *One-Third of US Adults Say Fear of Mass
    Shootings Prevents Them from Going to Certain Places or Events*
    (Aug. 15, 2019),
    https://www.apa.org/news/press/releases/2019/08/fear-mass-
    shooting.................................................................................10, 11, 12

Christina Caron, *What Gun Violence Does to Our Mental Health*
(June 22, 2023),
https://www.nytimes.com/2022/05/28/well/mind/gun-violence-
mental-health.html?smid=nytcore-ios-
share&referringSource=articleShare ...............................................................10

Diana Palmer, *Fired Up or Shut Down: The Chilling Effect of Open
Carry On First Amendment Expression at Public Protests*, Ne.
Univ. (2021) .........................................................................................................12

DOJ, *Critical Incident Review, Active Shooter at Robb Elementary
School* (2024),
https://portal.cops.usdoj.gov/resourcecenter?item=cops-r1141 .........................12

Everytown for Gun Safety, *Child & Teen Gun Safety*,
https://www.everytown.org/issues/child-teen-safety/ (last updated
Feb. 28, 2023) .......................................................................................................3

Everytown for Gun Safety, *Debunking Gun Myths at the Dinner Table*
(2023), https://www.everytown.org/debunking-gun-myths-at-the-
dinner-table/ .........................................................................................................12

Everytown for Gun Safety, *Mass Shootings in the United States*,
https://everytownresearch.org/mass-shootings-in-america/ (last
updated Mar. 2023)...............................................................................................9

Everytown for Gun Safety Support Fund & Armed Conflict Location
& Event Data Project, *Armed Assembly: Guns, Demonstrations,
and Political Violence in America* (2021),
https://everytownresearch.org/report/armed-assembly-guns-
demonstrations-and-political-violence-in-america/.............................................11

Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the
Public Sphere from Weapons Threats Under Bruen*, 98 N.Y.U. L.
Rev. 1795 (2023) .................................................................................................10

Kanisha Bond et al., *Did You Attend the March for Our Lives? Here's
What it Looked Like Nationwide*, Wash. Post (Apr. 13, 2018) ...........................1

## INTEREST OF *AMICUS CURIAE*

*Amicus Curiae* March For Our Lives Action Fund ("MFOL") is a non-profit organization of young people from across the country fighting for sensible gun violence prevention policies that will save lives. Formed in 2018 after the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, MFOL immediately began organizing the largest single day of protests against gun violence in U.S. history. Hundreds of thousands of people joined its March 24, 2018 march in Washington, D.C., and sibling marches all over the world.[1] Since then, students seeking change have formed hundreds of MFOL chapters across the country— including in California. These young people have a vital interest in ensuring that the Constitution is interpreted correctly to allow the enactment of gun violence prevention measures that will protect themselves, their peers, and all Americans.

Pursuant to Circuit Rule 29(a)(4)(E), no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. MFOL is authorized to file this brief by

---

[1] "[T]he March for Our Lives event brought out 1,380,666 to 2,181,886 people at 763 locations." Kanisha Bond et al., *Did You Attend the March for Our Lives? Here's What it Looked Like Nationwide*, Wash. Post (Apr. 13, 2018), https://www.washingtonpost.com/news/monkey-cage/wp/2018/04/13/did-you-attend-the-march-for-our-lives-heres-what-it-looked-like-nationwide/.

Federal Rule of Appellate Procedure 29(a)(2) because all parties have consented to its filing.

## INTRODUCTION

At issue in this case is the ability of legislative bodies to protect individuals from the threat of gun violence. The Supreme Court has consistently recognized the authority of governments to place restrictions on firearms in certain "sensitive places." *See District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022). The California law at issue in this case, Senate Bill 2 ("SB 2") is designed to do exactly that—protect people from the threat of gun violence in sensitive places.

California enacted SB 2 following *Bruen*. The law's "shall-issue" licensing system eliminates the government's discretion to withhold a concealed carry weapon license. SB 2 prohibits concealed carry weapon permittees from carrying firearms into certain locations identified as sensitive. Appellees here challenge California's decision to protect 15 sensitive places—health care facilities, public transit, establishments that sell liquor for consumption on-site, public gatherings and special events, playgrounds and youth centers, local parks and athletic facilities, state parks, casinos, stadiums, libraries, amusement parks, museums and zoos, houses of worship without the operator's consent, financial institutions, and private property without the owner's consent—as well as the legislature's inclusion of parking lots at

2

some of these spaces. *See May v. Bonta*, No. SACV23-01696-CJC(ADSx), 2023 WL 8946212, at *3 (C.D. Cal. Dec. 20, 2023) (listing provisions of SB 2 that Appellees challenge).

Upholding the California legislature's right to protect its citizens by implementing limited and common-sense gun restrictions is critically important to reduce the senseless loss of life to gun violence. Gun violence in the United States is an epidemic that disproportionately affects young people. Firearms are the leading cause of death for American children and teens, with over 19,000 children and teens shot each year. Everytown for Gun Safety, *Child & Teen Gun Safety*, https://www.everytown.org/issues/child-teen-safety/ (last updated Feb. 28, 2023). A further three million children are exposed to gun violence each year, and they must cope with the serious mental and physical effects of witnessing or experiencing gun violence. *Id.*

Many of the sensitive places SB 2 seeks to protect are disproportionately used by young people, who are vulnerable and ill-equipped to respond to the imminent danger posed by guns. Children lack the completed cognitive development, decision-making capabilities, life experience, and physical and emotional maturity to adequately respond to such situations—nor should they be expected to do so. Young people are also less capable of coping with the mental and emotional trauma that comes with exposure to gun violence.

3

Below, MFOL presents the voices and experiences of survivors of gun violence committed or threatened in sensitive places, including those sensitive spaces identified in SB 2 and challenged by Plaintiffs. These survivors—alongside today's youth—have gained a uniquely personal perspective on the tragic consequences of allowing guns in sensitive spaces. Their voices and experiences demonstrate why sensitive places must be better protected from gun violence.

The Court should reverse the district court's decision and uphold SB 2.

## ARGUMENT

### I. The Supreme Court has Upheld the Authority of Governments to Implement Firearm Restrictions in "Sensitive Places"

The U.S. Supreme Court has consistently recognized that the federal Constitution allows governments to restrict the carrying of firearms in "sensitive places" to protect against the threat of gun violence. *Heller*, 554 U.S. at 626-27; *Bruen*, 597 U.S. at 30. These places are deemed particularly "sensitive" and therefore deserving of elevated protections because they are critical to preserving our nation's civic and democratic values, including those freedoms guaranteed under the First Amendment. These protections are also "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 4.

The Supreme Court has declined to "comprehensively define 'sensitive places,'" thus granting flexibility and authority to the relevant legislative bodies to do so. *Id.* at 30. While the Court found that sensitive places include those locations

4

where weapons were historically prohibited, and places analogous or "relevantly similar" to such locations, it cautioned against constraining regulation through overly restrictive historical analysis. *Id.* at 29. Under *Bruen*, modern-day firearms regulations need not be "a dead ringer for historical precursors" in order to "pass constitutional muster." *Id*. at 30. The Court left room for legislatures and courts to analogize to the "'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" *Id*. at 3 (citation omitted). In other words, *Bruen* allows legislatures and courts to consider the implications of gun violence today—including the dangers posed by modern weapons—in their decisions, particularly when using analogical reasoning to evaluate sensitive place restrictions.

As established by the Government in its briefing and extensive supporting authority, the sensitive places identified in SB 2, including those challenged by Appellees, are undoubtedly "sensitive places" deserving of protections against the threat of gun violence. Each of these spaces is central to civic life and the free exercise of constitutionally protected rights, including through the facilitation of political expression, education, physical and/or mental care, recreation, or freedom

of religion. Indeed it is their status as pillars of our democratic community that makes these places uniquely vulnerable to the threat of gun violence.

## II. Sensitive Places are of Critical Importance to Communities and Especially to Young People

Sensitive places are integral to American society and provide spaces for communities to gather peacefully to exercise their constitutionally protected rights. These places protect and nurture our most vulnerable community members, including children, the elderly, individuals experiencing homelessness, and individuals with illnesses.

These spaces are critically important for young people. The consistent and, in some instances, *mandated* presence of minors in a known location should be a factor in determining whether a place is "sensitive," as minors often lack the ability to both handle active shooter situations and comprehend, process, and cope with the effects of witnessing or experiencing gun violence. Courts have recognized that the congregation of vulnerable populations within a place is one attribute that can make a place sensitive. *See Kipke v. Moore*, No. CV GLR-23-1293, 2023 WL 6381503, at *10 (D. Md. Sept. 29, 2023) (finding a place sensitive because it is crowded and serves "vulnerable populations like children and disabled people."); *Warden v. Nickels*, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010) ("Just as the Federal Courts do not want civilians entering into courthouses with weapons, the City does not want

those with firearms entering certain parks where children and youth are likely present.").

The Supreme Court in *Bruen* identified schools, among other areas, as a settled example of a sensitive place in which governments may regulate firearm possession. *Bruen*, 597 U.S. at 30. Schools contain large groups of defenseless individuals—young people—who have little chance of escape or other meaningful resistance in the event of an active shooter. Similarly, although spaces such as parks, athletic facilities, and public libraries are not explicitly reserved for young people, they are often disproportionately populated by—and usually designed to attract— young people. These places are used for recreation, formal and informal educational purposes, after-school and daycare programs, summer camps, youth sports leagues, informal celebrations and gatherings, and other programming targeted at young people. Moreover, the mere possibility or presence of non-vulnerable populations like adults in a place where vulnerable populations congregate does not diminish its status as a sensitive place. *Bruen* shows that schools are a settled category of sensitive places even though large numbers of teachers, administrators, and parents also frequent them. *See Bruen*, 597 U.S. at 3. The same reasoning applies to playgrounds, youth centers, public transportation, parks and athletic facilities, public

libraries, museums, and zoos, as well as other similar places that serve or concentrate vulnerable populations.

Even district courts that have erroneously struck down firearm restrictions in certain sensitive places have nonetheless *upheld* legislatures' designation of playgrounds as sensitive places. *See, e.g.*, *Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 WL 3478604, at *82 (D.N.J. May 16, 2023) (declining "to change its earlier ruling allowing the State to ban firearms at playgrounds . . . ." where the earlier ruling recognized that *Bruen* and *Heller* had identified legitimate restrictions in "sensitive places" like schools); *Siegel v. Platkin*, 653 F. Supp. 3d 136, 151, 152 (D.N.J. 2023) (because "schools and playgrounds intersect, . . . playgrounds fall within the sphere of schools" so courts "can assume it settled" that playgrounds—as places frequented by children—are "sensitive"); *see also We the Patriots USA, Inc. v. Grisham*, No. 1:23-cv-00773-DHU-LF, 2023 WL 6377288, at *3 (D.N.M. Sept. 29, 2023) (finding that "Plaintiffs are unable to show a substantial likelihood of success on the merits in their constitutional challenge of the Governor's Amended Order as it relates to playgrounds and other areas where children play," and, noting, the "analysis by the *Koons/Siegel* court that led to its determination that schools and playgrounds intersect is logically applicable to the restriction of firearms in 'other areas for children to play,' therefore the regulation

of gun activity in such areas may very well be constitutional under *Bruen* and *Heller*").

Thus, contrary to the district court's conclusion, the places identified in SB 2 are sufficiently analogous to schools and other sensitive places previously identified by the Supreme Court to merit sensitive place status, and their users are deserving of the same constitutional protections. *Bruen*'s analogical methodology extends the longstanding tradition of restricting weapons in government buildings and schools—places essential to sustaining participatory democracy, particularly for young people. *See Bruen*, 597 U.S. at 28 ("When confronting [] present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy . . . ."). Legislatures must be empowered to defend vulnerable citizens, especially children, by excluding firearms from sensitive places.

## III. Sensitive Places are Especially Vulnerable to the Threat of Gun Violence

While sensitive places are of critical importance to our communities, they are also particularly vulnerable to the threat of gun violence. In 2021, there were at least 686 mass shooting incidents (defined as shootings where "four or more people are shot and wounded or killed, excluding the shooter") in America. Everytown for Gun Safety, *Mass Shootings in the United States*, https://everytownresearch.org/mass-shootings-in-america/ (last updated Mar. 2023). In 2022, another 636 mass shootings were committed. *Id.* Many of these incidents occurred at public places

9

that are of critical importance to American society, including schools, demonstrations, and special events.

Sensitive places share a common purpose: to promote the public sphere's engagement in "democratic dialogue, democratic governance, and the reproduction of democratic community in which people can relate freely without intimidation or coercion." Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats Under Bruen*, 98 N.Y.U. L. Rev. 1795, 1799 (2023). The presence of guns disrupts these functions by invoking fear that violence could erupt, and research shows that public carrying of firearms disrupts public life and chills political participation.

Survey data from the American Psychological Association ("APA") shows that 62% of parents surveyed in 2019 fear that their children will be victims of a mass shooting. Am. Psych. Ass'n, *One-Third of US Adults Say Fear of Mass Shootings Prevents Them from Going to Certain Places or Events* (Aug. 15, 2019), https://www.apa.org/news/press/releases/2019/08/fear-mass-shooting. A 2018 Harris Poll conducted for the APA showed that "75% of young people between the ages of 15 and 21 said that mass shootings were significant sources of stress." Christina Caron, *What Gun Violence Does to Our Mental Health* (June 22, 2023), https://www.nytimes.com/2022/05/28/well/mind/gun-violence-mental-health.html?smid=nytcore-ios-share&referringSource=articleShare. More than

10

three-quarters (79%) of adults in America are stressed about the possibility of a mass shooting, and one-third say that fear of mass shootings stops them from going to certain places and events. Am. Psych. Ass'n, *supra*, at p. 10. Nearly one in four adults (24%) surveyed indicated that they have changed the way they live their lives out of fear of a mass shooting, with survey respondents most commonly identifying public events (53%), malls (50%), schools and universities (42%), and movie theaters (38%) as places causing stress of a mass shooting. *Id.*

Unfortunately, these fears are well-founded. Over an 18-month period between 2020 and 2021, at least 560 demonstrations were identified where attendees carried or brandished firearms. Everytown for Gun Safety Support Fund & Armed Conflict Location & Event Data Project, *Armed Assembly: Guns, Demonstrations, and Political Violence in America* (2021), https://everytownresearch.org/report/armed-assembly-guns-demonstrations-and-political-violence-in-america/. One of every six demonstrations with firearms present included reports of violent or destructive activity, compared to one of 37 for demonstrations where no firearms were identified. *Id.* Fatalities were reported at one of every 62 armed demonstrations, whereas a fatality occurred in merely one of every 2,963 demonstrations without firearms. *Id.* These findings directly contradict the district court's position that access to firearms promotes public safety. *See, e.g.*, *May*, 2023 WL 8946212, at *11, *13. This is tragically highlighted by the Department of

11

Justice's recent report on the mass shooting at Robb Elementary School in Uvalde, Texas (notably, an open-carry state), showing that even armed adults and law enforcement officers are unable to prevent mass shootings at schools. *See generally* DOJ, *Critical Incident Review, Active Shooter at Robb Elementary School* (2024), https://portal.cops.usdoj.gov/resourcecenter?item=cops-r1141.

Importantly, as noted by the Government, the legislature cited ample empirical studies supporting the fact that the presence of more guns, including guns in the hands of licensed/permitted individuals, only serves to increase the likelihood of violence. Gov't Br. at 5-6. Put plainly, "[i]f more guns everywhere made us safer, America would be the safest country on earth. Instead, we have a gun homicide rate 26x that of other high-income countries." Everytown for Gun Safety, *Debunking Gun Myths at the Dinner Table* (2023), https://www.everytown. org/debunking-gun-myths-at-the-dinner-table/.

Accordingly, research shows that citizens are significantly less likely to attend protests—to express themselves peacefully—if they believe that firearms will be present. *See* Diana Palmer, *Fired Up or Shut Down: The Chilling Effect of Open Carry On First Amendment Expression at Public Protests*, Ne. Univ. (2021). Empirical evidence unsurprisingly demonstrates that many Americans fear guns in public spaces. *See* Am. Psych. Ass'n, *supra*, at p. 10. Expanding the list of public places recognized as sensitive will promote heightened attendance and in turn, civic

engagement and democratic community building by reducing the fear of gun violence. As the Court in *Heller* carefully noted, "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. 570, 626. Historically, the right had never been viewed as "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* This right must be defined carefully—just as it was by the framers of the Constitution and has been throughout our nation's history—in light of the other constitutionally protected rights of individuals to exercise their First Amendment right to peaceably assemble, as well as the basic right to survive.

**IV. Experiences of Californians and Other Gun Violence Victims Demonstrate That These Places Are Sensitive In Practice**

Countless individuals, including Californians, have been affected by actual or threatened gun violence in the same types of sensitive places protected under SB 2. Several personal accounts are shared here to convey the lasting trauma these encounters have on Americans, and in particular, young people. These voices represent tens of thousands of other young people who, weighed down by the daily threat of gun violence, want their state governments to do all they can do to ensure the safety of their constituents.

**A. Kari Kueffler**

Kari Kueffler was aware of gun violence growing up, first exposed to it when her older brother watched *Scarface*. She recalls watching news coverage of the

13

Columbine shooting from the couch of her college apartment and remembers that she was traveling for work during the movie theatre shooting in Aurora, Colorado. As mass shootings became more frequent, Kari grew uncomfortable in certain spaces, but gun violence still felt removed from her day-to-day life. That all changed on October 1, 2017, when Kari and her 3-month-old son survived the Route 91 music festival in Las Vegas—the largest mass shooting in modern American history—which left 60 dead and nearly 500 injured in a span of 12 minutes.

Kari grew up in a close family in Naperville, Illinois, where she felt safe; indeed, her family rarely locked the door at night. She moved to Nashville, Tennessee in 2010 for her job in the music industry. She now lives in nearby Franklin, Tennessee.

Kari manages VIP experiences for guests at concerts, which requires her to travel around the country with artists. Shortly after returning from maternity leave, Kari was asked to manage the VIP experience at the Route 91 festival. Kari agreed to go, provided that she could bring her 3-month-old son, Leo, with her.

By 10:00 p.m. on the last day of her trip, Sunday, October 1, Kari's mind was already back in Nashville. As the last singer of the night, Jason Aldean, closed out the festival, Kari left Leo with a coworker to walk around the festival grounds and check on the VIP spaces. While heading back to get Leo, Kari heard a *pop pop popping* sound and saw dust kick up about 20 yards in front of her. She felt like the

14

world was suddenly in slow motion. The sound didn't stop, and people began to fall. She ran to the nearest production trailer and urged everyone to get down. Kari panicked because she did not know where Leo was. She was told he was in the office of the woman who ran the festival; Kari found Leo and hid with two other women under the desk behind a locked door.

The popping sounds would not stop. For brief moments, Kari would think it was over, but then the sounds would start up again. When the shooting began, Kari had heard a car speed by and assumed that shooters on foot or on motorbikes had come through the fence just behind them. She realized with a sinking fear that the shooters wouldn't even have to enter the office where she and her son were hiding; a bullet could kill them through the thin trailer walls. She prayed that Leo wouldn't cry and alert the shooters of their location. After about 12 excruciating minutes, people came into the trailer to grab the festival's merchandise shirts to use as makeshift tourniquets and bandages. Firefighters eventually came into the trailer to rescue Kari and the others, but only after they were able to persuade Kari and her companions that they weren't shooters. Kari's friends and family, including her husband, found out about the shooting from the news and some began texting her. Kari remembers texting back one friend nothing but "active shooter." By some miracle, 3-month-old Leo slept through the shooting and the chaos that followed.

The rest of the night was chaos. There was nowhere for survivors to go, and the hotel where she was staying, Mandalay Bay, was struck by the shooter and completely locked down. Information poured in from various sources about multiple shooters, attacks on the Las Vegas strip, and reports of suspicious abandoned luggage. Kari spent hours going from one place to another; she hid on buses with shot-out windows, at the airport, in an office building backroom, and outside the arena.

When she returned to Nashville on Monday evening, Kari felt like she had lived through a nightmare. She tried to return to some semblance of normal. The weekend after the shooting, Kari had to attend a concert for work in a venue that happened to also have gun show in the building. Hearing gunshots in the distance triggered her all over again, bringing her back to the scene of the Route 91 shooting one week before.

Now, nearly six years after the shooting, Kari continues to struggle with its lasting effects. Although she still enjoys going to concerts, Kari is more hesitant when in crowds. She has a hard time going in elevators, especially with strangers. And for some time Kari could not walk into a Starbucks because she associated the coffee chain with the lobby of the Mandalay Bay. To this day, Kari grapples with the uncertainty surrounding the shooter's motive. Why them? Why there?

16

Kari's experience at the Route 91 shooting has undoubtedly shaped the last six years of her life. The shooting affected her feeling of safety in her workplace and in public; it changed how she thinks about the safety of her son Leo, now six years old. She still thinks about how the shooting affects those closest to her, including her son, her husband, and her mother. Kari sees sensitive places as the underpinnings of America and questions what freedom means if people can't enjoy special events, schools, and parks without a sense of safety and security. Kari isn't against gun ownership, but she believes that guns do not belong in these sensitive places. Kari is sure that the presence of guns in sensitive places would make her feel *less* safe. She believes if guns had been carried by attendees at the Route 91 festival, it would only have caused even more panic, fear, chaos, and death. She can't imagine the additional terror created by a crowd of 25,000 people running in every direction, spotting strangers with guns and mistaking them for the shooter.

Kari views gun restrictions in sensitive places as a small step in the right direction towards protecting the public from the threat of gun violence.

### B. Patrick Korellis

Patrick was a senior at Northern Illinois University ("NIU") on February 14, 2008, when a gunman armed with semi-automatic pistols and a shotgun committed a mass shooting, killing five and injuring 17. Growing up at the start of what would become known as the mass shooting generation, Patrick saw mass shootings reported

17

on the news with increasing frequency. But before the NIU shooting, he never felt unsafe on or off campus and never thought a shooting could happen at his school.

On the morning of February 14, Patrick was debating whether he should attend his oceanography class, his last class of the day. Ultimately, he decided to go and sat in the aisle seat near the front of the lecture hall. About an hour into the lecture, he saw a gunman kick open a door at the front of the classroom and begin firing. Shocked and terrified, Patrick immediately took cover underneath his desk. After a pause in the barrage of bullets, someone yelled that the shooter was reloading. Patrick saw his classmates running to the doors at the back of the classroom. He followed his classmates, crawling on the floor. But before he could reach safety, the gunman opened fire again.

Patrick felt a sharp pain at the back of his neck, and when he reached back to feel the area, his fingers came back covered in blood. He was able to keep moving and finally pulled himself outside, light-headed but still conscious. Patrick was intiially placed in a police car when the first responders arrived because there were not enough ambulances for all of the students that had been harmed. He was soon transported to the hospital, where he learned that he had been shot in his arm and neck.

Patrick's mother and father, like many parents of NIU students that day, rushed to campus immediately after hearing about the shooting. The police told

Patrick's family that he had been shot, but his family did not know whether he was alive. Patrick's mother rushed into the hospital, in tears and with a red face, but ultimately overjoyed to find Patrick alive. His father and two brothers arrived soon after.

Patrick believes the shooting irrevocably changed him. Upon returning to classes the Monday after he was discharged from the hospital, he had to leave his first class after 10 minutes because he couldn't concentrate. He couldn't tear his eyes away from the door, waiting for it to be kicked in again. In his oceanography class, he just kept looking at his classmates still in bandages—and thinking of those who weren't there anymore. To this day, bullet fragments remain in Patrick's head and arm. He has visible scarring along his arm, and on cold days, he feels a sharp pain in his head. In public places, Patrick finds himself scanning for potential gunmen and planning escape routes. When he attended a music festival in Las Vegas last summer, he couldn't stop thinking about the Route 91 festival shooting and hoping that he'd be okay.

Once, when he was in Tennessee for a friend's birthday, Patrick saw someone walk into a restaurant holding a gun. He "completely freaked out" and hid. Though the individual was not wielding the gun with malicious intent, for those several harrowing moments, Patrick thought he was a mass shooter. Feeling safe in public is "the number one thing" Patrick looks for. If guns were allowed in sensitive places

19

like the ones protected by SB 2, Patrick would feel incredibly unsafe and terrified in public. He wouldn't know if someone was there to cause harm because there is no way to determine who is a "good person" with a gun and who is a "bad person" with a gun. Patrick wonders what would have happened if his classmates had guns in his lecture hall at NIU—innocent people could have been caught in the crossfire. He also thinks about how hard it would have been for the police to identify a malicious shooter if there were multiple people holding guns. None of this would have made him feel safe.

### C. Mary Kay Mace

Gun violence was not on Mary Kay's radar before her daughter was born. Ryanne Mace was Mary Kay and her husband Eric's only child. As Ryanne was growing up, consuming news coverage of mass shootings like Columbine and Virginia Tech caused Mary Kay immense anxiety. In February 2008, Ryanne was a sophomore at NIU studying to become a clinical therapist.

While at work, Mary Kay received a call from her boss's wife asking if she had heard that there had been a shooting at NIU. She immediately called Ryanne, and she tried not to worry when her daughter did not answer her phone. She left work to head home, where she and Eric tried, unsuccessfully, to reach Ryanne. Then one of Ryanne's friends called and told Mary Kay and Eric that Ryanne had been in

the oceanography lecture where the shooting had occurred. They immediately rushed to campus on roads packed with snow and ice.

On their way to the university, Mary Kay and Eric stopped at a hospital in Sycamore. Ryanne's name was not listed among the wounded, but a police officer told them that one victim who had been fatally shot had not yet been identified. After hours of waiting, and fighting the urge to leave to search for their daughter, Mary Kay and Eric were finally moved to a room where they found a hospital chaplain waiting for them. Mary Kay then knew that they were being taken to identify their daughter's body. She saw Ryanne lying on a cold metal table with a sheet pulled up to her chin.

Ryanne, along with four other classmates, died in the NIU shooting. She suffered multiple gunshot wounds and was the youngest killed that day, at only 19 years old. Mary Kay and Eric deeply feel the loss of their only daughter. They held Ryanne's funeral at the church where she had dreamed of having her wedding. Mary Kay often thinks of the grandchildren she and Eric might have had, and all the vacations they never got to go on as a family. The couple sold their house months after the NIU shooting, unable to cope with living in the house their daughter had once called home.

Safety was important to Mary Kay when considering Ryanne's education, and she gravitated towards NIU because she considered it a safe place. Now, Mary Kay

knows all too well the devastation of losing a loved one in a place that should have been safe. She is proud of democratically enacted gun safety regulations and feels safer in public because of them; if guns were allowed into sensitive places, she would feel considerably more fearful in public.

### D. Felix Gonzalez

Felix Gonzalez, now 18, first learned about gun violence in sixth grade after seeing reports about the Parkland shooting. He has lived in the Sacramento suburbs his entire life and loves the small and close-knit community. Since sixth grade, Felix has been nervous about the possibility of encountering gun violence in public spaces, even in his hometown. In crowds, waves of anxiety wash over him and he plans how he would escape should a shooting occur.

Mere days after the Parkland shooting, Felix's middle school organized a protest in solidarity with the Parkland survivors. Felix, along with 70-80 students, gathered on the blacktop behind the school. During a 15-minute moment of silence, Felix heard a teacher yelling through a megaphone, "Get to your classroom. Get to your classroom, now!" He still remembers the fear in that teacher's voice. At first, students were confused as to why the protest was stopped—but the students were soon told that school administrators believed an armed shooter was on campus.

The protest erupted into chaos. Only a few friends had accompanied Felix to the protest, and he was surrounded by unfamiliar faces. Felix saw students panicking

and running in all directions, searching for safety. Felix ran too. Seized with terror, he didn't think to duck into the nearest classroom. He could only focus on getting to his actual classroom, which was on the opposite end of the open-air campus, requiring Felix to run outside, fully exposed to any potential shooter nearby. Sprinting across campus, Felix thought about how "it was supposed to be a moment of silence for the victims of school shootings, and now, it's happening to us."

As he neared his classroom, Felix saw waves of police officers jump the fence and run onto campus. He saw the long guns they held in their hands. Instead of making him feel safer, seeing guns just "added fuel to the fire" of his terror—it was the first time Felix had ever seen a gun in person.

Felix reached his classroom unharmed and sheltered in place with his classmates for hours as police combed the campus. Eventually, everyone was allowed to go outside. Most students left the school entirely, but Felix couldn't get a ride home and had to stay and try to complete the day as if nothing happened. He wasn't successful. Felix felt tense and paranoid and was unable to focus in class, instead fixating on the trauma he had just experienced. When walking through the hallways and sitting in class, Felix found himself carefully examining everyone around him, just in case they had a gun. For weeks, Felix dreaded returning to school, fearful that it would happen again. Overwhelming fear when he returned to campus each day prevented him from focusing in class.

Despite never encountering a gun, Felix's life was undeniably changed that day. The threat of a gun at the protest radically shifted his outlook that guns and gun violence would be part of his life. As a result, his performance in and relationship with school suffered for weeks. And, above all, he transformed from a carefree child who felt safe wherever he went to a kid for whom the possibility of gun violence never leaves the back of his mind.

Today, Felix goes to the park with his four-year-old brother and volunteers at the library, spaces that the law at issue is designed to protect. He also lobbied for the passage of SB 2, channeling the memories of the lockdown he had tried to bury and using his experience to motivate him to continue. He advocates to ensure no one else has to experience what he felt that day.

Felix knows he would feel substantially *more* unsafe if people were allowed to carry guns into the spaces SB 2 was designed to protect. Without such laws, he would avoid the very places he currently frequents. If he saw a gun in a school, playground, or library, he would immediately leave regardless of who wields it or how safely they wield it. Felix believes everyone in his community deserves to feel safe. And the mere presence of guns nullifies the purpose of these spaces to be safe havens for the community to use and congregate.

24

### E.  Natalie Fall

Natalie Fall, 35, is the executive director of MFOL and has worked in the gun violence prevention movement for years.  Natalie has been aware of gun violence since the Columbine shooting, which occurred when she was in high school, but her work as a gun violence prevention advocate has heightened her awareness of the possibility of encountering a gun in public.  After the tragic shootings in Buffalo and Uvalde in 2022, Natalie and the MFOL staff felt compelled to rally.  The rally in Washington, D.C. on June 11, 2022, brought together tens of thousands of attendees, as well as thousands of individuals who rallied in sibling events internationally.

While planning the rally, Natalie was acutely aware of possible violence and felt overwhelmed by her responsibility to ensure the safety of attendees and her team. Survivors and MFOL spokespeople had become all too familiar with threats of violence for years.  One of the consequences of working with the gun violence prevention movement is that armed counter-protestors often attend events to purposefully intimidate attendees.  Nevertheless, Natalie felt excited on the morning of the rally.  She hoped the rally would be rewarding for her staff after their dedication and hard work.  She couldn't wait for them to feel joy, relief, and pride.

Natalie stayed backstage throughout the rally to work with the production team, survivors, and speakers to ensure the event ran smoothly.  During a moment of silence, a man in the crowd yelled something that sounded to some like, "I am

25

God," "I have a gun," or "This is what a gunshot sounds like," and threw a speaker in the air.  Natalie was no more than 50 feet from the crowd and saw a small, round object arching through the sky and thought it might be a bomb or a smoke grenade, designed to confuse the crowd so the man could start shooting.  She saw the crowd begin to panic while survivors and staff backstage looked terrified.  Fearing that the individual might have a gun, Natalie turned to flee but a large fence blocked her path.  As she searched for a way to escape, and finding none, Natalie thought about her parents who attended the rally to support her, and the team of volunteers and staff that she had brought together.  She felt immense terror.  She was certain that everyone backstage was trapped, including herself.  And she waited for the moment that she or those in her care would be hurt.

Even after the security team apprehended the culprit, Natalie was reeling from the aftermath.  Several young people and survivors backstage chose to leave the rally. She struggled to reach her staff on the periphery of the rally, many of whom were either confused about what unfolded or were themselves dealing with the fallout of the incident.  Staff members, fearful themselves, witnessed droves of protestors leave early after this incident.  Despite being told that the situation was resolved, multiple survivors, families, parents, kids, and young people were scared, frustrated, and terrified of the possibility that something could happen. During and after the rally,

26

Natalie grappled with guilt for putting her team, loved ones, and supporters in jeopardy.

Since the rally in D.C., Natalie and her staff feel more frightened when protesting.  She thinks about that day every time MFOL plans an event.  Natalie believes feeling safe in everyday life is the core prerequisite for participating in American civic life.  Unfortunately, the possibility of danger at MFOL events remains a primary concern for the organization.  Alongside the financial costs of ensuring the safety of MFOL events, Natalie acutely feels the "psychological and emotional wounds" carried by her and her staff due to the threat of violence at protests.  Threats against the movement and survivors feel more substantial, and armed counter-protestors, present at the majority of MFOL events, serve as a reminder of what happened that day—and what could happen still.

Stories such as Natalie's demonstrate why sensitive spaces are so important.  The vulnerability of those present in sensitive places, especially young people, and the importance of the activities taking place in those spaces—such as education and advocacy—are integral to American civic life.  Places populated by young people, especially places with core public and democratic functions, ranging from museums to parks to places of protest, must be protected from gun violence.

## CONCLUSION

Sensitive places are critical to Californians, and all Americans, providing space for communities to gather peacefully and regularly to exercise their constitutionally protected rights. These spaces are especially significant to vulnerable populations, particularly young people who disproportionately bear the physical and mental burden of gun violence in this country. The stories and statistics in this brief demonstrate the lasting impact of gun violence—or the mere threat of gun violence—in sensitive places.

MFOL urges the Court to overturn the preliminary injunction, uphold SB 2, and confirm the ability of governments to restrict firearms in sensitive places. Such a holding is consistent with the Supreme Court's decision in *Bruen*.

For the foregoing reasons, and those in the Government's brief, the district court's decision should be reversed.

Dated: January 26, 2024                    Respectfully submitted,

Jonathan L. Diesenhaus                     /s/ Stephanie Yonekura
Hannah M. Graae                            Stephanie Yonekura
Allisa Newman                              HOGAN LOVELLS US LLP
HOGAN LOVELLS US LLP                       1999 Avenue of the Stars, Ste. 1400
555 Thirteenth Street, N.W.                Los Angeles, CA 90067
Washington, D.C. 20004                     (310) 785-4600
(202) 637-5600                             stephanie.yonekura@hoganlovells.com

Rachel M. Bayer                            Elizabeth A. Och
Diala Alqadi                               HOGAN LOVELLS US LLP
HOGAN LOVELLS US LLP                       1601 Wewatta St. Ste. 900
390 Madison Avenue                         Denver, CO 80202

New York, NY 10017
(212) 918-3000

Joshua Schulster
HOGAN LOVELLS US LLP
600 Brickell Avenue, Ste. 2700
Miami, FL 33131
(305) 459-6500

(303) 899-7300

Alex Ervin
HOGAN LOVELLS US LLP
1735 Market Street, Floor 23
Philadelphia, PA 19103
(267) 675-4600

*Counsel for Amicus Curiae March For Our Lives*

**CERTIFICATE OF COMPLIANCE**

1.       This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,500 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.       This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in Times New Roman 14-point font.

 January 26, 2024                                    /s/ Stephanie Yonekura
                                                      Stephanie Yonekura

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 26, 2024. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

January 26, 2024                                    /s/ Stephanie Yonekura
                                                    Stephanie Yonekura