No. 23-4354

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

───────────────

MARCO ANTONIO CARRALERO, ET AL.,
*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF CALIFORNIA,
*Defendant-Appellant*.

───────────────

**On Appeal from the United States District Court
for the Central District of California**
No. 8:23-cv-01798-CJC-ADSx
The Honorable Cormac J. Carney, Judge

───────────────

## APPELLEES' RESPONSE BRIEF

───────────────

Bradley A. Benbrook
Stephen M. Duvernay
BENBROOK LAW GROUP, PC
701 University Avenue, Suite 106
Sacramento, CA 95825
(916) 447-4900
brad@benbrooklawgroup.com

David H. Thompson
Peter A. Patterson
Kate Hardiman
COOPER & KIRK, PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
dthompson@cooperkirk.com

February 16, 2024

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT .........................................................3

STATEMENT OF THE ISSUE................................................................3

ADDENDUM OF STATUTORY SOURCES ..........................................3

STATEMENT OF THE CASE..................................................................3

    I.    SB2's Sensitive Places Restrictions ...........................................3

    II.   SB2's Effect on Plaintiffs............................................................5

SUMMARY OF THE ARGUMENT .........................................................6

STANDARD OF REVIEW ......................................................................8

ARGUMENT ...........................................................................................8

    I.    SB2 Violates Plaintiffs' Second Amendment Rights.................8

        A. The Second Amendment's Plain Text Covers Plaintiffs' Conduct ............9

        B. Controlling Methodological Considerations Under *Bruen* .....................12

           1. The Relevant Historical Period Centers on 1791, not 1868 .........12

           2. A Historical Tradition Requires Proof of Representative, Relevantly Similar Analogues..........................17

           3. Analogies to Other Sensitive Places .............................19

        C. California's Fabricated and Overbroad Definitions of "Sensitive Places" Are Wrong and Must be Rejected ............................24

        D. California Erroneously Claims that Technological and Societal Changes Alter the Analogical Inquiry...................30

        E. California's Historical Evidence Fails to Establish an Analogous Tradition of Regulation For Each of the Challenged Locations .............................31

1. The No-Carry Default at Businesses Open to the Public...............31

2. Public Transportation .......................................................38

3. Places Selling Alcohol for Consumption on the Premises.............44

4. Public Gatherings Requiring a Permit ...............................46

5. Gambling Establishments, Stadiums, and Amusement Parks........50

6. Hospitals and Health Care Facilities...............................51

7. Parks, Areas Controlled by State Wildlife Agencies, and Zoos.....53

8. Museums and Libraries.............................................55

9. Parking Lots of the Challenged Locations...................56

II. The Other Preliminary Injunction Factors Favor Plaintiffs.......................57

CONCLUSION .................................................................59

STATEMENT OF RELATED CASES ..................................................60

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page**

*Antonyuk v. Chiumento*,
  89 F.4th 271 (2d Cir. 2023)................................................10, 11, 31, 34, 37, 46

*Baird v. Bonta*,
  81 F.4th 1036 (9th Cir. 2023)........................................................8, 30, 57, 58

*Bonidy v. U.S. Postal Service*,
  790 F.3d 1121 (10th Cir. 2015)................................................................56, 57

*Bradshaw v. Rawlings*,
  612 F.2d 135 (3d Cir. 1979).........................................................................27

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011)....................................................................................12

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
  29 F.4th 468 (9th Cir. 2022)...........................................................................8

*Christian v. Nigrelli*,
  642 F. Supp. 3d 393 (W.D.N.Y 2022) .....................................................32, 37

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)....................................................7, 10, 12, 13, 28, 30

*Elrod v. Burns*,
  427 U.S. 347 (1976).....................................................................................57

*Espinoza v. Mont. Dep't of Revenue*,
  140 S. Ct. 2246 (2020).................................................................................16

*Gamble v. United States*,
  139 S. Ct. 1960 (2019) .................................................................................14

*Hardaway v. Nigrelli*,
  636 F. Supp. 3d 329 (W.D.N.Y. 2022).....................................................20, 21

*Hawkins v. Hoffman*,
  6 Hill 586 (N.Y. Sup. Ct. 1844)..............................................................41, 42

*Hill v. State*,
  53 Ga. 472 (Ga. 1824) .................................................................................49

*Junior Sports Mags., Inc. v. Bonta*,
  80 F.4th 1109 (9th Cir. 2023)....................................................................8, 57

*Kipke v. Moore*,
No. 23-cv-1293, 2023 WL 6381503 (D. Md. Sept. 29, 2023) ...............36, 37

*Koons v. Platkin*,
No. 22-cv-7464, 2023 WL 3478604
(D.N.J. May 16, 2023)...............................................11, 18, 19, 23, 24, 32, 34,
37, 47, 50, 51, 52, 53, 55, 56

*Lara v. Comm'r Pa. State Police*,
91 F.4th 122 (3d Cir. 2024) ........................................14, 15, 16, 27

*McCauley v. Univ. of the Virgin Islands*,
618 F.3d 232 (3d Cir. 2010) .........................................................27

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ........................................................ 13, 14, 58

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012).........................................................42

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022)...............................................1, 2, 3, 7, 8, 9,
10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 24, 25, 26, 27, 29, 30, 31, 35, 36, 37,
42, 43, 44, 47, 49, 51, 58

*Ramos v. Louisiana*,
140 S. Ct. 1390 (2020) ........................................................... 14, 17

*Range v. U.S. Att'y Gen.*,
69 F.4th 96 (3d Cir. 2023).............................................................20

*Siegel v. Platkin*,
653 F. Supp. 3d 136 (D.N.J. 2023) ...........................................37, 51

*Springer v. Grisham*,
No. 1:23-cv-781, 2023 WL 8436312 (D.N.M. Dec. 5, 2023) ......................16

*State v. Hopping*,
18 N.J.L. 423 (N.J. 1842) .........................................................34, 35

*State v. Huntley*,
25 N.C. 418 (N.C. 1843) ................................................................26

*State v. Shelby*,
2 S.W. 468 (Mo. 1886) .............................................................49, 50

*Timbs v. Indiana*,
139 S. Ct. 682 (2019) .................................................................... 14

iv

*United States v. Alaniz,*
 69 F.4th 1124 (9th Cir. 2023)........................................................17

*United States v. Class,*
 930 F.3d 460 (D.C. Cir. 2019) ....................................................57

*United States v. Dorosan,*
 350 F. App'x 874 (5th Cir. 2009)...........................................56, 57

*Virginia v. Moore,*
 553 U.S. 164 (2008) ................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.,*
 555 U.S. 7 (2008).......................................................................7, 8

*Wolford v. Lopez,*
 No. 23-cv-265, 2023 WL 5043805
 (D. Haw. Aug. 8, 2023).............................11, 37, 43, 44, 52, 53

*Woods v. Devin,*
 13 Ill. 746 (Ill. 1852).....................................................................42

*Worth v. Harrington,*
 666 F. Supp. 3d 902 (D. Minn. 2023)..............................16, 17, 27

*Zepeda v. INS,*
 753 F.2d 719 (9th Cir. 1983)........................................................58

## Constitutions and Statutes

U.S. CONST.
 amend. III................................................................................9
 amend. IV................................................................................9

MD. CONST. art. 1 §§ 3, 14 (1776) ........................................................23

S.2 (Cal. Stat. 2023)...............................................................................1, 6

CAL. PEN. CODE
 § 26150 ...................................................................................5
 § 26165 ...................................................................................5
 § 26230(a)(7) .........................................................................4
 § 26230(a)(8) .........................................................................5
 § 26230(a)(9) .........................................................................4
 § 26230(a)(10) .......................................................................5
 § 26230(a)(12) .......................................................................4
 § 26230(a)(13) .....................................................................4, 5

§ 26230(a)(15) ............................................................4
§ 26230(a)(16) ............................................................4
§ 26230(a)(17) ............................................................4
§ 26230(a)(19) ............................................................4
§ 26230(a)(20) ............................................................4
§ 26230(a)(26) ............................................................4

## Other Authorities

1 LAWS OF NEW YORK (Charles R. & George Webster 1802) .................21

1 LAWS OF NEW YORK (Websters & Skinner 2d ed. 1807) ....................22

1 RECORDS OF THE COLONY OF RHODE ISLAND
  (John Russell Bartlett ed. 1856) ....................................29

1 STATUTES AT LARGE OF VIRGINIA (Samuel Shepherd ed., 1835) ..........40

1 THE STATUTES AT LARGE OF VIRGINIA (William Walker Hening ed., 1809) .........28

1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1765) .......34

10 PENNSYLVANIA STATUTES AT LARGE (William Stanley Ray ed., 1904) ........21, 22

2 LAWS OF DELAWARE (Samuel and John Adams eds. 1797) ....................21, 22, 23

9 STATUTES AT LARGE OF SOUTH CAROLINA (David J. McCord ed., 1841) .......40, 41

1812 KENTUCKY ACTS ......................................................42

1819 INDIANA ACTS .......................................................42, 43

1821 TENNESSEE ACTS .....................................................43

A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA
  (1803)...............................................................22

A COMPILATION OF THE LAWS OF GEORGIA
  (Augustine Smith Clayton ed. Augusta, Adams & Duyckinck 1812)...........21

A DIGEST OF THE LAWS OF GEORGIA
  (Robert & George Watkins ed., 1800) .........................22, 23, 40, 41

A MANUAL OF THE LAWS OF NORTH CAROLINA (John Haywood ed., 1814) .....22, 23

*A Museum of Art and Culture*, Peabody Essex Museum ......................................55

*About Us*, Charleston Museum ......................................................................55

*About Us*, N.Y. Hist. Soc'y Museum & Libr. ...............................................55

Abridgement of the Public Permanent Laws of Virginia
(Augustine Davis ed., 1796) ...............................................................23

Act for Regulating Ferries of 1791, *in* Acts and Laws of Connecticut
(1791) ................................................................................................40

Act for Regulating Ferries of 1797, ch. 42, *in* Acts and Laws of the
Commonwealth of Massachusetts (1896) ..........................................40

Act of May 28, 1746, *in* 3 Acts & Laws of Massachusetts Bay
(Boston, 1878) .........................................................................35, 36

Acts and Laws of the State of Connecticut
(New London, Timothy Green 1784) ...................................................22

Acts and Resolves of Massachusetts (Boston, Adams & Nourse 1893) .........22

John Adams, Argument for the Defense: 3-4 December 1770,
Nat'l Archives Founders Online .....................................................28

Samuel Adams, *American Independence* (Aug. 1, 1776) ................................46

An Act to Regulate the Ferry Between the City of New York and The
Island of Nassau (1732) ...................................................................40

Archives of Maryland (William Hand Browne ed., Baltimore,
Md. Hist. Soc'y 1885) ......................................................................28

'At The Instance of Benjamin Franklin': A Brief History of The Library
Company of Philadelphia (2015) ...............................................55, 56

Ian Ayres, *Guests with Guns: Public Support for 'No Carry' Defaults on Private
Land*, 48 J.L. Med. & Ethics 183 (2020) ......................................32

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-
Century Boston, New York, and Philadelphia*, 40 Landscape J. 1
(2021) ...............................................................................................53

*Bellevue History*, NYC Health + Hospitals ...............................................52

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church
Autonomy*, 8 Liberty Univ. L. Rev. 653 (2014) ............................28

*Boston Common*, Nat'l Park Serv. ............................................................53

T.H. Breen, *Horses and Gentlemen: The Cultural Significance of Gambling Among the Gentry of Virginia*, 34 WM. & MARY Q. 239 (1977) ...............................51

*California Concealed Carry Reciprocity Overview*, Concealed Coal......................6

Catie Carberry, *What's in a name? The Evolution of the Term 'Gun'*, DUKE CTR. FOR FIREARMS L. (July 24, 2019) ................................36

JANE CARSON, COLONIAL VIRGINIANS AT PLAY (1965)...........................................50

Clayton E. Cramer, *Colonial Firearms Regulation*, 16 J. FIREARMS & PUB. POL'Y 1 (2016)......................................................28

Ed Crews, *Gambling: Apple-Pie American and Older than the Mayflower*, Colonial Williamsburg (Autumn 2008)........................................................50

Charles Christopher Crittenden, *Ships and Shipping in North Carolina, 1763–1789*, *in* 8 THE NORTH CAROLINA HISTORICAL REVIEW (Jan. 1931) ......................41

*Duane Park Origins*, THE HIST. MARKER DATABASE ..............................................54

Donald L. Grant, THE WAY IT WAS IN THE SOUTH: THE BLACK EXPERIENCE IN GEORGIA (2001)...........................................48, 49

*Gun*, WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) .....35

Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms: Young v. Hawaii*, SSRN, https://bit.ly/3QyFZA5 ........................................26

Oliver W. Holmes, *The Stage-Coach Business in the Hudson Valley*, 12 Q. J. OF N.Y. STATE HIST. ASS'N (1931)....................................................39

NICHOLAS J. JOHNSON ET AL., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (3d ed. 2021)...............................................................................40

JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA (Richmond, Thomas W. White 1828)............................................................21

JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY (1835)...........................................................................21

VERNON N. KISLING JR., ZOO AND AQUARIUM HISTORY (2d ed. 2022)......................................................................................55

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 204 (2018) ................................19, 28, 32

LAWS OF NEW HAMPSHIRE (1797)..............................................................................22

LAWS OF NEW JERSEY (Joseph Bloomfield ed., Trenton, James J. Wilson 1811) ......................22, 23

LAWS OF VERMONT (Randolph, Sereno Wright 1808) .......................................21, 23

HENRY CHARLES MOORE, OMNIBUSES AND CABS: THEIR ORIGIN AND HISTORY
    (London, Chapman & Hall, LD. 1902) ...................................................38, 39

*Monday Paper*, AURORA GEN. ADVERTISER (Dec. 2, 1793) ...................................42

*Monday Paper*, THE EUGENE GUARD (May 15, 1893) ...........................................37

Shira Lurie, *Creation: The New York City Liberty Poles*, *in* MONUMENTS OF
    COLONIAL NEW YORK: GEORGE III AND LIBERTY POLES, GOTHAM CTR.
    (Oct. 15, 2020) .......................................................................................46, 47

Office of the Governor of California (@CAgovernor), Press Conference,
    TWITTER [X], https://bit.ly/46qMATf ...........................................................3, 4

*Our History*, THE PEALE ..............................................................................55

BARBARA PEPE, FREEHOLD: A HOMETOWN HISTORY 81 (2003) .......................50, 51

Jay Precht, *Legalized Gambling*, 64 Parishes (last updated Apr. 23, 2019) ............50

PUBLIC LAWS OF SOUTH CAROLINA
    (Philadelphia, R. Aitken & Son 1790)..............................................21, 22, 23

PUBLIC RECORDS OF THE COLONY OF CONNECTICUT
    (Hartford, Brown & Parsons 1850) ................................................................29

*Saturday Paper*, INDEP. GAZETTEER (Aug. 31, 1782)..............................................39

CHRISTINE SISMONDO, AMERICA WALKS INTO A BAR: A SPIRITED HISTORY OF
    TAVERNS, SALOONS, SPEAKEASIES AND GROG SHOPS (2011)........................45

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in
    1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022),
    https://bit.ly/3RRRSmD .......................................................................12, 13

Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the
    Founders: Understanding the Meaning and Purpose of the Second
    Amendment's Right to Keep and Bear Arms*, 2020 PEPP. L. REV. 71
    (2020)..................................................................................................29, 58

*The Earliest New York City Parks*, N.Y. CITY DEP'T OF PARKS & RECREATION......53

Ian E. Philp, THE HISTORY OF THE THAMES WATERMEN (Apr. 29, 1957) ...............38

THE LAWS OF MARYLAND, ch. 25 (1799).............................................................22

THE PUBLIC LAWS OF RHODE ISLAND
    (Providence, Carter & Wilkinson 1798).................................................21, 23

THOMAS JEFFERSON, LEGAL COMMONPLACE BOOK (2019) ...............................29, 58

ix

GEORGE A. THRUPP, THE HISTORY OF COACHES
(London, Kerby & Endean 1877)..................................................39

*Thursday Paper*, ALBANY WEEKLY HERALD (Sept. 28, 1893) ...............................37

*Thursday Paper*, THE PA. GAZETTE (Apr. 30, 1761) ...............................39

Trust for Public Land, *The 150 Largest City Parks*...........................................53, 54

*Tuesday Paper*, AM. DAILY ADVERTISER (Sept. 16, 1794)................................39, 41

*Tuesday Paper*, SOUTH-CAROLINA GAZETTE; AND COUNTRY J. (Nov. 22, 1768) ....39

Ron Vineyard, *Stage Waggons and Coaches*, COLONIAL WILLIAMSBURG FOUND.
(2002)..................................................................................39

Margaret Walls, *Parks & Recreation in the U.S.: Local Park Systems*,
RESOURCES FOR THE FUTURE (June 2009) ......................................53

GEORGE WEBB, THE OFF. AND AUTHORITY OF A JUSTICE OF PEACE
(Williamsburg, William Parks 1736)..............................................41

*Wednesday Paper*, POUGHKEEPSIE J. (Apr. 18, 1787).............................................39

## INTRODUCTION

In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court confirmed that the Second Amendment protects a "general right to publicly carry arms for self-defense." 597 U.S. 1, 31 (2022). Frustrated with that ruling, California enacted Senate Bill 2 ("SB2") in open retaliation. SB2 unconstitutionally limits where law-abiding, licensed Californians may keep and bear arms. Its laundry list of so-called "sensitive" locations includes all manner of ordinary venues that Californians frequent. *See* S.2 (Cal. Stat. 2023). As a result, licensed individuals cannot exercise their constitutional right to bear arms during most daily activities— going to work, hiking in a park, taking public transportation, running errands, eating at a restaurant, entering a hospital, attending sporting events, and more. Far from being "consistent with this Nation's historical tradition of firearm regulation[,]" *Bruen*, 597 U.S. at 17, SB2's sweeping "sensitive place" restrictions are outliers in this Nation's history, and the district court properly enjoined them.

Plaintiffs are law-abiding citizens licensed to carry in California and organizations that have members possessing California carry licenses, including the named individual Plaintiffs. Plaintiffs challenge the provisions of SB2 imposing particularly egregious restrictions on their right to bear arms outside the home. These are SB2's restrictions on carry inside public transportation, places selling alcohol for consumption on the premises, hospitals, parks, gambling establishments, stadiums,

1

public libraries, amusement parks, zoos, museums, and public gatherings. Plaintiffs also challenged SB2's "no-carry default," which makes it unlawful for licensed citizens to carry firearms in businesses open to the public without express consent of the business owner. No representative or relevantly similar analogues from the Founding era exist to support these restrictions, so none are part of this Nation's historical tradition.

On appeal, the State reiterates the flawed arguments rejected below. It asserts—with *zero* historical or precedential support—that "sensitive places" include (1) anywhere where governmental activities or constitutional rights are exercised, (2) anywhere that is crowded, and (3) anywhere where vulnerable people gather. The problem with California's rule is that it encompasses virtually every public place, nullifying *Bruen*'s recognition of "the general right to publicly carry arms for self-defense" and ignoring its instruction that places are not sensitive simply because they are crowded. *Id.* at 31. Worse, the State's theory flatly contradicts this Nation's tradition, dating to the Colonial and Founding eras, of permitting carry in all manner of places where people gathered. By labeling virtually every public place in California a de facto "gun free zone," SB2 defies *Bruen* and effectively "eviscerate[s] the general right to publicly carry arms for self-defense." *Id*. This Court should affirm the preliminary injunction.

2

## JURISDICTIONAL STATEMENT

Plaintiffs agree with California's jurisdictional statement. Ninth Cir. R. 28-2.

## STATEMENT OF THE ISSUE

Whether the district court appropriately granted Plaintiffs' motion for a preliminary injunction.

## ADDENDUM OF STATUTORY SOURCES

An addendum of pertinent statutory sources has been filed with this brief. Ninth Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### I.    SB2's Sensitive Places Restrictions

The Supreme Court recently reiterated that the Second Amendment right to "bear arms" includes the ability to "carry a handgun for self-defense outside the home." *Bruen*, 597 U.S. at 8. California passed SB2 in direct response to that holding. At a press conference announcing SB2, Governor Newsom called *Bruen* a "bad ruling," an "absurdity," and ridiculed the right to carry firearms outside the home. *See* Office of the Governor of California (@CAgovernor), Press Conference, TWITTER [X], https://bit.ly/46qMATf (last accessed Feb. 13, 2024) (called *Bruen* an absurdity at 41:09; used air quotes while discussing "right" to carry outside home at 41:24; called *Bruen* a bad ruling at 1:01:46). Furthering this mockery, SB2 decrees

virtually everywhere a "sensitive place" and prohibits even permit holders from carrying there.

SB2 adds Section 26230 to the California Penal Code. Among other restrictions, it restricts licensed carry in: (a) "any . . . privately owned commercial establishment that is open to the public, unless the operator of the establishment clearly and conspicuously posts a sign" that carry is permitted (the "no-carry default"), CAL. PEN. CODE § 26230(a)(26); (b) buildings and parking lots of "establishment[s] where intoxicating liquor is sold for consumption on the premises[,]" *id.* § 26230(a)(9); (c) buildings and their parking lots "used for gambling or gaming of any kind whatsoever," *id.* § 26230(a)(15); (d) "[a] stadium, arena, or the real property or parking area under the control of a stadium, arena, or a collegiate or professional sporting or eSporting event[,]" *id.* § 26230(a)(16); (e) buildings or parking lots of a public library, *id.* § 26230(a)(17); (f) buildings or parking lots of amusement parks, *id.* § 26230(a)(19); (g) buildings or parking lots of zoos or museums, *id.* § 26230(a)(20); (h) buildings or parking lots of a hospital, medical office, or other place where "medical services are customarily provided[,]" *id.* § 26230(a)(7); (i) "[a] park, athletic area, or athletic facility that is open to the public and a street or sidewalk immediately adjacent to those areas[,]" *id.* § 26230(a)(12); (j) property under the control of the Department of Parks and Recreation or Department of Fish and Wildlife, except those areas designated for

4

hunting, *id.* § 26230(a)(13); (k) a "bus, train, or other form of transportation paid for in whole or in part with public funds, and a building, real property, or parking area under the control of a transportation authority supported in whole or in part with public funds[,]" *id.* § 26230(a)(8); and (l) "[a] public gathering or special event conducted on property open to the public that requires the issuance of a [government] permit[,]" *id.* § 26230(a)(10).

## II.    SB2's Effect on Plaintiffs

SB2's restrictions fall on Californians who have already gone through the onerous state licensing process to obtain a license to carry a concealed weapon (CCW). To obtain a CCW license, California requires individuals to complete a lengthy application, police interview, background check, training course, and shooting proficiency exam. *See id*. §§ 26150, 26165. Individual Plaintiffs are law-abiding citizens licensed to carry in California, as are many members of the Organizational Plaintiffs. SER-4; SER-10; SER-16; SER-22; SER-26. Yet, SB2 strips them of their Second Amendment right to self-defense in public spaces while criminals may roam free.

Notably, California previously *allowed* licensed individuals to carry for self-defense in all but one of the challenged locations pre-*Bruen*. As California admits, it barred carry altogether in only school zones, various buildings owned and operated by the government, and "sterile areas" of public transportation facilities. *See*

5

Opening Br. ("Br.") at 3, Doc. No. 17 (Jan. 19, 2024). And some 121,000 Californians held licenses at that time. *See, e.g.*, *California Concealed Carry Reciprocity Overview*, Concealed Coal. But the challenged locations in SB2 did not somehow become "sensitive" overnight. So what changed? The answer is simple, and California states it. After *Bruen*, Californians can get licensed more easily, and more residents are choosing to do so. Br. 59–60. The legislature acknowledged the same by listing as a motivation behind the bill alleged increases in crime "when more people carry firearms in public places." SB2 ¶ 1(d). But it defies logic and law to decree that virtually every location in the state where individuals have been carrying for years has become "sensitive" overnight.

## SUMMARY OF THE ARGUMENT

The challenged provisions of SB2 are unconstitutional. Plaintiffs' proposed conduct—carrying firearms in public for self-defense—is covered by the plain text of the Second Amendment. California thus bears the burden of supporting each of its restrictions by presenting representative, relevantly similar analogues. Though the State has marshalled a small army of historians, their evidence often *supports* Plaintiffs' arguments. California fails to show that any of its proffered analogues are sufficiently widespread within the relevant time period—the Founding era—or relevantly similar in "how" and "why" they burden the right to self-defense. Indeed, most of the challenged locations existed in some form at the Founding, and Plaintiffs

6

are not aware of any tradition of carry bans there—nor, importantly, has California offered any such tradition. As Plaintiffs will show, the assertion that there is a historical tradition of barring carry in most public places is belied by Founding-era laws sanctioning carry in public gatherings.

California argues that the district court misapplied *Bruen*'s requirements. *See, e.g.*, Br. 8–9, 17–20. It did not. The court below paid careful attention to every analogue California offered and rejected each one. While California accuses the district court of adopting an "improperly narrow frame of reference" by focusing on law-abiding concealed carry permit holders, this is misleading. The district court's statements about licensed individuals in no way drove its analysis. Rather, those statements mirror the Supreme Court's repeated instructions that courts must focus on the law-abiding when assessing carry restrictions. *See, e.g.*, *Bruen*, 597 U.S. at 50 (rejecting laws about bearing arms to terrorize others as unpersuasive in assessing carry bans falling on the law-abiding); *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008) (reasoning that the Second Amendment does not protect arms "not typically possessed by law-abiding citizens for lawful purposes"). After all, criminals cannot be expected to abide by California's sensitive place restrictions.

The district court also correctly balanced the equities. The challenged restrictions cause Plaintiffs irreparable harm by depriving them of their fundamental right to carry in myriad public spaces. And because it is always in the public interest

7

to prevent the violation of a party's constitutional rights, the remaining factors favor injunctive relief. This Court should affirm.

## STANDARD OF REVIEW

Plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm without preliminary relief; (3) the balance of equities favors them; and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Likelihood of success on the merits is "[t]he most important" factor. *Junior Sports Mags., Inc. v. Bonta*, 80 F.4th 1109, 1115 (9th Cir. 2023). If Plaintiffs show that a law is likely unconstitutional, the other three *Winter* factors favor an injunction. *See id.*; *see also Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). This Court reviews the district court's decision to grant injunctive relief for an abuse of discretion and assesses its legal holdings de novo. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022).

## ARGUMENT

## I.    SB2 Violates Plaintiffs' Second Amendment Rights

There is no question that "the Second Amendment guarantees a general right to public carry," meaning Americans are entitled to "bear arms in public for self-defense." *Bruen*, 597 U.S. at 33. Any locational restrictions on this "general right to public carry" must comport with the original meaning of the Second Amendment, as understood by the Founding generation. *Id.* To determine whether a government

8

restriction is constitutional, the first question is whether "the Second Amendment's plain text covers an individual's conduct"; if so, "the Constitution presumptively protects that conduct," the challenged restriction is presumed *un*constitutional, and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. It is the government's burden to "affirmatively prove that its firearms regulation is part of th[at] historical tradition," and the Court is "not obliged to sift the historical materials for evidence." *Id.* at 19, 60. California has failed to meet its burden, and its restrictions were properly enjoined.

### A. The Second Amendment's Plain Text Covers Plaintiffs' Conduct

The plain text of the Second Amendment protects Plaintiffs' proposed conduct—carry in public for self-defense. California makes a textual argument only with respect to carry in businesses open to the public. Br. 51–52.

California's textual argument fails. The Second Amendment's plain text protects carrying firearms regardless of location. This is so because "[n]othing in the Second Amendment's text draws a home/public distinction[,]" *Bruen*, 597 U.S. at 32—or for that matter, any distinction between locations at all. The Second Amendment's textual silence differs from other constitutional amendments that contain locational restrictions. *See* U.S. CONST. amend. III; U.S. CONST. amend. IV. Thus, as a matter of plain text, the Second Amendment has long been understood to

secure for citizens "the right to keep and carry arms wherever they went." *Bruen*, 597 U.S. at 60 (cleaned up). While California argues that the right of self-defense is "most acute" in the home, Br. 52, *Bruen* decisively put to rest the idea that the Second Amendment is so limited, *see* 597 U.S. at 60.

It also follows directly from *Heller* and *Bruen* that the Second Amendment's plain text protects carrying at private businesses open to the public. To "bear" simply means to "carry," which "naturally encompasses public carry" for self-defense. *Heller*, 554 U.S. at 580–82, 584; *Bruen*, 597 U.S. at 28, 32. Because "confrontation can surely take place outside the home"—including in businesses and other private property open to the public—it follows that as a textual matter the right to carry firearms extends to private property open to the public. *Bruen*, 597 U.S. at 33. That *Bruen* and *Heller* identified a few sensitive places as exceptions to this general rule does not mean that the general rule doesn't exist, as California suggests. Br. 52. Moreover, to the extent those exceptions are constitutional, they are because a historical tradition supports banning carry in them, not because of plain text.

The State also claims that Plaintiffs are arguing for carry without consent on private property in violation of the common law and non-binding precedents. *See id.* at 52–53. Not so. The constitutional defect Plaintiffs identify is that SB2 flips the default rule (a presumption of carry in public places)—under SB2, carry is not permitted unless a business owner so states. And yet, every court to have faced such

10

a restriction since *Bruen* has found against a no-carry default, instead finding that carrying firearms for self-defense on private property open to the public falls within the Second Amendment's plain text. *See, e.g.*, *Antonyuk v. Chiumento*, 89 F.4th 271, 383 (2d Cir. 2023) (analyzing a similar no-carry default and holding that carrying a firearm for self-defense on private property open to the public satisfies the plain text analysis); *Koons v. Platkin*, No. 22-cv-7464, 2023 WL 3478604, at *56 (D.N.J. May 16, 2023);[1] *Wolford v. Lopez*, No. 23-cv-265, 2023 WL 5043805, at *27 (D. Haw. Aug. 8, 2023). The law of trespass, specifically the "well-developed concept of implied license," allows individuals to enter property open to the public with a firearm unless the owner "withdraw[s] consent." *Koons*, 2023 WL 3478604, at *58, *61. Just as it would implicate the First Amendment to prohibit customers wearing hijabs or Biden 2024 shirts from entering businesses open to the public without the owner's express consent, it implicates the Second Amendment to do the same for firearms.

California's argument that the no-carry default is not state action is easily dismissed. California is using its sovereign authority to set a no-carry default rule backed by criminal penalties. *Accord id.* at *61 ("The [no-carry default] is thus state

---

[1] The Third Circuit stayed portions of the *Koons* injunction pending appeal without reasoning, but it refused to stay the portion enjoining enforcement of New Jersey's no-carry default. *See* Order, *Koons v. Platkin*, No. 23-1900 (3d Cir. June 20, 2023), Doc. No. 29.

action insofar as the State is construing the sound of silence. While landowners can ratify or depart from that default, it is the State that is presumptively excluding firearms in the first instance."). Laws like California's "do not enforce [a property owner's] authority over [its property]; they impose *governmental* authority, subject only to a [property owner's] veto." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011).

Thus, "the Constitution presumptively protects" Plaintiffs' licensed carry in private businesses open to the public. *Bruen*, 597 U.S. at 17. Accordingly, "the burden falls on [California] to show that [the challenged bans are] consistent with this Nation's historical tradition of firearm regulation." *Id.* at 33–34.

### B. Controlling Methodological Considerations Under *Bruen*

#### 1. The Relevant Historical Period Centers on 1791, not 1868

*Bruen* was explicit that "not all history is created equal." *Id.* at 34; *see also id.* at 36–37 (Sources originating "'75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.'" (quoting *Heller*, 554 U.S. at 614)). This is so because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them[.]" *Heller*, 554 U.S. at 634–35. The people adopted the Second Amendment in 1791, so the public understanding of the right at that time controls. *Bruen*, 597 U.S. at 37; *see also* Mark W. Smith, *Attention Originalists: The Second*

12

*Amendment Was Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD. Consequently, evidence that long pre- or post-dates 1791 is less probative. *See Bruen*, 597 U.S. at 35–37. Indeed, post-Founding history is only relevant to the extent it confirms traditions "already . . . established" at the Founding. *Id.* at 37. Laws from the 20th century are categorically entitled to no weight unless they confirm an earlier historical tradition. *See id.* at 66 n.28; *see also id.* at 36 ("[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." (cleaned up)).

The Second Amendment binds the States and the federal government equally. *Bruen* made clear that the "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* at 37. Likewise in *McDonald v. City of Chicago*, the Court held that "incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." 561 U.S. 742, 765 (2010) (cleaned up). And *Heller* established that, as applied against the Federal Government, the Second Amendment has the same scope today as at the Founding. *See* 554 U.S. at 576–77.

While *Bruen* acknowledged a "scholarly" debate about the weight evidence

13

from around the Fourteenth Amendment's ratification in 1868 might carry in the Second Amendment analysis, there is no such debate in the case law. While the Second Amendment extends to the States via the Fourteenth Amendment, that is true of *every* Bill of Rights provision that has been incorporated against the States. To accept the period surrounding 1868 as "more probative" would be contrary to established precedent incorporating Bill of Rights provisions against the States. *See, e.g.*, *McDonald*, 561 U.S. at 764–65 & nn.12, 13.

For example, *Bruen* relied on two recent incorporation decisions that both looked to the Founding era in analyzing the substance of incorporated rights. *See* 597 U.S. at 37 (citing *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020) (discussing the history in "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791), and *Timbs v. Indiana*, 139 S. Ct. 682, 686–87 (2019) (similar)). The Supreme Court's other precedents are in accord. *See, e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve.").

In short, accepting 1868 as the more probative era effectively discards decades of jurisprudence looking to 1791 when addressing incorporated rights. *See Lara v.*

14

*Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir. 2024) (To "maintain consistency in our interpretation of constitutional provisions, we hold that the Second Amendment should be understood according to its public meaning in 1791."). Thus, when the Second Amendment was incorporated against the states, it carried with it the meaning established in 1791—"when the people adopted" it. *Bruen*, 597 U.S. at 34 (cleaned up). And this makes sense; the Fourteenth Amendment simply changed *whether* the Second Amendment applied to the states, not what the Amendment means. Indeed, there is no more reason to think that applying the Second Amendment to the states in 1868 changed the Amendment's meaning than adding a fifty-first state in 2024—and thus applying the Second Amendment to that state for the first time—would reset the Amendment to a 2024 meaning. There is one Second Amendment, and it will always carry its 1791 meaning, regardless of how far its reach expands.

*Bruen*'s reasoning also underscores that 1791 carries the most weight. After initially rejecting "medieval English regulations," *id.* at 40, *Bruen* turned to sources leading up to the ratification of the Second Amendment, including the 1689 English Bill of Rights. *See id.* at 44–45. After finding these sources somewhat probative of the Amendment's *general* original meaning (*i.e.*, that the right to bear arms is an individual, not a collective, right), the Court focused on "the history of the Colonies and early Republic," plus "the first decade after [the Second Amendment's]

adoption." *Id.* at 46–50. And it found that the challenged law had "no historical basis" because no analogue in that relevant historical period supported it. *Id.* at 50.

Only after canvassing the historical evidence from these periods did the Court discuss sources from the mid-to-late 19th century. *Id.* at 60–70. But the Court found that much of this later evidence "conflict[s] with the Nation's earlier approach to firearm regulation" and is "most unlikely to reflect 'the origins and continuing significance of the Amendment.'" *Id.* at 67. Thus, the Court declined to rely on such laws and regulations. *See id.* at 66–68; *accord Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020) (holding that "more than 30" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions were not grounded in Founding-era practice). *Bruen* thus cautioned lower courts to "guard against giving postenactment history more weight than it can rightly bear." 597 U.S. at 35.

In other words, as the court below correctly held, *see* 1-ER-60–61, *Bruen*'s reasoning mandates that the Founding era is the benchmark against which historical evidence from later time periods must be measured. *Accord Lara*, 91 F.4th at 133–35 (holding that 1791 is the most probative period when evaluating restrictions on carry by 18-to-20-year-olds); *Springer v. Grisham*, No. 1:23-cv-781, 2023 WL 8436312, at *7 (D.N.M. Dec. 5, 2023) (same in sensitive places case); *Worth v.*

16

*Harrington*, 666 F. Supp. 3d 902, 919 (D. Minn. 2023) (same). While California points to *United States v. Alaniz*, to support its contention that Reconstruction-era analogues are sufficient, Br. 32, *Alaniz* expressly declined to "reach the question of the proper era from which to draw the historical analogues," 69 F.4th 1124, 1129 n.2 (9th Cir. 2023).

Even if the Fourteenth Amendment's enactment in 1868 somehow imbued the Bill of Rights with new meaning (it did not), laws enacted in the years *preceding* the Fourteenth Amendment's ratification would be most probative of what that new meaning is. *See, e.g.*, *Ramos*, 140 S. Ct. at 1396 (looking to the "backdrop" of many state constitutions against which the Founders drafted and the states ratified the Sixth Amendment). California cannot engage in "freewheeling reliance on historical practice from the mid-to-late 19th century[,]" because that does not establish the Second Amendment's meaning in *either* 1868 or 1791. *Bruen*, 597 U.S. at 83 (Barrett, J., concurring). Attention to the correct historical period matters because California relies almost exclusively on laws from the late 1800s. These analogues, far removed from the Founding and largely post-dating the Fourteenth Amendment's ratification, are not sufficient to form a historical tradition under *Bruen*.

## 2. A Historical Tradition Requires Proof of Representative, Relevantly Similar Analogues

*Bruen* held that forming a historical tradition requires proof of representative, relevantly similar analogues. Analogues may be representative if they are present in

many states and therefore affect large swaths of the population. *Id*. at 65 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 46 (doubting that "*three* colonial regulations could suffice to show a tradition of public-carry regulation"); *id.* at 67–68 (rejecting regulations applying to only 1% of the population). In other words, laws existing in only a few jurisdictions— historical "outlier[s]"—should be disregarded. *Id.* at 30; *see also Koons*, 2023 WL 3478604, at *68 (finding three Reconstruction-era laws non-representative); *see also id.* at *85 (finding one state law and 25 local ordinances, covering less than 10% of the nation's population, insufficient). California is thus incorrect to argue that the population covered by various restrictions does not matter under *Bruen*. Br. 45. Similarly, laws in the territories are afforded "little weight" because they were "localized," "rarely subject to judicial scrutiny," and "short lived." *Bruen*, 597 U.S. at 67–69.

*Bruen* also held that, where the challenged regulation addresses "a general societal problem" of a type also present during the Founding, any historical analogue must also be "distinctly similar" to the challenged regulation, measured by "how and why [it] burdens a law-abiding citizen's right to armed self-defense." *Id.* at 26. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id.* at 29. This requirement means that Founding-era laws arising in different contexts,

18

and for different reasons, will be inapt comparators. For example, historical poaching and hunting restrictions are generally insufficient to demonstrate the constitutionality of a modern-day restriction on carrying firearms during day-to-day life. Both *how* hunting laws burdened the right to carry firearms for self-defense (when hunting) and *why* they did so (to regulate hunting and reduce the taking of certain animals in certain places during certain seasons) have nothing to do with restricting the right of self-defense in modern-day California. *See, e.g.*, *Koons*, 2023 WL 3478604, at *64–65. Indeed, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen,* 597 U.S. at 26.

### 3. Analogies to Other Sensitive Places

The Supreme Court has not yet had occasion to comprehensively define the scope of the "sensitive places" doctrine. Instead, *Bruen* simply "assume[d]" that carry could be restricted at certain places, in accordance with a yet-untested historical tradition. *Id.* at 30. But even then, the Court anticipated there might be only three such sorts of locations at the Founding "where weapons were altogether prohibited": legislative assemblies, polling places, and courthouses. *Id.*; *see also* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 289–90 (2018) ("Kopel & Greenlee"). Accordingly, this Court may analogize to "*those* historical regulations of 'sensitive places' to

determine that modern regulations prohibiting the carry of firearms in *new and analogous* sensitive places are constitutionally permissible." *Bruen*, 597 U.S. at 30 (emphases added). Moreover, the Court cautioned against overexpansion of sensitive places, lest they become the exception that swallows the rule of "a general right to public carry." *Id.* at 33. Thus, "sensitive places" must remain "few" and "exceptional." *Id.* at 30, 38; *see also Range v. U.S. Att'y Gen.*, 69 F.4th 96, 105 (3d Cir. 2023) ("[H]istorical restrictions on firearms in 'sensitive places' do not empower legislatures to designate any place 'sensitive' and then ban firearms there[.]").

Understanding *why* the three sensitive places *Bruen* identified were historically deemed sensitive requires analysis of what they have in common. All shared a key characteristic at the Founding: they were enclosed, securable locations protected by government-provided comprehensive security, which impacted the public's need for individual weapons. *See, e.g.*, 1-ER-83 ("[H]istorical laws . . . disarm[ed] people in spaces . . . where people stood guard at the entry to the building to ensure that no one was carrying a weapon[.]"); Kopel & Greenlee, *supra*, at 290 ("When armed guards are present, the government takes the responsibility for having armed force at the ready to protect citizens."); Amicus Br. for Angus Kirk McClellan et al., *Wolford v. Lopez*, No. 23-16164 (9th Cir. Nov. 9, 2023), Doc. 48-1. They also are not places of frequent concourse by typical law-abiding citizens, and "uniform lack of firearms is generally a condition of entry."

*Hardaway v. Nigrelli*, 636 F. Supp. 3d 329, 346 (W.D.N.Y. 2022). In other words, based on the relevant historical tradition, comprehensive security *at a minimum* is required for a place to be deemed sensitive.

Founding-era examples of comprehensive security in these locations abound. Start with legislatures. Rhode Island, Delaware, Pennsylvania, South Carolina, New York, Georgia, New Jersey, Virginia, and Vermont all enacted statutes compensating law enforcement to attend and provide security at their legislatures. *See* THE PUBLIC LAWS OF RHODE ISLAND 220, 222 (Providence, Carter & Wilkinson 1798) (providing fees for sheriffs, town sergeants, and constables to attend the general assembly); 2 LAWS OF DELAWARE 1100, 1118 (Samuel and John Adams eds. 1797) (similar); 10 PENNSYLVANIA STATUTES AT LARGE 378 (William Stanley Ray ed., 1904) (referencing sergeant-at-arms and door-keeper for legislature); PUBLIC LAWS OF SOUTH CAROLINA 426, 427 (Philadelphia, R. Aitken & Son 1790) (providing for payment of door-keepers for the legislature); 1 LAWS OF NEW YORK 532 (Charles R. & George Webster 1802) (similar); A COMPILATION OF THE LAWS OF GEORGIA 373 (Augustine Smith Clayton ed. Augusta, Adams & Duyckinck 1812) (similar); JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY 239, 240 (1835) (similar); JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA 77 (Richmond, Thomas W. White 1828) (similar); LAWS OF VERMONT 382, 387 (1808) (similar).

The same was true of courthouses. South Carolina, Virginia, Delaware, New Jersey, New York, and Pennsylvania by statute required law enforcement officials to attend court. *See* PUBLIC LAWS OF SOUTH CAROLINA, *supra*, at 271 ("The Said sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts"); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 69–71 (1803) (similar); 2 LAWS OF DELAWARE, *supra*, at 1088, 1091 (similar); LAWS OF NEW JERSEY 49, 50, 58 (Joseph Bloomfield ed., Trenton, James J. Wilson 1811) (similar); 1 LAWS OF NEW YORK 176 (Websters & Skinner 2d ed. 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons. . . . And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); 10 STATUTES AT LARGE OF PENNSYLVANIA, *supra*, at 57 (similar). Beyond these statutory requirements, the legislative record in other states indicates that law enforcement officials were compensated for attending judicial proceedings. *See* ACTS AND LAWS OF THE STATE OF CONNECTICUT 63–65 (New London, Timothy Green 1784); A DIGEST OF THE LAWS OF GEORGIA, 471, 473–74, 478 (Robert & George Watkins ed., 1800); THE LAWS OF MARYLAND, ch. 25 (1799) (1799 law); ACTS AND RESOLVES OF MASSACHUSETTS 235 (Boston, Adams & Nourse 1893) (1786 law); LAWS OF NEW HAMPSHIRE 112–16 (1797); A MANUAL OF THE LAWS OF

22

NORTH CAROLINA 190–91, 196 (John Haywood ed., 1814); THE PUBLIC LAWS OF RHODE ISLAND, *supra*, at 220; LAWS OF VERMONT 382, 287 (Randolph, Sereno Wright 1808) (1798 law).

Polling places were similarly secured by government-provided security at the Founding, including in Georgia, Virginia, New Jersey, Maryland, Delaware, and South Carolina. *See* A DIGEST OF THE LAWS OF GEORGIA, *supra*, at 611 ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (Augustine Davis ed., 1796) (similar); MD. CONST. art. 1, §§ 3, 14 (1776) (similar); LAWS OF NEW JERSEY, *supra*, at 36 (providing security at polling places); 2 LAWS OF DELAWARE, *supra*, at 984 (similar); THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA, *supra*, at 386–88 (table of fees includes payment to sheriffs for polling-place-related duties).

In other words, the sensitivity of legislative assemblies, polling places, and courthouses is demonstrated through the government's provision of comprehensive security. Comprehensive security today consists of measures such as the guards and metal detectors guarding entry into federal courthouses and the secured area of airports. *See Koons*, 2023 WL 3478604 at *90 ("Airports have many security measures such as Transportation Security Administration (TSA) officers, air

marshals, police officers, metal detectors, and luggage scanners that all check people and their baggage for weapons and dangerous devices, like explosives."). That the government can prohibit firearms in places it comprehensively secures makes sense. The Second Amendment ensures that Americans can be "armed and ready" for "ordinary self-defense needs." *Bruen*, 597 U.S. at 32, 60. But when the government secures a location and protects those in it, the need for ordinary, law-abiding Americans to be ready to defend themselves is lessened.

Founding-era prohibitions on firearms in polling places, courthouses, and legislatures are significantly different than California's broad prohibitions here. State-provided comprehensive security is nowhere to be found at the challenged locations. No Californian walks past numerous armed guards and through metal detectors to eat at a restaurant, picnic in a park, take public transportation, or hike in the wilderness.

### C. California's Fabricated and Overbroad Definitions of "Sensitive Places" Are Wrong and Must be Rejected

California posits its own, faulty definition of what places are sensitive. According to the State, places are sensitive (1) because of the activities taking place there, including the exercise of constitutional rights, (2) because of their physical nature, including that they are crowded, and (3) because vulnerable people congregate there. Br. 13–17. California's framing is far too broad. Worse, the State ignores highly probative Founding era history that expressly permitted, if not

*required*, the bearing of arms in locations encompassed by its exceedingly broad categories.

The first category would sweep in virtually any public place, especially given the wide variety of spaces where individuals may exercise constitutional rights. Any sidewalk or other location where a Californian speaks or petitions would automatically become "sensitive," which plainly cannot be the rule after *Bruen* recognized a "general right to publicly carry arms for self-defense." 597 U.S. at 31. While the state attempts to ground this category in "laws prohibiting firearms in places of election and legislative assembly[,]" Br. 14, there can be no real dispute that constitutional rights are exercised in infinitely more locations than those places. A narrow historical tradition (to the extent one even exists) of prohibiting carry in two specific places where constitutional rights are exercised does not justify a ban *anywhere* such rights are available.

The lynchpin for California's second category about the "physical nature" of a place is whether it is "crowded." *Id*. But *Bruen* expressly stated that this cannot be the determining factor for whether a place is sensitive: "there is no historical basis for New York to effectively declare [a location] a 'sensitive place' simply because it is crowded[.]" 597 U.S. at 31. This *must* be the case, lest every crowded city in America become suddenly "sensitive." Moreover, California has no historical grounding for this category. While it points to a Virginia statute prohibiting going

armed to the terror of the people, Br. 15 (citing 6-ER-1184–1186), *Bruen* rejected such laws as not analogous to modern ones that "impair[] the right of the general population to peaceable public carry," *see* 597 U.S. at 50–51; *see also id.* at 44 (noting that laws prohibiting carry to terrorize others required "evil intent or malice").

California also cites a purported North Carolina law to justify this category. Br. 33 (citing 4-ER-642–645). But this 1792 publication did not purport to be laws actually enacted by North Carolina, but rather a collection of English statutes allegedly in force. Moreover, a historian recently noted that "[l]ater compilers wrote that this work 'was utterly untrustworthy'" and inserted many laws which were never in force. Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms:* Young v. Hawaii at 21, SSRN, https://bit.ly/3QyFZA5 (citation omitted). In any event, the English law the compiler posited was applicable in North Carolina was the Statute of Northampton, which, as *Bruen* made clear, did not prohibit law-abiding citizens from carrying firearms in a peaceable manner. 597 U.S. at 41–42. And to the extent the statute was ever in effect in North Carolina, it ceased to have any force as of January 1838. *See State v. Huntley*, 25 N.C. 418 (N.C. 1843).

The third category—places where "vulnerable people" gather—must also be rejected. California does not offer any historical analogues supporting this category. Br. 16–17. Rather, it cites only *Heller*'s dictum about schools and various non-

26

binding, pre-*Bruen* cases. *See id.* But as its own expert acknowledged below, early firearms regulations on college campus disarmed only students, and they did so not because they were vulnerable but because their schools exercised *in loco parentis* authority over them. *See* 7-ER-1210; *see also Lara*, 91 F.4th at 144–45 (Restrepo, J., dissenting) (evidence "strongly suggest[s] that [authority to bar students from possessing firearms] was not predicated on or justified by the student's presence at a sensitive location, but rather stemmed from the inherent power of the authority standing *in loco parentis*"); *Worth*, 666 F. Supp. 3d at 921–22. Historical exercises of this authority do not support restricting firearm carry by anyone not subject to that sort of authority.[2] It therefore follows that analogies from schools to places where other vulnerable people gather lack any basis. Because California does not have *in loco parentis* authority over law-abiding adults who would carry firearms to protect themselves and others in public, historical restrictions on students carrying in schools carry no weight. This conclusion gains further support from *Bruen*'s approving reference to carry by teachers at Freedmen's schools before the Fourteenth Amendment's ratification. *See* 597 U.S. at 61.

---

[2] Although colleges and universities were historically understood to possess *in loco parentis* authority over their students, they are no longer understood to have that authority. *See, e.g.*, *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 243 (3d Cir. 2010); *Bradshaw v. Rawlings*, 612 F.2d 135, 139 (3d Cir. 1979). These historical laws accordingly would not justify firearm bans on college students today.

More fatally, Colonial- and Founding-era laws combine to form a robust tradition of permitting (and sometimes requiring) firearm carry in public assemblies and religious services—places where vulnerable people undoubtedly gathered. *See* Kopel & Greenlee, *supra*, at 232–34 & n.108, 244; Clayton E. Cramer, *Colonial Firearms Regulation*, 16 J. FIREARMS & PUB. POL'Y 1 (2016); Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014). At one public gathering, now remembered as the Boston Massacre, British soldiers opened fire on a crowd of colonists in 1770. In defending the soldiers at trial, John Adams conceded that, in this country, "every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence[.]" John Adams, Argument for the Defense: 3-4 December 1770, NAT'L ARCHIVES FOUNDERS ONLINE. And some Founding-era gatherings—replete with firearms—presumably included the presence of children and other vulnerable groups. For example, *Heller* cited a 1770 Georgia law requiring men to carry firearms "to places of public worship." 554 U.S. at 601 (cleaned up). Similarly, Maryland in 1642 and Virginia in 1631, 1642, and 1755 required able-bodied men to bear arms while at church. ARCHIVES OF MARYLAND 103 (William Hand Browne ed., Baltimore, Md. Hist. Soc'y 1885); 1 THE STATUTES AT LARGE OF VIRGINIA 174, 263, 534 (William Walker Hening ed., 1809). And Connecticut in 1639,

Massachusetts in 1642, and Rhode Island in 1639 all required individuals to come armed to public meetings. *See* PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 95 (Hartford, Brown & Parsons 1850); 1 RECORDS OF THE COLONY OF RHODE ISLAND 94 (John Russell Bartlett ed. 1856).

While California cites a 15th century English law for the proposition that carry was banned in churches, Br. 21 (citing 4-ER-552–553), it offers no evidence that this analogue crossed the sea to the colonies—and the history just recounted refutes it. Just as in *Bruen*, this Court can reject it as far too early to be probative of the scope of Second Amendment rights, *see* 597 U.S. at 41, especially in light of the contrary Founding-era tradition of permitting carry in churches.

In sum, history reveals that the Founding-era tradition was to *require* the bearing of arms around vulnerable people, such as in churches, because disarming the vulnerable and their caretakers makes them *more defenseless*, not less. *See, e.g.*, Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms*, 2020 PEPP. L. REV. 71, 83 (2020) (explaining that the Founders were influenced by prominent Enlightenment Thinker Cesare Beccaria who wrote that gun control laws "make things worse for the assaulted and better for the assailants") ("*Beccaria's Influence*"); *see also* THOMAS JEFFERSON, LEGAL COMMONPLACE BOOK 521 (2019) (quoting this language).

### D. California Erroneously Claims that Technological and Societal Changes Alter the Analogical Inquiry

California also contends that the "more nuanced" approach appropriate for cases involving "unprecedented societal concerns or dramatic technological changes" applies here. Br. 12–13, 27 (cleaned up). And it suggests that "gun violence" is a pressing societal concern today. *See, e.g.*, *id.* at 6, 58. But *Bruen* explained that there is nothing remotely unprecedented about gun violence. *See* 597 U.S. at 26. Indeed, "gun violence" as a societal "problem" has existed since the Founding. *Heller*, 554 U.S. at 636. Thus, the presence of "gun violence" emphatically is not a new societal concern. And, as just explained, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," any historical analogues must be "distinctly similar." *Bruen*, 597 U.S. at 26; *see also Baird*, 81 F.4th at 1046. In short, here just as in *Bruen*, the "historical analogies . . . are relatively simple to draw" and this Court need not invoke "a more nuanced approach" to which *Bruen* makes a passing reference. 597 U.S. at 27. Society is always changing, but the societal concerns California identifies were known to the Framers. The fact that they addressed them in the exact opposite way undermines California's argument.

Lastly, to the extent social or technological changes have enhanced the ability of criminals to commit violence, that *strengthens*, rather than detracts from, the right of law-abiding citizens to carry common firearms for self-defense. While California

and the *Bruen* dissent "seemingly think[ ] that the ubiquity of guns and our country's high level of gun violence provide reasons for sustaining" restrictions on public carry, they "appear[ ] not to understand that it is these very facts that cause law-abiding citizens to feel the need to carry a gun for self-defense." *Id.* at 73–74 (Alito, J., concurring).

### E. California's Historical Evidence Fails to Establish an Analogous Tradition of Regulation For Each of the Challenged Locations

Applying *Bruen*'s framework faithfully, the State's historical evidence is both too little and too late. And a closer look at its primary sources reveals that "how" and "why" California's analogues burdened Second Amendment rights differ, rendering them unpersuasive.

### 1. The No-Carry Default at Businesses Open to the Public

The State's no-carry default bars carry at *all* private businesses open to the public unless the owner posts a sign stating that carry is allowed. Thus, rather than presuming licensed, law-abiding citizens have Second Amendment rights, SB2 does the opposite. It places the burden on individuals to secure consent from businesses open to the public before those individuals can exercise their right to carry firearms for self-defense. *Accord Antonyuk*, 89 F.4th at 379 (no-carry defaults create a "presumption that carriage on any private property [open to the public] is unlawful"). The no-carry default is unprecedented in this nation's pre-*Bruen* history and sweeping in nature. Indeed, it is designed to broadly thwart the right to carry in

31

public. As scholars who have promoted the idea have explained, "[g]iven the inertial tendency to stick with the status quo, lawmakers should expect that a prohibited-unless-permitted default would radically expand the private spaces where guns could not be carried." Ian Ayres, *Guests with Guns: Public Support for 'No Carry' Defaults on Private Land*, 48 J.L. MED. & ETHICS 183, 184 (2020). The restriction applies to all manner of locations that Plaintiffs frequent during daily activities, including all grocery stores, home and garden stores, convenience stores, drug stores, and more. SER-5–6, SER-10–12; SER-15–18.

Worse, it turns our Nation's traditional regulatory approach on its head. At the Founding, "private property owners" had principal responsibility to "exclude others from their property." *Christian v. Nigrelli*, 642 F. Supp. 3d 393, 407 (W.D.N.Y 2022); *accord* Kopel & Greenlee, *supra*, at 290–91. As such, carry on private property is "generally permitted absent the owner's prohibition." *Christian*, 642 F. Supp. 3d at 407. These principles stem from the law of trespass, specifically "the well-developed concept of implied license." *Koons*, 2023 WL 3478604, at *58. Generally, the public has implied consent to enter property open to the public, "unless such consent is conditioned or subsequently revoked by the property owner." *Id.* And because "[t]he right to armed self-defense follows the individual everywhere he or she lawfully goes" in public, carrying on property open to the public is permitted unless the owner "withdraw[s] consent[.]" *Id.* at *61. Given these principles, California cannot point

to any widespread or relevantly similar Founding-era regulation like the no-carry default. The State's effort to flip a longstanding Second Amendment presumption cannot stand.

The State presents the same deeply flawed analogues that the district court and several other courts have rejected. Br. 54–55. The State cites four pre-Founding era laws from Pennsylvania, New Jersey, and New York, *see id.*, but none are similar in "how" or "why" they burden Second Amendment rights. Start with "why" these laws were enacted. All are hunting restrictions. They reference killing deer, hunting seasons, and preserve the rights of property owners to hunt on their own land. The 1721 Pennsylvania law limited deer hunting to certain months and banned "shoot[ing] at or kill[ing] with a firearm any pigeon, dove, partridge, or other fowl . . . in the gardens, orchards and inclosures adjoining upon and belonging to any of the dwelling houses" within city limits. 4-ER-575–580. The 1722 New Jersey law also limited deer hunting to specific months, forbade the sale of deer skins or venison within those months, and barred hunting on the private property of others without permission. 4-ER-581–585. The 1763 New York law singled out the carrying, shooting, or discharging of "any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, Corn-Field, or other inclosed Land whatsoever, within the City of *New-York*, or the Liberties thereof." 4-ER-608–611. And the 1771 New Jersey law limited deer hunting to specific days,

defined who was "qualified" to "hunt on the waste and unimproved Lands in this Colony[,]" and also made clear its statute would not "restrain the Owners of Parks, or of tame Deer, from killing, hunting or driving their own Deer." 4-ER-612–619.

As Blackstone explained at the time, words in statutes must be read in context. *See* 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 60 (1765) ("[W]ords are always to be understood as having a regard" to the "subject matter."). These Colonial-era laws indisputably regulate hunting. Their titles confirm as much. *See* 4-ER-577 ("An Act to Prevent the Killing of Deer out of Season, and Against Carrying of Guns or Hunting by Persons Not Qualified"); 4-ER-583 ("An Act to prevent Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons Not Qualified"); 4-ER-609 ("An Act to prevent hunting with Fire-Arms in the City of New-York, and the Liberties thereof"). These laws were plainly enacted to regulate the times and places where colonists could hunt. *Accord Antonyuk*, 89 F.4th at 380; *Koons*, 2023 WL 3478604, at *66.

Next consider "how" these laws burdened Second Amendment rights. They prohibit hunting on land owned by others, rather than entering businesses open to the public with firearms. For example, Pennsylvania's 1721 law, New Jersey's 1722 law, and New York's 1763 law all refer to "inclosed Land." 4-ER-578, 4-ER-584, 4-ER-610. New Jersey's 1771 law similarly prohibits people from carrying firearms for hunting on "any [l]ands" not their own, or others' private property. 4-ER-613. As

the Supreme Court of Judicature of New Jersey explained in 1842, "inclosures, or inclosed fields [are] lands fenced in, and thus withdrawn and separated from the wastes or common lands." *State v. Hopping*, 18 N.J.L. 423, 424 (N.J. 1842). Thus, the plain language of these statutes does not broadly prohibit carry in businesses open to the public. Indeed, the laws nowhere reference businesses or indoor enclosures. They are best read as aggravated trespassing laws—they punished people who brought a firearm onto land to hunt where they had no right (or implied consent) to be.

Another indication that the colonial hunting laws did not have the broad reach of California's no-carry default is the lack of any prosecutions for violating the laws based on carrying firearms in businesses and other similar properties open to the public. *See Bruen*, 597 U.S. at 58. This "barren record of enforcement" is an "additional reason to discount [the laws'] relevance." *Id.* at 58 n.25.

These laws (other than New York's) also only refer to long guns, not handguns. This is evident from the fact that they ban only "guns." As Noah Webster explained in 1828, "one species of fire-arms, the pistol, is never called a gun." *Gun*, WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828). Colonial era statutes confirm that pistols were not referred to as "guns." Pennsylvania's 1721 law banned carry of *guns* on enclosed plantations but shooting *with a firearm* any fowl in the open streets of Philadelphia. 4-ER-579. Massachusetts in 1746 similarly

35

banned people from "discharg[ing] any gun *or* pistol, charged with shot or ball, in the town of Boston[.]" *See* Act of May 28, 1746, *in* 3 ACTS & LAWS OF MASSACHUSETTS BAY 306 (Boston, 1878) (emphasis added). As these examples show, the difference between naming "guns" and omitting "pistols" is significant. *See* Catie Carberry, *What's in a name? The Evolution of the Term 'Gun'*, DUKE CTR. FOR FIREARMS L. (July 24, 2019). Thus, the statutes California cites not only were targeted at trespassers, but also banned *only* long guns. This reaffirms that these statutes relate to hunting and imposed a materially different burden on law-abiding citizens.

California also cites three laws enacted decades after the Founding. Br. 55. These laws flunk the relevantly similar analogue test too. The 1866 Texas law prohibited the carrying of firearms onto the "inclosed premises or plantation of any citizen," 5-ER-757, and the 1865 Louisiana law prohibited carry on plantations without consent, 5-ER-746. And both statutes were part of those states' discriminatory Black Codes enacted before they were readmitted to the Union, and thus should be dismissed as unpersuasive. *See, e.g.*, *Kipke v. Moore*, No. 23-cv-1293, 2023 WL 6381503, at *13 (D. Md. Sept. 29, 2023); *Bruen*, 597 U.S. at 58 (concluding that two discriminatory statutes were "surely too slender a reed on which to hang a historical tradition"). These laws were not models of constitutionality for other reasons, too. For example, the 1866 Texas law also

prohibited "loud and vociferous talking [and] swearing" in any public place, which violates the First Amendment. 5-ER-757. Finally, the 1893 Oregon law—doubly unpersuasive because of its great distance from the Founding, *see supra* Part I.B.1— specifically references "trespass[ing] upon any enclosed premises or lands[,]" 6-ER-1050. Moreover, that law was understood at the time to prevent hunters from trespassing. *See, e.g.*, *Thursday Paper* at 3, ALBANY WEEKLY HERALD (Sept. 28, 1893) (discussing the law as a trespass law related to "sportsmen"); *Monday Paper* at 2, THE EUGENE GUARD (May 15, 1893) (calling enactment a "very stringent hunting law").

Laws prohibiting hunting on private land are a world away from SB2, which prohibits everyday carry by law-abiding citizens for self-defense in businesses open to the public without express consent. Even if these laws were relevantly similar in "why" and "how" they burden Second Amendment rights, *Bruen* held that a few restrictions do not suffice to establish a national tradition. *See* 597 U.S. at 46. This Court should follow the lead of the many courts enjoining these provisions as unconstitutional under the Second Amendment. *See, e.g.*, *Antonyuk*, 89 F.4th at 383–87; *Koons*, 2023 WL 3478604, at *68; *Christian*, 642 F. Supp. 3d at 407; *Wolford*, 2023 WL 5043805, at *29; *Siegel v. Platkin*, 653 F. Supp. 3d 136, 156–58 (D.N.J. 2023); *Kipke*, 2023 WL 6381503, at *14.

### 2. Public Transportation

California asserts that carry can be prohibited on public transportation and in each of the categories of locations addressed in the next three subsections (i.e., public gatherings, places selling alcohol for consumption on the premises, and gambling establishments or amusement parks) because of their "physical nature," including that they are "crowded." Br. 15, 26. California also argues that public transportation is sensitive because it serves the vulnerable. Br. 26, 28–29. For the reasons explained *supra* in Part I.C, there is no historical tradition of banning carry simply due to the presence of vulnerable individuals—in fact, tradition cuts the other way.

While the Founding generation may not have imagined today's myriad modes of public transportation, public transportation undoubtedly existed in the Colonial and Founding eras. California's experts agree. *See, e.g.*, 9-ER-1630; 9-ER-1816–1827. Indeed, public transportation can be traced at least to 16th century England, when Henry VIII granted licenses to "watermen" who transported passengers across the Thames River. *See* Ian E. Philp, THE HISTORY OF THE THAMES WATERMEN 46–53 (Apr. 29, 1957). Eventually, hired hackney coaches were introduced in the 17th century. *See* HENRY CHARLES MOORE, OMNIBUSES AND CABS: THEIR ORIGIN AND HISTORY 182 (London, Chapman & Hall, LD. 1902). These coaches were so popular

that they threatened the "monopoly of carrying the public" the watermen previously enjoyed. *Id.*

Both types of public transportation crossed the Atlantic and developed in the colonies. Stagecoach services providing shared transportation to passengers "began in several areas of the colonies in the early eighteenth century." Ron Vineyard, *Stage Waggons and Coaches* at 4, COLONIAL WILLIAMSBURG FOUND. (2002) ("Vineyard"); *see also* GEORGE A. THRUPP, THE HISTORY OF COACHES 124 (London, Kerby & Endean 1877) (noting that hackney coaches were being built in American factories by 1790). Early in the 1700s, stage lines connected cities within New Jersey, Boston to Rhode Island, and New York to Philadelphia. *See id.*; *see also* Oliver W. Holmes, *The Stage-Coach Business in the Hudson Valley*, 12 Q. J. OF N.Y. STATE HIST. ASS'N 231, 231–33 (1931) ("Staging had developed somewhat in the colonies before the Revolution, especially around Boston and Philadelphia[.]"). Some of these stage lines used a combination of boats and coaches as the topography demanded. *See* Vineyard at 4. Stagecoach services offering to carry goods and passengers were even advertised in various states' newspapers during the Founding era to attract patrons. *Thursday Paper* at 4, THE PA. GAZETTE (Apr. 30, 1761); *Tuesday Paper* at 3, SOUTH-CAROLINA GAZETTE; AND COUNTRY J. (Nov. 22, 1768); *Saturday Paper* at 4, INDEP. GAZETTEER (Aug. 31, 1782); *Wednesday Paper* at 4, POUGHKEEPSIE J. (Apr. 18, 1787); *Tuesday Paper* at 4, AM. DAILY ADVERTISER (Sept. 16, 1794). Despite

widespread use of stagecoaches and stage boats, Plaintiffs are aware of no laws banning firearms while individuals traveled on them. Precisely the opposite. "Stagecoach guards and travelers carried blunderbusses, or other short guns, such as traveling or coaching carbines, or (most often) a pair of ordinary pistols." NICHOLAS J. JOHNSON ET AL., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021).

Additionally, the public used various boats to travel during the Founding. Virginia, for example, established numerous ferries to be kept "constantly" running. 1 STATUTES AT LARGE OF VIRGINIA 152 (Samuel Shepherd ed., 1835). So too South Carolina, which established a public ferry as early as 1725. 9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (David J. McCord ed., 1841). Many ferries during the Colonial and Founding eras were also publicly owned and operated. *See* Act for Regulating Ferries of 1797, ch. 42, *in* ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 74–76 (1896) (Massachusetts law providing that local government would operate the ferry and threatening fines for towns that did not provide free ferriage); Act for Regulating Ferries of 1791, *in* ACTS AND LAWS OF CONNECTICUT 405–06 (1791) (Connecticut law licensing towns to operate ferries and allowing them to receive all fares and profits); AN ACT TO REGULATE THE FERRY BETWEEN THE CITY OF NEW YORK AND THE ISLAND OF NASSAU (1732) (New York City owned ferry and was entitled to receive fares); DIGEST OF THE LAWS OF GEORGIA, *supra*, at

40

283–84 (establishing a public ferry in Augusta and directing profits to a public school). Another option for river and canal travel were packet boats. These smaller vessels carried domestic mail, goods, and passengers between cities during the Founding era. *See, e.g.*, *Tuesday Paper* at 4, AM. DAILY ADVERTISER (Sept. 16, 1794). Large vessels capable of weathering the ocean also existed and transported passengers. Contemporary newspaper advertisements show that many transported passengers between ports on the East Coast, and even abroad. *See* Charles Christopher Crittenden, *Ships and Shipping in North Carolina, 1763–1789* at 10–13, *in* 8 THE NORTH CAROLINA HISTORICAL REVIEW (Jan. 1931). Indeed, by 1800, passengers could travel up and down the East Coast in a matter of days. *See id.* at 11–12; *see also* 9-ER-1630 (California's expert Rivas discussing ferries and packet ships); 9-ER-1818 (California's expert Salzmann noting that ferries were "fixtures of colonial American infrastructure[.]").

Again, Plaintiffs are aware of no laws banning firearms on any of these ships, nor has California pointed to any. And at least some of them expressly permitted carry. For example, South Carolina mandated "free" "ferriage" for "all persons under arms in times of alarms and expresses" on its public ferry. 9 STATUTES AT LARGE OF SOUTH CAROLINA, *supra*, at 61; *see also* GEORGE WEBB, THE OFF. AND AUTHORITY OF A JUSTICE OF PEACE 153 (Williamsburg, William Parks 1736) (men attending militia training could ride ferry for free). Similarly, guns were considered "baggage"

41

on public conveyances such as steamboats and were "usually carried." *See Hawkins v. Hoffman*, 6 Hill 586 (N.Y. Sup. Ct. 1844); *Woods v. Devin*, 13 Ill. 746 (Ill. 1852) (baggage on common carriers includes guns carried for protection). And the packet boats traversing the Ohio River were "well armed against any Indian attempt." *Monday Paper* at 3, AURORA GEN. ADVERTISER (Dec. 2, 1793). That people would be armed on these early forms of public transportation makes sense; traveling in the early Republic was dangerous due to the presence of wildlife, hostile Native American tribes, and more. *Cf. Bruen*, 597 U.S. at 78 (Alito, J., concurring) (noting that in 1791 people relied on guns for self-defense because "there were no police departments, and many families lived alone on isolated farms or on the frontiers"); *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012).

The absence of Founding-era restrictions on public conveyances makes sense given that several States *exempted* travelers from then-existing firearms regulations. *See, e.g.*, 1812 KENTUCKY ACTS 100–01, ch. 89, § 1 ("[A]ny person in this commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined...."); 1819 INDIANA ACTS 39, ch. 23, § 1 ("That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor . . . *Provided however*, that this act shall not be so construed

as to affect travelers."); 1821 TENNESSEE. ACTS 15, ch. 13 (exempting "any person that may be on a journey to any place of out his county or state").

As *Bruen* explained, where the government seeks to address a "perceived societal problem," such as violence while traveling, and it "employ[s] a regulation" that the "Founders themselves could have adopted to confront that problem," such as a "flat ban on the possession of handguns," the absence of any such bans from the Founding is proof that a modern ban is "unconstitutional." 597 U.S. at 26–27 (cleaned up). Moreover, *Bruen* also instructs that a modern law is likely unconstitutional "if earlier generations addressed the societal problem, but did so through materially different means." *Id*. at 26. In this case, both are true—the Founders did not bar carry on public transportation, and at times exempted travelers from restrictions.

California raises three primary arguments. First, the State claims that public transportation must receive a "more nuanced approach" because it did not exist until the twentieth century. Br. 27. Plaintiffs' evidence above, which incorporates statements from California's own experts, undermines this argument. Regardless, as described above, societal change does not alter the need to present widespread, relevantly similar analogues. It is not Plaintiffs' burden to identify "historical twin" locations to those challenged here. *Bruen*, 597 U.S. at 30 (emphasis omitted). For "*Bruen* does not direct courts to look at when a historical place became akin to the

43

modern place being regulated. Rather, the focus is on 'determining whether a historical regulation is a proper analogue[.]'" *Wolford*, 2023 WL 5043805, at *21 (cleaned up). Thus, California cannot support its law merely by (incorrectly) arguing that public transportation is a novel creation and may only be judged based on 19th and 20th century analogues. Br. 27. As the Court noted in *Bruen*, lower courts must "guard against giving postenactment history more weight than it can rightly bear" because restrictions far removed from the Founding are less probative. 597 U.S. at 35.

Second, California contends that public transportation is sensitive because it is like schools and government buildings, because all serve vulnerable people and are crowded. Br. 28. For all the reasons explained in Part I.C, there is *zero* historical justification for this conclusion. Indeed, the relevant historical evidence—especially laws requiring arms while traveling and in churches—points the other direction. Third, California argues that a handful of regulations from private railroad companies in the late 19th century suffice to create a historical tradition. Br. 29–30. But the district court rightly rejected such analogues because they were imposed by private actors and were not sufficiently numerous. 1-ER-69.

### 3. Places Selling Alcohol for Consumption on the Premises

California also fails to present a historical tradition of carry bans in places selling alcohol. Taverns, public houses, and restaurants serving alcohol existed at the

Founding, as California's experts admit. 8-ER-1538–1539; 9-ER-1637; *see also* CHRISTINE SISMONDO, AMERICA WALKS INTO A BAR: A SPIRITED HISTORY OF TAVERNS, SALOONS, SPEAKEASIES AND GROG SHOPS 10–20 (2011) ("Sismondo"). Indeed, "[i]n all states" during the Founding era, "tavern legislation was involved and constantly changing." Sismondo, *supra*, at 15. Nevertheless, Plaintiffs are unaware of any Founding era tradition banning mere possession of firearms in these places, even though violence in and around them is nothing new. Moreover, the tradition of public carry in places where people congregated at the Founding, *see supra* Part I.C, eviscerates California's restrictions on carry in these locations.

Nor are California's analogues relevantly similar. Br. 30. The laws restricting the sale of alcohol to militiamen differ in "how" they burden Second Amendment rights because they applied only to a select group of people (militiamen), and often only when they were on duty. 4-ER-594; 4-ER-600; 4-ER-635. So too the late 19th century laws restricting carry by intoxicated people, *e.g.*, 5-ER-761; 5-ER-859, which come too late to be probative of a historical tradition and are also not sufficiently widespread, *see supra* Parts I.B.1–2. These laws are even more inapt comparators considering that Plaintiffs here seek only to carry a firearm where *others* may be drinking alcohol, they do not drink while carrying. SER-5; SER-11; SER-17. California also identifies a smattering of 19th century laws and ordinances from the territories, Br. 31, but *Bruen* explained that later-in-time history can serve

45

only to confirm an already existing historical tradition and expressly stated that territorial restrictions are not proper analogues, *see supra* Part I.B.2.

The State's reliance on *Antonyuk*'s endorsement of territorial and municipal laws is misplaced. First, the Second Circuit's conclusion on this point rests on a flawed reading of *Bruen*. *See supra* Part I.B.2. Second, *Antonyuk* permitted consideration of later laws only when they purportedly *confirmed* what had already been established in earlier eras. 89 F.4th 360–61. California has failed to situate its mid-to-late-19th century analogues in prior history, and in any event they are not sufficiently widespread.

### 4. Public Gatherings Requiring a Permit

This category is sweeping, encompassing everything from political rallies to public markets to neighborhood block parties. Public gatherings of all sorts obviously existed at the Founding. Indeed, the Founders themselves used such gatherings to speak to fellow citizens about American Independence. *See, e.g.*, Samuel Adams, *American Independence* (Aug. 1, 1776) (delivered on the steps of the Philadelphia State House). Similarly, to protest British rule and gather to discuss the issues of the day, colonists frequently erected "Liberty Poles" around which they gathered. *See, e.g.*, Shira Lurie, *Creation: The New York City Liberty Poles*, *in* MONUMENTS OF COLONIAL NEW YORK: GEORGE III AND LIBERTY POLES, GOTHAM CTR. (Oct. 15, 2020) (General Thomas Gage once remarked that "[i]t is now as

46

common here to assemble on all occasions of public concern at the Liberty Pole and Coffee House as for the ancient Romans to repair to the Forum. And orators harangue on all sides[.]").

There is no historical tradition of banning firearms at the numerous public gatherings at the Founding. Indeed, colonists sometimes arrived armed to political gatherings in which they could potentially clash with British soldiers. *See, e.g.*, *id.* (noting battle between colonists and British Army over the destruction of liberty poles); *see also Koons*, 2023 WL 3478604, at *73 ("The colonial generation recognized that citizens attending public gatherings exposed themselves to violent attack . . . To abate that risk, American colonists obligated their citizenry to arm themselves for protection.").

For analogues, California reaches back to the Statute of Northampton from 1300 England. Br. 32–33. But *Bruen* unequivocally held that that "the Statute of Northampton . . . has little bearing on the Second Amendment adopted in 1791." 597 U.S. at 41. First, the Court explained that it is too old to inform the meaning of the Second Amendment at the Founding. *See id*. Second, it noted that its prohibition on going or riding armed centered on large weapons used in combat because handguns were not yet invented. *See id.* at 41–42. Third, the Court reasoned that the Statute of Northampton confirmed and echoed the common law "affray" tradition that individuals cannot go armed with evil intent to terrify others. *See id.* at 40. For all

47

these reasons, the Statute of Northampton and its Virginia (and alleged North Carolina) replica, Br. 33, are not viable analogues to laws prohibiting carry by the law-abiding.

California fails to counter the Colonial and Founding era historical tradition permitting (and sometimes requiring) firearms in various public assemblies, such as meetings and worship services. *See supra*, Part I.C. Instead, it presents a few analogues from the postbellum South that *contradict* that earlier tradition by restricting carry in assemblies. Br. 33–34. These analogues include laws from 1870 Texas and 1874 Missouri barring carry where people are "assembled for educational, literary, or scientific purposes," 5-ER-790–793; 7-ER-1235, laws from 1869 Tennessee and 1870 Georgia barring carrying in all public assemblies, 7-ER-1234–1235, and a handful of late 19th-century territorial restrictions.

Given the political turmoil present in the post-Civil-War South, laws from that era and region are unlikely to be probative of the Amendment's original meaning, much less a "National" tradition. Other features of these laws also render them inapt analogues. The 1874 Missouri law differs in "how" it burdens Second Amendment rights because it only prohibits concealed carry. 5-ER-830.[3] And the 1870 Georgia law was only selectively enforced. *See* DONALD L. GRANT, THE WAY IT WAS IN THE

---

[3] An 1875 law from Missouri prohibited all carry in public assemblies. 5-ER-832–833.

SOUTH: THE BLACK EXPERIENCE IN GEORGIA 122 (2001) (no enforcement against white supremacists who intimidated at polling places); *Bruen*, 597 U.S. at 127 (rejecting reliance on regulations "designed or enforced in a [racially] discriminatory manner"). The 1889 Arizona and 1893 Oklahoma laws are both territorial restrictions, which *Bruen* expressly said are not probative because they were "transitory" and "temporary." 597 U.S. at 67–69. And the 1901 Idaho and 1903 Montana laws are so far removed from the Founding that they cannot possibly form a historical tradition. *See id.* This Court may also summarily dismiss California's local ordinances, because *Bruen* rejected reliance on "localized" restrictions. *Id.* at 67; *see also supra* Part I.B.2.

California is left with judicial opinions from a smattering of states upholding the laws just refuted as proper analogues. Br. 34. One of these decisions, *Hill v. State*, dealt with an indictment for carrying in a courthouse, and explains that the government has a duty to protect people in courthouses, which supports Plaintiffs' theory that sensitive places at the Founding had comprehensive security. 53 Ga. 472, 478 (Ga. 1824). Three other decisions (*Owens, Brooks*, and *Alexander*) are all from post-bellum Texas, a time and location that *Bruen* dismissed as an "outlier[]" considering Texas's unique state constitutional provision regulating firearms. 597 U.S. at 64–65. *State v. Shelby* is similarly unpersuasive because it discussed a conviction for carrying while drunk, rather than general public carry for self-defense.

*See* 2 S.W. 468, 468 (Mo. 1886). California is left with a smattering of other decisions that are plainly insufficient to establish a tradition of regulation, contemporaneous with the Founding, barring carry by law-abiding citizens for self-defense at public gatherings.

### 5. Gambling Establishments, Stadiums, and Amusement Parks

America "has a long history of gambling establishments." *Koons*, 2023 WL 3478604, at *88. "Gambling in the English-speaking world was a powerful economic and social force from the 1660s . . . into the 1800s." Ed Crews, *Gambling: Apple-Pie American and Older than the Mayflower*, COLONIAL WILLIAMSBURG (Autumn 2008). The practice "crossed the Atlantic" into America, and "colonial gaming gained a character all its own[,]" developing into a "pastime." *Id.* Louisiana eventually established a casino in 1753. *See* Jay Precht, *Legalized Gambling*, 64 PARISHES (last updated Apr. 23, 2019). And Founding-era Americans frequently bet on horse races. *See* Crews, *supra*. Indeed, gambling was so pervasive that General Washington had to admonish soldiers in the Continental Army for it. *See id.*

Venues resembling stadiums, arenas, and amusement parks also existed at the Founding. *See, e.g.*, 9-ER-1631 (California expert noting that "cockfighting, horse racing, and all manner of gambling" were "likely to take place" in Philadelphia at the Founding); JANE CARSON, COLONIAL VIRGINIANS AT PLAY 108 (1965) (discussing prevalence of race tracks); BARBARA PEPE, FREEHOLD: A HOMETOWN

50

HISTORY 81 (2003) (similar); T.H. Breen, *Horses and Gentlemen: The Cultural Significance of Gambling Among the Gentry of Virginia*, 34 WM. & MARY Q. 239, 251 (1977) (noting at least a dozen racetracks by 1700).

Despite widespread existence of analogous venues, Plaintiffs are unaware of any carry bans there. *See, e.g.*, *Koons*, 2023 WL 3478604, at *87–89; *Siegel*, 653 F. Supp. 3d at 155–56 (same). California largely regurgitates the same evidence it presented for public gatherings. Br. 37. For the reasons already discussed, these analogues are unpersuasive on their own terms, *see supra* Part I.E.3, and all fly in the face of extensive Colonial and Founding-era evidence supporting carry by law-abiding citizens in places where people gathered, *see supra* Part I.C. The State offers only a few new analogues. But restrictions applicable only in New Orleans in 1816 and 1882 are "localized" and therefore not afforded weight under *Bruen* as part of a historical tradition. 597 U.S. at 67. So too the 1853 New Mexico and 1889 Arizona laws, which are from territories. *See id.*; *see also supra* Part I.B.2.

### 6. Hospitals and Health Care Facilities

California's main argument about the remaining categories of places is that vulnerable people gather there, so carry can be banned. California also gestures to a tradition of carry bans in places with "scientific purposes," Br. 39–40, but it offers largely the same analogues as it does for public gatherings, which are not persuasive for reasons described *supra* in Part I.E.3. For the reasons discussed in Part I.C,

51

whether vulnerable people gather in a place has no bearing on whether it is sensitive. Regardless, this Court can also reject all of California's analogues, most of which originate long after the Founding era and are thus afforded little weight under *Bruen*. *See supra* Part I.B.1.

As the District Court of New Jersey recently held, "hospitals and medical care facilities existed before and after this Nation's founding." *Koons*, 2023 WL 3478604, at *93. For example, Bellevue Hospital opened in New York City in 1736 and is the nation's "oldest operating hospital." *Bellevue History*, NYC HEALTH + HOSPITALS. And Benjamin Franklin helped found the Pennsylvania Hospital in 1751. *See Koons*, 2023 WL 3478604, at *93. Weill Cornell Medical Center opened as New York Hospital in 1791. *See id.* And "[u]p north, Massachusetts opened the Boston Medical Dispensary in 1796—today Tufts Medical Center—and then the Massachusetts General Hospital in 1811." *Id.* California again falls back on the factual argument that carbon copies of today's health care facilities, museums and libraries did not exist at the Founding. Br. 38–39. But that is factually incorrect and regardless it is not Plaintiffs' burden to offer exactly analogous Founding era venues. *See Wolford*,

52

2023 WL 5043805, at *21. Plaintiffs are aware of no historical tradition barring carry in early medical centers, nor has California pointed to any.

### 7. Parks, Areas Controlled by State Wildlife Agencies, and Zoos

Many parks existed before 1800, including the National Mall in Washington, DC, Boston Common in Massachusetts, Battery and Duane parks in New York, and more. *See* Trust for Public Land, *The 150 Largest City Parks* ("*Largest City Parks*"); Margaret Walls, *Parks & Recreation in the U.S.: Local Park Systems*, RESOURCES FOR THE FUTURE (June 2009) ("Walls").

For example, Boston Common, established in 1634, is considered "the nation's first city park." Walls at 1; *accord Koons*, 2023 WL 3478604, at *83. It was far from a gun-free zone. Indeed, the space was commonly used for militia purposes, including training with firearms. *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 3–6 (2021). And "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." *Id.*; *see also Boston Common*, NAT'L PARK SERV. ("[T]he Common was a place for recreation as early as the 1660s."). In New York, City Hall Park began as a "public common" in the 17th century. *The Earliest New York City Parks*, N.Y. CITY DEP'T OF PARKS & RECREATION. And New York's Bowling Green Park was established in 1733. *Id.*

Nearby Duane Park was also the first open space purchased "specifically for use as a public park" in 1797. *Duane Park Origins*, THE HIST. MARKER DATABASE. Other examples abound throughout the colonies and early Republic. *See, e.g.*, *Largest City Parks* at 5–6. And because militia could drill in such parks, guns were permitted. *See, e.g.*, 10-ER-1959 (California's expert). Government-controlled state parks resemble those early parks, but at even greater scale.

California again attempts to say that only 19th century analogues are probative because parks did not emerge in their "modern" form until then. Br. 43. This is false based on the sources just described, and California's experts at times agree that parks existed at the Founding. *See, e.g.*, 7-ER-1413. In any event, California's 19th and 20th century analogues come too late, *see supra* Part I.B.1, and are also mostly localized so are unpersuasive under *Bruen*, *see supra* Part.I.B.2. To the extent California argues that various ordinances swept more broadly than individual parks, Br. 44, the laws' plain text belies that contention. Moreover, many of the State's ordinances are rife with unconstitutional restrictions, so they are not probative of the scope of Second Amendment rights. For example, the Boston ordinance banned solicitation and playing music, 6-ER-945, and the Rochester ordinance banned uttering "loud or indecent language," 6-ER-1120. Such restrictions also suggest that mid-nineteenth century parks were refined, aristocratic spaces, *dissimilar* from modern parks and parks at the Founding, where anyone could gather for any purpose.

54

Finally, the national park restrictions California cites were clearly geared toward hunting. *See, e.g.*, 6-ER-1122.

Finally, zoos. While zoos were not widespread during the Founding era, traveling showmen visited towns with menageries displaying exotic species for public viewing. *See* VERNON N. KISLING JR., ZOO AND AQUARIUM HISTORY 141–44 (2d ed. 2022) (calling such menageries "popular" toward the end of the 18th century and listing the types of animals publicly displayed). California supplies no relevantly similar analogues banning carry around such events, nor are Plaintiffs aware of any. *Accord Koons*, 2023 WL 3478604, at *81. In any event, there is no historical tradition that would justify banning carry at zoos.

### 8. Museums and Libraries

Museums and libraries date back to the colonial era in the United States. For example, the Charleston Museum dates to 1773. *See About Us*, CHARLESTON MUSEUM. The Peabody Essex Museum was founded by sea captains in Salem, Massachusetts in 1799 as the East India Marine Society. *See A Museum of Art and Culture*, PEABODY ESSEX MUSEUM. The Peale Center in Baltimore opened its doors in 1814. *See Our History*, THE PEALE. New York's first museum opened in 1804. *See About Us*, N.Y. HIST. SOC'Y MUSEUM & LIBR. And Benjamin Franklin founded America's first lending library in Philadelphia in 1731. 'AT THE INSTANCE OF

55

BENJAMIN FRANKLIN': A BRIEF HISTORY OF THE LIBRARY COMPANY OF PHILADELPHIA 5 (2015).

California again relies on the same handful of mid-to-late 19th century analogues as it did to support its public gathering provision. Those all come too late to be probative, are not sufficiently widespread, and are not relevantly similar in "how" they burden the right to carry. *See supra* Part E.2. There is simply no historical tradition of banning firearms at these locations. *See Koons*, 2023 WL 3478604 at *86.

### 9. Parking Lots of the Challenged Locations

Because all the places just discussed are not "sensitive," their parking lots are not either. California offers 1776 Delaware and 1870 Louisiana laws prohibiting carry near polling places on election day, Br. 49 (citing 4-ER-623–626, 5-ER-782–787), but these restrictions differ greatly in "how" they burden Second Amendment rights given their limited duration and geographical scope. They only apply to polling places on the day of the election, *see id.*, not to myriad locations on every day of the year. California's precedent, *see id.*, does not engage in *Bruen*'s analogical reasoning and is thus unpersuasive. The cited cases also only involved parking lots around government buildings. For example, *Bonidy v. U.S. Postal Service* and *United States v. Dorosan* (both decided pre-*Bruen*) hold only that guns could be restricted in U.S. Postal Service parking lots. *See* 790 F.3d 1121, 1125 (10th Cir.

56

2015); 350 F. App'x 874, 875 (5th Cir. 2009). Similarly, *United States v. Class* reasoned that guns could be banned in a parking lot 1,000 feet from the U.S. Capitol's entrance, but expressly noted that this area could be easily avoided and thus did not affect carry elsewhere in the District. 930 F.3d 460, 466–67 (D.C. Cir. 2019). These restrictions do not compare to the burden on the right of self-defense imposed by banning carry in parking lots around virtually every place open to the public throughout the state, making them inept analogues. *See Bruen*, 597 U.S. at 29–30.

## II.  The Other Preliminary Injunction Factors Favor Plaintiffs

When a party "has established likelihood of success on the merits of a constitutional claim—particularly one involving a fundamental right—the remaining *Winter* factors favor enjoining the likely unconstitutional law." *Junior Sports Mags.*, 80 F.4th at 1120; *see also Baird*, 81 F.4th at 1042.

Because Plaintiffs show that they are likely to succeed on the merits of their claim that the challenged locations of SB2 violate their constitutional rights, they necessarily suffer ongoing, irreparable injury while it remains in force. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (reasoning that the loss of First Amendment rights "for even minimal periods of time, unquestionably constitutes irreparable injury"). Indeed, "when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Baird*,

81 F.4th at 1042 (cleaned up). Because Plaintiffs are likely to succeed on the merits of their Second Amendment claim, they need not show any further irreparable harm. *See, e.g.*, *id.*

As for the final two factors, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (cleaned up). And the government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983). While California argues that it suffers irreparable injury when one of its laws is enjoined, that cannot be true for *un*constitutional enactments. *See, e.g.*, *id.* And this Court should roundly reject California's attempted reliance on a public interest in preventing gun violence. Br. 58. *Bruen* rejected *all* interest balancing in the Second Amendment context, *see* 597 U.S. at 19, and has repeatedly explained that the Second Amendment is "not the only constitutional right that has controversial public safety implications," *McDonald*, 561 U.S. at 783 (plurality); *Bruen*, 597 U.S. at 17 n.3 (quoting this language). There is therefore no basis to conclude that nebulous public interest concerns factor into the analysis of any injunctive relief factor. Regardless, the most likely public safety consequence of California's carry ban is to, by disarming the law-abiding, make allegedly vulnerable people more vulnerable. *See, e.g.*, Smith, *Beccaria's Influence*, *supra*, at 83; Jefferson, *supra*, at 521. It is hard to imagine any criminal intent on committing heinous crimes being

deterred by the State's ban, but a disarmed parent will be unable to protect his or her children from a violent predator intent on doing them harm. Thus, the remaining equitable factors favor Plaintiffs.

## CONCLUSION

For all these reasons, this Court should affirm the district court's preliminary injunction order.

Dated: February 16, 2024

/s/ David H. Thompson

Bradley A. Benbrook
Stephen M. Duvernay
BENBROOK LAW GROUP, PC
701 University Avenue, Suite 106
Sacramento, CA 95825
(916) 447-4900
brad@benbrooklawgroup.com

David H. Thompson
Peter A. Patterson
Kate Hardiman
COOPER & KIRK, PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com

59

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiffs-Appellees agree that *Wolford v. Lopez*, No. 23-16164 (9th Cir.) is a related case. *Wolford* is an appeal from a preliminary injunction order enjoining certain provisions of Hawaiʻi's Act 52, which prohibits carrying or possessing firearms in specified locations.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 23-4354

I am the attorney or self-represented party.

**This brief contains** | 13,892 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ David H. Thompson | **Date** | 02/16/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, which will transmit the foregoing document via email to all counsel of record.

Dated: February 16, 2024

/s/David H. Thompson
David H. Thompson
*Counsel for Plaintiffs-Appellees*