Nos. 23-4354 and 23-4356

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RENO MAY, ET AL.,

*Plaintiffs-Appellees*,

V.

ROB BONTA, IN HIS OFFICIAL CAPACITY

AS ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellant.*

**On Appeal from the United States District Court
for the Central District of California**
No. 8:23-cv-01696-CJC-ADSx
The Honorable Cormac J. Carney, Judge

**BRIEF OF *AMICI CURIAE* PEACE OFFICERS RESEARCH
ASSOCIATION OF CALIFORNIA, THE CALIFORNIA STATE
SHERIFFS' ASSOCIATION, THE CALIFORNIA ASSOCIATION OF
HIGHWAY PATROLMEN, AND THE CRIME PREVENTION RESEARCH
CENTER IN SUPPORT OF APPELLEES AND AFFIRMANCE OF
PRELIMINARY INJUNCTION**
All Parties have agreed to the filing of this Amicus Curiae brief.
(Fed. R. App. P. 29(a); Circuit Rule 29-2(a))

David E. Mastagni, Bar No. 204244
Email: davidm@mastagni.com
MASTAGNI HOLSTEDT, APC
1912 I Street
Sacramento, CA 95811
Telephone: (916) 446-4692
Fax: (916) 447-4614
*Attorneys for Amici Curiae*

Timothy K. Talbot, Bar No. 173456
Email: ttalbot@RLSlawyers.com
RAINS LUCIA STERN
ST. PHALLE & SILVER, PC
2300 Contra Costa Blvd Ste 500
Pleasant Hill, CA 94523
Telephone: (916) 646-2860
Fax: 925-609-1690
*Attorneys for Amici Curiae*

*(Additional caption appears on next page)*

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARCO ANTONIO CARRALERO, ET AL.,

*Plaintiffs-Appellees*,

V.

ROB BONTA, IN HIS OFFICIAL CAPACITY

AS ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellant.*

**On Appeal from the United States District Court
for the Central District of California**
No. 8:23-cv-01798
The Honorable Cormac J. Carney, Judge

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure, Rule 26.1, *Amici Curiae*

the Peace Officers Research Association of California, the California State

Sheriffs' Association, the California Association of Highway Patrolmen, and the

Crime Prevention Research Center state that each has no parent corporation and no

publicly held corporation has an ownership interest of 10% or more.

Dated: February 23, 2024        s/ David E. Mastagni
                                     David E. Mastagni
                                     *Attorney for Amici Curiae*

# TABLE OF CONTENTS

STATEMENT OF IDENTITY, INTEREST AND AUTHORITY TO FILE ...........1

ARGUMENT ....................................................................................................8

  A.  S.B. 2 Violates the Second and Fourteenth Amendment by Designating Virtually the Entire State as a "Sensitive Place." ...........................................8

  B.  S.B. 2 Does Not Increase Public Safety. .....................................................10

  C.  The Legislature Possesses Less Restrictive and More Effective Means of Reducing Gun Violence................................................................................13

  D.  The Studies Relied Upon by the Legislature in Support of S.B. 2 Are Fatally Flawed.........................................................................................................16

  E.  Studies that Compare Early Adopting States to Late Adopting States Do Not Account for Differences in Permitting Requirements...........................20

  F.  Evidence Shows that Right-to-Carry Laws Do Not Increase Violent Crime… .......................................................................................................26

CONCLUSION................................................................................................33

SIGNATURE ATTESTATION........................................................................34

CERTIFICATE OF COMPLIANCE...............................................................35

CERTIFICATE OF SERVICE .......................................................................36

# TABLE OF AUTHORITIES

**Cases**

*Barnett v. Raoul,*
   2023 WL 3160285  (S.D. Ill. Apr. 28, 2023) .......................................................16

*District of Columbia v. Heller,*
   554 U.S. 570 (2008).........................................................................................5, 9

*Lance Boland, et al. v. Robert Bonta, et al.,*
   No. 8:22-cv-01421-CJC(ADSx) (C.D. Cal. Nov. 15, 2022), ECF No. 57-2 .......14

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022)................................................................................... passim

*People v. McDonnell,*
   32 Cal. App. 694 (1917) ......................................................................................5

*United States v. Torres,*
   911 F.3d 1253 (9th Cir. 2019) .............................................................................5

**Constitution**

Cal. Const. Art. 1, sec. 1 ...........................................................................................5

**Statutes**

Cal. Penal Code §  26202(b) ....................................................................................10

Cal. Penal Code § 12022.5.......................................................................................13

Cal. Penal Code § 12022.53(h) ................................................................................13

Cal. Penal Code § 1385.............................................................................................14

Cal. Penal Code § 25400...........................................................................................5

Cal. Penal Code § 25455...........................................................................................5

Cal. Penal Code § 25900...........................................................................................5

Cal. Penal Code § 26165(a) .....................................................................................10

Cal. Penal Code § 26190(e)(2)...............................................................10

Cal. Penal Code § 26202(a) ...................................................................10

Cal. Penal Code § 26230............................................................................5

Tenn. Code § 39-17-1309 .......................................................................11

**Other Authorities**

2023 California Senate Bill No. 2, 2023-2024 Regular Session (Dec. 5, 2022)... 17, 19

Clément de Chaisemartin and Xavier D'Haultfoueille, *Two-Way Fixed Effects and Differences-in-Differences Estimators with Several Treatments*, National Bureau of Economic Research Working Paper 30564 (Revised July 2023) ...................26

Clément de Chaisemartin and Xavier D'Haultfoueille, *Two-Way Fixed Effects Estimators with Heterogeneous Treatment Effects*, 110 Am. Econ. Rev. 9 (2020) ..................................................................................................... 19, 20, 26

CPRC, *Active shooter attack in Atlanta Hospital occurred in yet another Gun-free Zone* (May 3, 2023), https://crimeresearch.org/2023/05/active-shooter-attack-in-atlanta-hospital-occurred-in-yet-another-gun-free-zone/ ....................................12

CPRC, *annual report on number of concealed handgun permits*, https://crimeresearch.org/tag/annual-report-on-number-of-concealed-handgun-permits (last visited February 21, 2024)..............................................................25

CPRC, *New York Mass Public Shooter Explicitly targeted: "areas where CCW are outlawed or prohibited may be good areas of attack" "areas with strict gun laws are also great places of attack," Another Socialist/Environmentalist* (May 14, 2022), https://crimeresearch.org/2022/05/new-york-mass-public-shooter-explicitly-targeted-areas-where-ccw-are-outlawed-or-prohibited-may-be-good-areas-of-attack-areas-with-strict-gun-laws-are-also-great-places-of-attack/........12

CPRC, *Old National Bank Shooting in Louisville was in yet ANOTHER Gun-free Zone, the murderer was another left-winger* (Apr. 11, 2023), https://crimeresearch.org/2023/04/old-national-bank-shooting-in-louisville-was-in-yet-another-gun-free-zone/...............................................................12

CPRC, *UPDATE: Texas Mall Shooting in yet ANOTHER Gun-free Zone, though not all parts of the mall might have been properly posted* (May 6, 2023),

https://crimeresearch.org/2023/05/texas-mall-shooting-in-yet-another-gun-free-zone/ ................................................................................................................. 12

CPRC, *Updated information on Mass Public Shootings* (Mar. 28, 2023), https://crimeresearch.org/2023/03/updated-information-on-mass-public-shootings/ ....................................................................................................... 13

CPRC, *UPDATED: Mass Public Shootings keep occurring in Gun-Free Zones: 94% of attacks since 1950* (Jun. 15, 2018), https://crimeresearch.org/2018/06/more-misleading-information-from-bloombergs-everytown-for-gun-safety-on-guns-analysis-of-recent-mass-shootings/ ................................................................................................... 12

Federal Bureau of Investigation, *2019 Crime in the United States*, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-4 (last visited February 21, 2024) ...................................... 23

John R. Lott, Jr. and David B. Mustard's *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 Journal of Legal Studies 1 (1997) .............................. 20

John R. Lott, Jr. and Rujun Wang, *Concealed Carry Permit Holders Across the United States: 2020*, SSRN (Sept. 21, 2020), appendix ...................................... 24

John R. Lott, Jr., *Concealed Carry Permit Holders Across the United States: 2022*, SSRN (Nov. 17, 2022) ........................................................................................... 10

John R. Lott, Jr., *Concealed Carry Permit Holders Across the United States*: 2023, SSRN (Nov. 30, 2023) ........................................................................................... 23

John R. Lott, Jr., *More Guns, Less Crime: Understanding Crime and Gun Control Laws* 177-178, 255-277, Ch. 10 (3rd ed. 2010) ................................................... 22

Kirill Borusyak, Xavier Jaravel, and Jann Spiess, *Revisiting Event Study Designs: Robust and Efficient Estimation*, arXiv: 2107.13737 (2023) .............................. 26

Lott (2010), *supra*, at 256-57 ................................................................................... 23

Lydia Fielder and Tony Garcia, *Nashville school shooter purchased 7 guns, planned attack on multiple locations, police say*, WSMV (Mar. 27, 2023), https://www.wsmv.com/2023/03/28/nashville-school-shooter-purchased-7-guns-planned-attack-multiple-locations-police-say/ ..................................................... 11

Michael Siegel, MD, MPH, *State-by-State*, State Firearm Laws, https://statefirearmlaws.org/states/CA/2018 (last visited February 21, 2024).....14

National Research Council, *Firearms and Violence, A Critical Review* 272, 275 (2005).....................................................................................................26

Office of Governor Gavin Newson, *FACT SHEET: California's Gun Safety Policies Save Lives, Provide Model for a Nation Seeking Solutions*, (Jun. 2, 2022) https://www.gov.ca.gov/2022/06/02/fact-sheet-californias-gun-safety-policies-save-lives-provide-model-for-a-nation-seeking-solutions/....................15

Office of the Attorney General, *California Department of Justice Releases 2022 Armed and Prohibited Persons System Program Annual Report* (Apr. 3, 2023), https://oag.ca.gov/news/press-releases/california-department-justice-releases-2022-armed-and-prohibited-persons-system .......................................................14

San Diego County Public Defender Office, *Three Strikes Law*, https://www.sandiegocounty.gov/public_defender/strikes.html (last visited February 21, 2024)................................................................................15

State of California Department of Justice, *Attorney General Bonta Releases First-Ever Data Report by DOJ's Office of Gun Violence Prevention* (Aug. 15, 2023), https://oag.ca.gov/news/press-releases/attorney-general-bonta-releases-first-ever-data-report-doj%E2%80%99s-office-gun-violence ..............................................7

The Disaster Center, *California Crime Rates 1960 – 2019*, https://www.disastercenter.com/crime/cacrime.htm (last visited February 21, 2024) .............................................................................................15

## STATEMENT OF IDENTITY, INTEREST AND AUTHORITY TO
## FILE

Pursuant to Rule 29(c)(2) of the Federal Rules of Appellate Procedure, *Amici Curiae* the Peace Officers Research Association of California ("PORAC"), the California State Sheriffs' Association ("CSSA"), the California Association of Highway Patrolmen ("CAHP"), and the Crime Prevention Research Center ("CPRC") respectfully submit this *Amici Curiae* brief, with the consent of all parties, in support of Plaintiffs/Appellees Reno May, *et al*. No counsel for a party authored this brief in whole or in part, and no party or party's counsel contributed money to fund this brief. No person other than *Amici Curiae* made any monetary contribution to fund the preparation or submission of this brief.

PORAC was incorporated in 1953 as a professional federation of local, state, and federal law enforcement agencies, and represents over 78,000 law enforcement and public safety professionals in California. It is the largest law enforcement organization in California and the largest statewide association in the nation. PORAC's mission is to maintain a leadership role in organizing, empowering, and representing the interests of rank-and-file peace officers. It seeks to identify the needs of the law enforcement community and provide programs to meet those needs through conducting research, providing education and training, and defining and enhancing standards for professionalism. Its goal is to protect the rights and

benefits of officers while creating an environment in which the law enforcement community and the communities they serve can interact and work toward achieving common goals and objectives.

PORAC lobbies to advance or amend laws and regulations. PORAC provides history, context, and perspective unique to law enforcement professionals on key public policy issues. PORAC also files *amicus curiae* briefs in litigation impacting public safety.

CSSA was formed in 1894 for the purpose of giving California sheriffs a single effective voice. CSSA is a nonprofit professional organization that represents each of the 58 California sheriffs. It was formed to share information and resources between the sheriffs and department personnel to allow for the general improvement of law-enforcement throughout the State of California. California sheriffs work diligently with fellow sheriffs through CSSA to improve the profession and elevate the law enforcement system through cooperation with other law enforcement agencies. As the sheriffs are Constitutionally elected officials, the California Legislature regulates their duties and responsibilities.

Founded in 1920, CAHP advocates on behalf of California Highway Patrol officers. Holding a philosophy deeply rooted in collaborative-based initiatives, CAHP often partners with the California Highway Patrol to ensure the CHP's historically high level of trust from the public only enhances with time. CAHP

2

aspires to be an example for all law enforcement officers and to provide the public the highest level of service.

CPRC is a research and education organization dedicated to conducting and publishing academic quality research on the relationship between laws regulating firearms, crime, and public safety. CPRC also strives to advance the scientific understanding of policing to promote enhanced public safety through improved awareness and knowledge.

As a 501(c)(3) nonprofit organization, CPRC does not accept donations from organizations associated with guns, ammunition, or the gun control debate. Academic advisors for CPRC are affiliated with Wharton, University of Chicago, Harvard, University of Michigan, Emory, and other universities. Dr. John R. Lott, Jr., an economist and a world-recognized expert on guns and crime, founded CPRC.  Lott has served as the Senior Advisor for Research and Statistics in the Office of Justice Programs and the Office of Legal Policy in the U.S. Department of Justice. He has held research or teaching positions at various academic institutions, including the University of Chicago, Yale University, the Wharton School of the University of Pennsylvania, Stanford University, UCLA, and Rice University, and was the chief economist at the United States Sentencing Commission from 1988-1989. He holds a Ph.D. in economics from UCLA, and has published over 100 articles in peer-reviewed academic journals and written ten

books, including "More Guns, Less Crime," "The Bias Against Guns," and "Freedomnomics." Among economics, business, and law professors, his research is currently the 14th most downloaded worldwide.

Senate Bill ("S.B.") 2, codified in Penal Code section 26240, renders concealed handgun licenses ("CCW permits") effectively impossible to exercise in California by defining nearly every location as a purported "sensitive place" where carry is prohibited. S.B. 2 fails to adhere to the directive of the U.S. Supreme Court in *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111, 2118-19 (2022), and instead seeks to obviate its efficacy. *Bruen* held "only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2126.

Our highest Court identified "settled" sensitive places, such as "legislative assemblies, polling places, and courthouses," where the carrying of firearms may be prohibited and directed lower courts to "use analogies to those historical regulations" to determine if new sensitive places restrictions are constitutionally permissible. *Id*. at 2133. The California Legislature flagrantly disregarded the Court's warning against "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement" and "effectively declar[ing] the island of Manhattan a 'sensitive place.'" *Id*. at 2134.

Defying these Constitutional commands, S.B. 2 expands California's longstanding sensitive place definition to encompass nearly the entire state, other than some streets, sidewalks, and businesses willing to post a "guns allowed" sign.

In this regard, S.B. 2 does not align with *Amici's* shared values: *Amici* believe in encouraging citizens who wish to exercise their Constitutional right to carry to go through the legal process to acquire CCW permits. Law abiding citizens have a Constitutional right to be armed for self-defense. In California "[t]he right to defend life is one of the inalienable rights guaranteed by the constitution of the state." *People v. McDonnell*, 32 Cal. App. 694, 704 (1917); Cal. Const. Art. 1, sec. 1. Similarly, "[c]entral to the rights guaranteed by the Second Amendment is 'the inherent right of self-defense.'" *United States v. Torres*, 911 F.3d 1253, 1257 (9th Cir. 2019) (citing *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008)).

Many retired peace officers are not subject to Penal Code section 26230, as they are exempt from the prohibition on carrying a concealed and/or loaded firearm on their person or in a vehicle. Cal. Penal Code §§ 25400, 25900. Most honorably retired California peace officers are entitled to CCW permits pursuant to California Penal Code section 25455, but some retired officers must apply for permits in the same manner as private citizens. PORAC opposes the sweeping expansion of prohibited carry places in section 26230 because it impairs citizens'

self-defense rights in public and ensures minimal Constitutional safeguards against legislative repeal of concealed carry exemptions for retired officers, who are often targets of former arrestees. In California, CCW permit holders are some of the most highly vetted, trained, responsible and law-abiding citizens, who do not jeopardize public safety. Dkt. 45, 5:1-3[1]. PORAC President Brian Marvel explained, "[v]iolent criminals don't bother with CCW permits and simply carry illegally." Dkt. 45, 5:3-4. Crime data demonstrates that permissive right to carry laws actually reduce violent crime, especially murder and rape.

Armed citizens do for themselves what law enforcement cannot always be there to do. Dkt. 13-6, ¶ 4. Even in situations where police are present, attackers can either wait for the police to leave the area before attacking, move to another target, or kill the officer since they know that he is the only one who is armed. Concealed carry enhances safety because criminals will not know who is able to stop them. Concealed carry improves officer safety because attackers cannot eliminate their risk of being stopped by simply engaging the officer.

Regrettably, gun-free zones without comprehensive police protection, attract mass shooting incidents by advertising that only the mass murderers will have guns. Dkt. 45, 42:25-43:3; Dkt. 13-6, ¶ 13. Law-abiding citizens will obey the law,

---

[1] All references to Dkt. refer to *May, et al. v. Bonta*, Case No. 23-cv-01696 unless stated otherwise.

while criminals intent on murder will not be deterred by these sensitive places designations. The district court properly credited Marvel's expertise that "someone intent on committing a mass murder will likely choose to do so in a 'sensitive' place, where he or she is less likely to encounter armed victims." Dkt. 45, 43:1-3.

*Amici* agree with the Attorney General's assertion that gun violence is a true epidemic that requires immediate and proactive attention. *See* State of California Department of Justice, *Attorney General Bonta Releases First-Ever Data Report by DOJ's Office of Gun Violence Prevention* (Aug. 15, 2023), https://oag.ca.gov/news/press-releases/attorney-general-bonta-releases-first-ever-data-report-doj%E2%80%99s-office-gun-violence. However, S.B. 2 will likely encourage gun violence by constricting self-defense options and reducing the risks to criminals. The already scarce law enforcement resources and personnel should be focused on suppressing violent crime and prosecuting those who use firearms to commit violent crimes to the fullest extent of the law.

Unfortunately, meaningful efforts to reduce gun violence are being thwarted by some local prosecutors and condoned by the Attorney General through his adoption of dangerous policies that nullify effective firearms laws through blanket non-enforcement. Dkt. 13-6, ¶¶ 17-24. The Attorney General should exercise his duty to prosecute gun enhancements and strikes where local prosecutors prohibit the filing of enhancements in cases where firearms were used in the commission of

serious felonies. *Amici* believe that rather than encumber California's already overburdened peace officers with enforcing feel-good legislation designating most public places as sensitive areas, public officials should actually enforce existing laws which make it a crime for prohibited persons, such as felons, to possess any gun, anywhere.

## ARGUMENT

### A. S.B. 2 Violates the Second and Fourteenth Amendment by Designating Virtually the Entire State as a "Sensitive Place."

The injunction issued by the district court should be affirmed because S.B. 2 violates the Second and Fourteenth Amendments to the U.S. Constitution. The U.S. Supreme Court recently reaffirmed the appropriate standard for Second Amendment analysis in *Bruen*, as follows:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." 142 S. Ct. at 2129-30.

The *Bruen* Court further explained that the government has the burden of proving that the challenged regulation is consistent with the "Nation's historical tradition of firearm regulation" by analogy to historic regulations which imposed a

8

"comparable burden on the right of armed self-defense and [ ] that [the] burden is comparably justified." *Id*. at 2133. In reaffirming the standard set forth in *Heller*, the Court rejected "interest-balancing inquiries" as inappropriate for Second Amendment analysis. *Id*. at 2129.

As to whether there are special locations where the right to bear arms might be restricted without infringing Second Amendment rights, the Court explained that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." *Id.* at 2133. Thus, sensitive places are intended to be the exception to the general rule that firearms must be permitted virtually everywhere.

The Court cautioned that:

> [E]xpanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. . . . [It] would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense. *Id.* at 2134.

For example, "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2118-19. Despite California's longstanding and largely compliant definitions of sensitive places prior to *Bruen,* the California Legislature willfully disregarded this Supreme Court warning and passed a blatantly unconstitutional law extending the prohibited carry

areas to most of the state.

**B. <u>S.B. 2 Does Not Increase Public Safety.</u>**

S.B. 2 makes little sense from a law enforcement perspective. CCW permit holders are remarkably law-abiding. *See* Dkt. 45, 42:1-20. Obtaining a CCW permit in California requires significant effort and expense. Applicants subject themselves to a months-long process that includes considerable fees, a mandatory training course, a thorough background check conducted by the Department of Justice, and sometimes even a psychological exam in certain jurisdictions. Cal. Penal Code §§ 26202(a)-(b), 26165(a), 26190(e)(2); Dkt. 13-6, ¶ 13. People who are willing to go through this process before they exercise their right to carry are simply not likely to break the law; quite the opposite – they demonstrate a tremendous law-abiding predisposition. In the 19 states with comprehensive data, the average permit revocation rate for any reason is about 1/10 of 1%. John R. Lott, Jr., *Concealed Carry Permit Holders Across the United States: 2022*, SSRN (Nov. 17, 2022). Permit holders are convicted of firearms-related violations at 1/12 the rate of police officers, and about 1/240th the rate of the general population. *Id.*

Conversely, criminals intent on committing gun violence are not going to obtain CCW permits or refrain from committing gun crimes in an area simply because it is labeled a "sensitive place." The recent mass murder at the Covenant

10

School in Nashville, Tennessee in March, 2023 illustrates this point. Individuals who violate Tennessee's gun-free school zone laws can receive up to six years in prison. Tenn. Code § 39-17-1309. While that is a severe penalty for law-abiding citizens, an additional six years for a mass murderer is irrelevant. If the murderer had survived, he would be facing multiple life sentences or the death penalty. An extra six years on top of life sentences represents no additional marginal deterrence.

Mass murderers count on gun-free zones to ensure they will be the only armed person present. While the Nashville shooter's manifesto has not been publicly released, Nashville Police Chief John Drake has seen it, and noted, "there was another location that was mentioned, but because of a threat assessment by the suspect of too much security, they decided not to." Lydia Fielder and Tony Garcia, *Nashville school shooter purchased 7 guns, planned attack on multiple locations, police say*, WSMV (Mar. 27, 2023), https://www.wsmv.com/2023/03/28/nashville-school-shooter-purchased-7-guns-planned-attack-multiple-locations-police-say/. Similarly, the Tops Friendly Markets shooter in Buffalo, New York wrote in his manifesto, "Areas where CCW permits are outlawed or prohibited may be good areas of attack." CPRC, *New York Mass Public Shooter Explicitly targeted: "areas where CCW are outlawed or prohibited may be good areas of attack" "areas with strict gun laws are also great places of attack," Another Socialist/Environmentalist*

11

(May 14, 2022), https://crimeresearch.org/2022/05/new-york-mass-public-shooter-explicitly-targeted-areas-where-ccw-are-outlawed-or-prohibited-may-be-good-areas-of-attack-areas-with-strict-gun-laws-are-also-great-places-of-attack/.

Many other attacks in 2023 occurred in places where firearms were banned such as an Old National Bank in Louisville, Kentucky, an outlet mall in Allen, Texas, and a hospital in Atlanta, Georgia. CPRC, *Old National Bank Shooting in Louisville was in yet ANOTHER Gun-free Zone, the murderer was another left-winger* (Apr. 11, 2023), https://crimeresearch.org/2023/04/old-national-bank-shooting-in-louisville-was-in-yet-another-gun-free-zone/; CPRC, *UPDATE: Texas Mall Shooting in yet ANOTHER Gun-free Zone, though not all parts of the mall might have been properly posted* (May 6, 2023), https://crimeresearch.org/2023/05/texas-mall-shooting-in-yet-another-gun-free-zone/; CPRC, *Active shooter attack in Atlanta Hospital occurred in yet another Gun-free Zone* (May 3, 2023), https://crimeresearch.org/2023/05/active-shooter-attack-in-atlanta-hospital-occurred-in-yet-another-gun-free-zone/. In fact, 94% of mass public shootings occur in places where civilians are banned from having guns. CPRC, *UPDATED: Mass Public Shootings keep occurring in Gun-Free Zones: 94% of attacks since 1950* (Jun. 15, 2018), https://crimeresearch.org/2018/06/more-misleading-information-from-bloombergs-everytown-for-gun-safety-on-guns-analysis-of-recent-mass-shootings/; CPRC,

12

*Updated information on Mass Public Shootings* (Mar. 28, 2023),

https://crimeresearch.org/2023/03/updated-information-on-mass-public-shootings/.

In sum, by designating almost the entire state as a sensitive place, S.B. 2 does nothing to reduce crime. It merely ensures that those intent on committing a violent offense can do so without fear of encountering armed civilians.

C. **The Legislature Possesses Less Restrictive and More Effective Means of Reducing Gun Violence.**

The California Legislature has a myriad of options to reduce gun violence without insisting on symbolic carry restrictions foreclosed by *Bruen*. *Amici* are dedicated to advocating for public safety, victims' rights, and a fair criminal justice system. The S.B. 2 provisions at issue do not advance these interests.

If California sincerely desired to reduce gun violence and promote public safety, the Legislature could enact laws and fund enforcement to keep guns out of the hands of prohibited persons and to impose meaningful consequences when guns are used in violent crime. Instead, it targets Californian's self-defense rights while reducing or eliminating sentencing enhancements for committing gun crimes.

For example, in 2017, California enacted S.B. 620 which amended California Penal Code sections 12022.5 and 12022.53(h) to eliminate the prohibition on striking allegations or findings relating to gun enhancements and

13

expand the grounds to strike or dismiss gun enhancements at the time of sentencing. In 2021, S.B. 81 amended Penal Code section 1385 to further expand the grounds to dismiss firearm enhancements.

To improve safety regarding firearms, the State should ensure the Department of Justice has the necessary resources and directives to remove firearms from the approximately 24,000 individuals on the list of prohibited persons in possession of a firearm. *Lance Boland, et al. v. Robert Bonta, et al.*, No. 8:22-cv-01421-CJC(ADSx) (C.D. Cal. Nov. 15, 2022), ECF No. 57-2, ¶ 16; Office of the Attorney General, *California Department of Justice Releases 2022 Armed and Prohibited Persons System Program Annual Report* (Apr. 3, 2023), https://oag.ca.gov/news/press-releases/california-department-justice-releases-2022-armed-and-prohibited-persons-system. As over one hundred (100) gun laws exist in California, the State could mandate that District Attorneys fully enforce gun violations and the Attorney General should intervene when prosecutors refuse to do so. Michael Siegel, MD, MPH, *State-by-State*, State Firearm Laws, https://statefirearmlaws.org/states/CA/2018 (last visited February 21, 2024). Imposing consequences for gun violence is effective deterrence.

The Governor's claim that California's 1990 assault weapon ban reduced firearm mortality by 55% from 1993 to 2017 is inaccurate. Office of Governor Gavin Newson, *FACT SHEET: California's Gun Safety Policies Save Lives,*

14

*Provide Model for a Nation Seeking Solutions*, (Jun. 2, 2022)

https://www.gov.ca.gov/2022/06/02/fact-sheet-californias-gun-safety-policies-

save-lives-provide-model-for-a-nation-seeking-solutions/. California's murder rate

actually rose immediately after the 1990 ban and peaked in 1993 at 13.1 per

100,000 people, compared to 10.9 in 1989. The Disaster Center, *California Crime*

*Rates 1960 – 2019*, https://www.disastercenter.com/crime/cacrime.htm (last visited

February 21, 2024). The murder rate fell by 10% in 1994, not 1990, and continued

to fall by 53% by 2000 because California's tough three-strikes law increased the

risks and consequences for engaging in gun violence beginning on March 7, 1994.

San Diego County Public Defender Office, *Three Strikes Law*,

https://www.sandiegocounty.gov/public_defender/strikes.html (last visited

February 21, 2024).

Currently, so called "progressive prosecutors" in large urban counties, such

as Los Angeles, Alameda, and Contra Costa, have adopted policies and directives

effectively prohibiting enforcement of the Three Strikes law and Penal Code

section 12022.53. Dkt. 13-6, ¶ 17. These laws dramatically reduced gun violence in

California by removing some of the most dangerous criminals from our

communities and imposing meaningful sentences.

Non-enforcement of prohibited possession laws imperils the public and

officers on the streets. Sadly, on June 14, 2022, two El Monte peace officers were

murdered by a gang member who should have been in prison after being arrested for unlawful possession of a firearm. Dkt. 13-6, ¶ 22. Due to the Los Angeles District Attorney's failure to enforce prohibited persons laws, these two officers were murdered. At least one court has echoed the public safety concerns raised by *Amici*:

> There is a wide array of civil and criminal laws that permit the commitment and prosecution of those who use or may use firearms to commit crimes. Law enforcement and prosecutors should take their obligations to enforce these laws seriously. Families and the public at large should report concerning behavior. Judges should exercise their prudent judgment in committing individuals that pose a threat to the public and imposing sentences that punish, not just lightly inconvenience, those guilty of firearm-related crimes. *Barnett v. Raoul*, 2023 WL 3160285, at *12 (S.D. Ill. Apr. 28, 2023).

It is critical to the safety of the public that we keep guns out of the hands of prohibited persons and disincentivize the unlawful use of firearms through both enforcement and criminal enhancements. The provisions of S.B. 2 challenged in this appeal do not further these common-sense goals.

**D. The Studies Relied Upon by the Legislature in Support of S.B. 2 Are Fatally Flawed.**

The studies cited by the California Legislature in support of S.B. 2 are infected with bias. The Legislature cites three kinds of studies of the effects of right-to-carry (RTC) laws, which have objective requirements to obtain a permit (passing a criminal background check, age, and sometimes requiring training):

cross-section, synthetic control, and panel data two-way fixed-effects models. The first two categories have serious flaws, and the third can be misused, creating biases in all the cited studies.

The cited Everytown-ACLED study relies on cross-section data. 2023 California Senate Bill No. 2, 2023-2024 Regular Session (Dec. 5, 2022). An obvious bias plagues such cross-section studies. Suppose a study finds that State X has no RTC law and low crime while State Y has an RTC law and high crime. The conclusion is that RTC laws are bad. However, many reasons exist why States X and Y may differ in their laws and the amount of crime. For example, Texas and Alaska have RTC laws, while New York and Hawaii do not. Cross-section studies attempt to control these states' differences by including variables like income, poverty rate, unemployment, police, incarceration, etc. However, there are many other factors that vary across states for which cross-section studies cannot control, including certain characteristics of states that are constant over the sample period, such as climate, history, tradition, attitudes toward crime, other laws, etc. Because these constant characteristics are unobservable, they are omitted by cross-section studies. Statistical Literature refers to this problem as "unobserved heterogeneity." As a result, cross-section studies are plagued by omitted variable bias.

Two of the studies cited by the Legislature use synthetic control models: Donohue et al. (2019) and Gius (2019). *Id.* Synthetic control models were

developed as a second-best approach when data is extremely limited because there is only one experiment to observe. These limitations don't exist with RTC laws, where 42 states enacted such laws.

The synthetic control methodology does not control for changes in laws, police activity, prison population, income, unemployment, poverty, etc., in the post-law period. This weakness invalidates both studies that employ the synthetic control method.

These concerns have led to the widespread adoption of panel data models with repeated observations on states for several years using the so-called "fixed effects" model. Different crime rates cannot be attributed to a particular law by simply comparing states such as California and Idaho. If California adopts a gun control law, it is necessary to compare crime rates in the two states both before and after adoption of the law. Fixed-geographic effects allow estimates to measure the pre-existing differences in state crime rates.

Similarly, crime rates often go up and down nationally, which requires recognition of the timing particular states adopted a law in relation to national crime rate changes. The correct question is whether the crime rates changed in those states that adopted the law relative to those states that did not adopt a similar law. Fixed-year effects account for the average drop from one year to another so that the state-level changes can be meaningfully compared to the national change.

18

The gold standard for panel data policy analyses is the two-way fixed-effects ("TWFE") model. The TWFE model includes fixed effects for states to solve the unobserved heterogeneity problem and fixed effects for years to control for federal laws and other factors that could affect all states in a given year. Most of the research cited by the California Legislature employs the TWFE model: Crifasi et al. (2019), Donohue et al. (2019), Donohue (2017), Doucette et al. (2019), Firdel (2021), Gius (2019), Knopov et al. (2019), Sabbath et al. (2020), Siegel et al. (2019), and Zimmerman (2013). *Id.*

Yet these particular TWFE models have a potential problem because researchers calculated the effect of RTC laws by finding the difference in the crime rate for states recently adopting RTC laws compared to states that already had RTC laws. The correct comparison is between recently adopting states and states that have not adopted the policy. Overlooking this issue causes seriously biased estimates of the effect of the policy. *See* Clément de Chaisemartin and Xavier D'Haultfoueille, *Two-Way Fixed Effects Estimators with Heterogeneous Treatment Effects*, 110 Am. Econ. Rev. 9 (2020).

One obvious way this bias can arise is from truncation of the sample. By 1989, ten states (AL, IN, ME, ND, NH, FL, GA, VT, WA, and WV) had adopted RTC laws. If a study uses all 50 states, but begins in 1990 for example, the authors are necessarily making comparisons to ten states that already had these laws.

Nearly all the panel data studies cited by the California Legislature begin in 1990 or later (Donohue, Doucette, Fridel, Gius, Knopov, Sabbath, and Zimmerman). Even the Donohue et al. 2017 study, which uses a sample from 1977-2014, makes comparisons to four states that already had these laws (AL, NH, VT, and WA). TWFE studies that compare changes in crime rates for states that already have the laws to states that only recently adopted the laws can produce biased results. *See id.*

## E. Studies that Compare Early Adopting States to Late Adopting States Do Not Account for Differences in Permitting Requirements.

The majority of studies using regression analysis found RTC laws reduce violent crime. Since the publication of John R. Lott, Jr. and David B. Mustard's *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 Journal of Legal Studies 1 (1997), 52 academic studies on the empirical effect of RTC laws on violent crime have been conducted. Twenty-five studies found these laws reduce violent crime, while only 12 found they increased violent crime. The remaining 15 studies found no significant effect. Thus, 40 out of 52 studies found that the right to carry did not increase violent crime. Considering only peer reviewed studies, 22 found RTC laws reduce crime, while 9 found the contrary. Therefore, the overwhelming majority of social science evidence supports the deterrence hypothesis.

Moreover, the studies that found RTC laws increase violent crime were all

published after 2010. As explained below, this discrepancy between the recent and older studies is attributable to the bias that results from comparing early adopting states to later adopting states.

The date a state adopted RTC laws is closely related to permissiveness of the permitting requirements and the number of permits issued. The early adopting states generally imposed the fewest restrictions on obtaining a permit. States that more recently adopted RTC laws often did so reluctantly. When forced to recognize a disfavored right, the government often conjures restrictions to limit that right.

Regulations governing the issuance of CCW permits during 2005, the mid-period examined, provides a useful comparison. As shown in Tables 1 and 2, the late-adopting states imposed much more restrictive regulations—higher fees, longer training requirements, more location restrictions, and slightly higher age restrictions. This holds true in both 2005 and 2021. Within a single state, permitting rules generally became more permissive over time. Thus, early-adopting states continue to make it easier for people to get a permit, resulting in further increases to the number of permits issued.

Illinois and Washington, DC are extreme examples of this point. Illinois started issuing permits in 2014, only because it was forced to do so as a result of litigation. Illinois requires a permit fee of $150 for a five-year permit and 16 hours

21

of training. The fees for 16-hour training classes typically total $250 to $300. Washington, DC was also forced to start issuing permits in 2008 as a result of a court decision, charging $110 for a two-year permit (the equivalent of $275 on a five-year basis) and also 16 hours of training.

As shown in Tables 1 and 2, the longer it took states to adopt RTC laws, the more restrictive their permitting rules. In Table 1, the pre-1977 RTC states have permit fees that are just one-fourth the average yearly fee for states that adopted after 2000, and their training requirements are just 7% as long. While fees and training requirements have declined considerably between 2005 and 2021, the pattern remains the same in 2021, with later-adopting states enacting higher fees and longer training requirements (Table 2).

The more costly it is to obtain a permit, the less likely people are to obtain one and the smaller the growth in the number of permits over time. Hence, relatively few people in the later-adopting states obtain permits, and those states have relatively smaller drops in violent crime rates. John R. Lott, Jr., *More Guns, Less Crime: Understanding Crime and Gun Control Laws* 177-178, 255-277, Ch. 10 (3rd ed. 2010).

For example, consider two neighboring states: Illinois and Indiana. Given that the total cost of obtaining a permit is over $400 in Illinois and is free in Indiana, it is not surprising that in 2023, Illinois had 4.9% of the population

22

holding permits while Indiana had 23%. John R. Lott, Jr., *Concealed Carry Permit Holders Across the United States*: 2023, SSRN (Nov. 30, 2023). Correspondingly, Indiana had a lower violent crime rate than Illinois (373.5 vs 414.4 per 100,000) and a lower murder rate (6.2 vs 7.1 per 100,000). Federal Bureau of Investigation, *2019 Crime in the United States*, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-4 (last visited February 21, 2024).

Accordingly, studies examining this later period are comparing these late-adopting states to the states that already had very liberal RTC laws. These studies assume that any state that adopts a RTC law is having a relatively large increase in the percent of the population that is carrying a concealed handgun, but that is not the case. These studies fail to account for the number of permits issued in each state; only Lott's 2010 study accounted for that fact.

Table 1: Criteria for permits based on the Right-to-Carry laws during 2005

| Year law adopted | Average permit fee per year | Average training hours | Average qualifying age |
|---|---|---|---|
| Before 1977 | $5.81 | 0.63 | 19.13 |
| 1980s | $11.21 | 2.83 | 20.00 |
| 1990s | $15.13 | 6.12 | 20.59 |
| 2000s | $22.09 | 9.50 | 20.88 |

*See* Lott (2010), *supra*, at 256-57.

Table 2: Criteria for permits based on the Right-to-Carry laws during 2021

| Year law adopted | Average permit fee per year | Average training hours | Average qualifying age |
|---|---|---|---|
| Before 1977 | $3.89 | 0.00 | 18.43 |
| 1980s | $9.82 | 1.50 | 20.40 |
| 1990s | $5.31 | 2.56 | 20.44 |
| 2000s | $13.61 | 6.00 | 20.38 |

*See* John R. Lott, Jr. and Rujun Wang, *Concealed Carry Permit Holders Across the United States: 2020*, SSRN (Sept. 21, 2020), appendix.

The difficulty in acquiring a permit to carry concealed weapons is reflected in the rate of growth of permits, which is slower in late-adopting states.

Table 3: The change in the percent of the adult population with Right-to-Carry permits

|  | Percentage point change in permits from 1999 to 2015 | Percentage point change in permits from 2007 to 2015 | Percentage point change in permits from 1999 to 2017 | Percentage point change in permits from 2007 to 2017 | Percentage point change in permits from 1999 to 2019 | Percentage point change in permits from 2007 to 2019 |
|---|---|---|---|---|---|---|
| States that adopted right-to-carry laws after 1999 | 3.1% (8) | 3.1% (11) | 3.9% (8) | 4.3% (11) | 4.3% (8) | 4.8% (11) |
| All other states | 4.2% (19) | 3.7% (35) | 5.3% (19) | 5.0% (35) | 6.0% (19) | 5.8% (35) |

*See* CPRC, *annual report on number of concealed handgun permits*,

https://crimeresearch.org/tag/annual-report-on-number-of-concealed-handgun-permits (last visited February 21, 2024).

To summarize, recent studies are flawed because they confine themselves to more recent data. These later empirical analyses of the impact of RTC laws all assume that these laws are the same across states and over time. However, the effects of these laws are not the same because states differ widely as to the number of permits issued. Failing to take these differences into account results in biased measurement of the laws' impact on crime. Therefore, the findings of recent panel

data studies showing that RTC laws increase crime should be discounted more than earlier studies, which overwhelmingly find the opposite.

The California Legislature noted that the "existing data and methods" were likely insufficient to resolve the question and that "new analytical approaches and data" were needed "if further headway is to be made." National Research Council, *Firearms and Violence, A Critical Review* 272, 275 (2005). The following section applies such new analytical approaches and data to determine the effect of RTC laws on violent crime.

## F. <u>Evidence Shows that Right-to-Carry Laws Do Not Increase Violent Crime.</u>

There are two new procedures for avoiding the problems of unobserved heterogeneity and omitted variables in the post-law period. The first is by de Chaisemartin and D'Hautfoueille ((2020), *supra*, and *Two-Way Fixed Effects and Differences-in-Differences Estimators with Several Treatments*, National Bureau of Economic Research Working Paper 30564 (Revised July 2023) ("CH Model")) and the second is by Kirill Borusyak, Xavier Jaravel, and Jann Spiess, *Revisiting Event Study Designs: Robust and Efficient Estimation*, arXiv: 2107.13737 (2023) ("BJS Model").

The below analysis by CPRC applies these methods to the FBI violent index crimes: murder, rape, robbery, and assault. We study each of these crimes

separately and combine the results into an overall measure of the effect of RTC laws by weighting the effect of each law by the corresponding victim costs (including hospital costs, lost wages, pain and suffering, and value of lost life) to get an overall benefit-cost ratio. The effect of the RTC law can be shown graphically with the average change year-by-year before and after the year of adoption, over a 15-year period since implementation. This captures the long-run effects of the policy.[2]

The event study graphs include four years before the implementation of the RTC law. That is a reality test for the analysis because the laws weren't in effect before the implementation date. The effect of the pre-implementation "placebo" law should be insignificantly different from zero, even though the actual estimate could be randomly positive or negative.

All the event studies have insignificant placebo law estimates. The vertical lines are 95% confidence intervals. If they include a point on the zero line, the corresponding effect estimate is not significantly different from zero using the standard 5% significance level. National Research Council, Reference Manual on Scientific Evidence, 251 (3rd ed., 2011).

---

[2] The FBI changed the definition of rape in 2013 and published data using the legacy definition until 2016. As a result, our sample is truncated by two years, which is enough to cause the BJS Model to fail. Therefore, we cut back the event study for rape to 10 years in the post-law period for both models.

Figure 1: Murder



The average effect of the RTC law on the murder rate in the post-law period is significantly negative in the BJS Model. The average effect on murder in the post-law period for the CH Model is not significantly different from zero, but it is negative in 11 out of the 15 years.

Figure 2: Rape



The average effect of the RTC law on the rape rate is negative in the BJS Model, but not significantly different from zero. The average effect of the RTC law on the rape rate in the CH Model is uniformly negative and highly significantly different from zero (p<.01).

Figure 3: Robbery



The average effect of the RTC law on the robbery rate is slightly negative and not significantly different from zero in the BJS Model and slightly positive and not significantly different from zero in the CH Model.

Figure 4: Assault



The effect of the RTC law on the assault rate is slightly negative but insignificantly different from zero in the BJS Model. In the CH Model, where the effect is slightly positive, it is insignificantly different from zero.

The overall effect of the RTC law on violent crime depends on the model used to evaluate the policy and the different effects on the four components: murder, rape, robbery, and assault. The effect is summarized in Table 5. Per-incident victim costs are taken from U.S. Department of Justice reports published in 1993 and 1996, and are updated to 2022 prices using the Consumer Price Index.

31

Table 5: Victim costs for the RTC law (Using the BJS Model and the CH Model).

| Violent Crime | Average Effect | | Victim Costs | Weight | Weighted Average Victim Costs | |
|---|---|---|---|---|---|---|
| | BJS | CH | | | BJS | CH |
| Murder | **-5.88** | -6.47 | $5,556,600 | 0.962 | -5.66 | -6.23 |
| Rape | -1.13 | **-9.92** | $163,485 | 0.028 | -0.03 | -0.28 |
| Robbery | -4.41 | 1.88 | $35,910 | 0.006 | -0.03 | 0.01 |
| Assault | -0.89 | 1.09 | $17,672 | 0.003 | 0.00 | 0.00 |
| Sum | -12.31 | -13.42 | $5,773,667 | 1.000 | -5.72 | -6.49 |

Note: Average effects and average victim costs are percentages; bold indicates significant at the five percent level.

Focusing on the significant results and assuming the insignificant effects are zero, then the RTC law is associated with a 5.88 percent decline in the murder rate and/or a 9.92 percent decline in rape, depending on which model is used. The BJS results consistently indicate that RTC laws reduce all types of violent crimes. The CH Model estimates are mixed, with the average effect on rape and murder showing benefits while the effects on robbery and assault are essentially zero. The net result for the CH Model is a reduction in victim costs of 6.49 percent.

The BJS Model finds a significant decline in murder and an insignificant decline in rape while the CH Model finds a significant decline in rape and an insignificant decline in murder. No matter which model is used, the RTC laws are associated with declines in victim costs. Overall, the data show that RTC laws reduce violent crime, especially murder and rape. There is no statistically significant evidence of an increase in any type of violent crime.

## CONCLUSION

This appeal presents this Court with an opportunity to affirm the supremacy of the U.S. Constitution and U.S. Supreme Court's application of citizen's Constitutional rights over the State Legislature's overt disobedience of *Bruen*. *Bruen* unequivocally disapproved of overbroad sensitive places definitions, such as those enacted by S.B. 2, which are incompatible with our historical traditions of regulating the carrying of firearms. Nonsensically, this law targets law-abiding citizens as a symbolic rebuke of *Bruen*, while the Attorney General and elected officials openly condone the wide-spread non-enforcement of effective firearm laws that enhance penalties for gun violence.

These S.B. 2 restrictions will increase violent crime, as criminals will continue to violate California's carry laws knowing they create defenseless targets and that they are not likely to face significant consequences for doing so, particularly in Los Angeles and the Bay Area.

S.B. 2 will divert scarce law enforcement resources towards enforcing this ineffective law. It strips CCW permit holders of their constitutional right to carry a handgun for self-defense and erodes public safety. Thus, *Amici* respectfully request this Court affirm the trial court's granting of Plaintiffs' motion for a preliminary injunction.

Dated: February 23, 2024                     **MASTAGNI HOLSTEDT, APC**

                                         s/ David E. Mastagni

David E. Mastagni, CASBN # 204244
1912 I Street
Sacramento, CA 95811
davidm@mastagni.com
*Attorneys for Amici Curiae*

 

**RAINS LUCIA STERN
ST. PHALLE & SILVER, PC**

                                         s/ Timothy K. Talbot

Timothy K. Talbot, CASBN # 173456
2300 Contra Costa Blvd Ste 500
Pleasant Hill, CA 94523
ttalbot@RLSlawyers.com
*Attorneys for Amici Curiae*

## SIGNATURE ATTESTATION

I hereby attest that I have obtained the authorization from signatories to this e-filed document and have been authorized to indicate their consent by a conformed signature (s/) within this e-filed document.

                                  By:   s/ David E. Mastagni
                                       David E. Mastagni
                                       *Attorney for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I am counsel for *Amici* curiae. The brief contains 6,477 words, excluding the items exempt by Federal Rule of Appellate Procedure 32(f). The brief's size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6). I certify that this brief is an amicus brief and complies with the 6,500 word limit of the Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i).

Dated: February 23, 2024                        __s/ David E. Mastagni__

                                             David E. Mastagni
                                             *Attorney for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2024, I electronically filed the forgoing document with the Clerk of the Court by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: February 23, 2024        s/ David E. Mastagni
                                  David E. Mastagni
                                  *Attorney for Amici Curiae*