Nos. 23-4354 and 23-4356

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

—————————

MARCO ANTONIO CARRALERO, ET AL.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellant*.

—————————

## On Appeal from the United States District Court
## for the Central District of California
No. 8:23-cv-01798-CJC-ADSx
The Honorable Cormac J. Carney, Judge

—————————

## APPELLANT'S REPLY BRIEF

—————————

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
R. MATTHEW WISE
MARK R. BECKINGTON
*Supervising Deputy Attorneys General*

ROBERT L. MEYERHOFF
TODD GRABARSKY
JANE REILLEY
LISA PLANK
CAROLYN DOWNS
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
(213) 269-6177
Robert.Meyerhoff@doj.ca.gov
*Attorneys for Rob Bonta as Attorney
General of the State of California*

March 8, 2024

(*Additional caption appears on next page*)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

—————————————

RENO MAY, ET AL.,
*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF CALIFORNIA,
*Defendant-Appellant*.

—————————————

## On Appeal from the United States District Court
## for the Central District of California
No. 8:23-cv-01696-CJC-ADSx
The Honorable Cormac J. Carney, Judge

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................... 1

Argument ....................................................................................................... 3

I.    Plaintiffs' Proposed Second Amendment Framework Suffers from
Several Pervasive Analytical Errors .................................................. 3

    A.    Plaintiffs' Proposed Rule that Sensitive Places Must Have
Government-Provided Security Is Inconsistent with *Bruen* and
History ..................................................................................... 3

    B.    Plaintiffs Erroneously Attempt to Read Out Schools and
Government Buildings from *Bruen*'s Plain Language ......................... 6

    C.    Plaintiffs Ignore the Supreme Court's Specific Guidance for
Determining the Constitutionality of Sensitive Place
Restrictions ............................................................................. 10

    D.    This Court Can Consider a Broader Historical Record than the
One Advanced by Plaintiffs ....................................................... 12

II.    Each of the Challenged Provisions of SB 2 Is Constitutional ................. 15

    A.    Places of Worship Without the Operator's Consent ......................... 15

    B.    Financial Institutions ................................................................ 16

    C.    Public Transit ......................................................................... 18

    D.    Places Where Liquor Is Sold for Consumption on Site ..................... 20

    E.    Permitted Gatherings and Special Events ..................................... 21

    F.    Casinos, Stadiums, and Amusement Parks ................................... 22

    G.    Health Care Facilities ............................................................... 25

    H.    Playgrounds and Youth Centers .................................................. 26

    I.    Parks and Athletic Facilities ...................................................... 27

    J.    Public Libraries, Zoos, and Museums .......................................... 28

    K.    Parking Lots ........................................................................... 30

    L.    Private Commercial Property Without the Owner's Consent ............. 31

III.    The Other Preliminary Injunction Factors Favor Reversal .................... 35

i

## TABLE OF CONTENTS
### (continued)

**Page**

Conclusion ................................................................................................36

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*
526 U.S. 40 (1999) ................................................................33

*Baird v. Bonta*
81 F.4th 1036 (9th Cir. 2023) ..............................................13

*Belgau v. Inslee*
975 F.3d 940 (9th Cir. 2020) ...............................................33

*Bonidy v. U.S. Postal Serv.*
790 F.3d 1121 (10th Cir. 2015) ..............................................8

*Burson v. Freeman*
504 U.S. 191 (1992) ................................................................4

*D.C. v. Heller*
554 U.S. 570 (2008) .......................................................*passim*

*Goldstein v. Hochul*
2023 WL 4236164 (S.D.N.Y. June 28, 2023) ...............3, 11

*Jones v. Bonta*
2023 WL 8530834 (S.D. Cal. Dec. 8, 2023) ......................19

*Kipke v. Moore*
2023 WL 6381503 (D. Md. Sept. 29, 2023) ............18, 24, 26

*Koons v. Platkin*
2023 WL 3478604 (D.N.J. May 16, 2023) ....................28, 36

*Lara v. Comm'r Pennsylvania State Police*
91 F.4th 122 (3d Cir. 2024) ...................................................9

*Minnesota Voters All. v. Mansky*
585 U.S. 1 (2018) ..................................................................12

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*
618 F. Supp. 3d 901 (N.D. Cal. 2022) ................................................. 35

*United States v. Alaniz*
69 F.4th 1124 (9th Cir. 2023) ............................................................. 13

*United States v. Allam*
2023 WL 5846534 (E.D. Tex. June 14, 2023) ........................... 9, 11, 31

*United States v. Ayala*
2024 WL 132624 (M.D. Fla. Jan. 12, 2024) ......................................... 8

*United States v. Baird*
85 F.3d 450 (9th Cir. 1996) ............................................................. 8, 13

*United States v. Class*
930 F.3d 460 (D.C. Cir. 2019) ............................................................. 4

*United States v. Dorosan*
350 F. App'x 874 (5th Cir. 2009) ......................................................... 8

*United States v. Endsley*
2023 WL 6476389 (D. Alaska Oct. 5, 2023) ....................................... 10

*United States v. Hinkson*
585 F.3d 1247 (9th Cir. 2009) (en banc) ............................................ 15

*United States v. Metcalf*
2024 WL 358154 (D. Mont. Jan. 31, 2024) .......................... 7, 9, 10, 31

*United States v. Roberts*
2024 WL 50889 (D. Alaska Jan. 4, 2024) ............................................. 8

*United States v. Robertson*
2023 WL 131051 (D. Md. Jan. 9, 2023) ............................................... 8

*United States v. Tallion*
2022 WL 17619254 (D. Md. Dec. 13, 2022) ...................................... 11

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Vidal*
    504 F.3d 1072 (9th Cir. 2007) ...............................................34

*United States v. Vongxay*
    594 F.3d 1111 (9th Cir. 2010) .................................................8

*United States v. Walter*
    2023 WL 3020321 (D.V.I. Apr. 20, 2023) ...................................7, 31

*We the Patriots, Inc. v. Grisham*
    2023 WL 6622042 (D.N.M. Oct. 11, 2023) ...........................*passim*

*Wolford v. Lopez*
    2023 WL 5043805 (D. Haw. Aug. 8, 2023) ...................................35

STATUTES

Cal. Pen. Code § 25605(b) ........................................................32

CONSTITUTIONAL PROVISIONS

Second Amendment ...........................................................*passim*

OTHER AUTHORITIES

Jacob D. Charles, *On Sordid Sources in Second Amendment
Litigation*, 76 Stan. L. Rev. Online 30 (2023).................................14

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13
Charleston L. Rev. 205 (2018) ...............................................13

T.H. Breen, *Horses and Gentlemen: The Cultural Significance of
Gambling Among the Gentry of Virginia*, 34 Wm. & Mary Q. 239
(1977) ......................................................................23

## INTRODUCTION

In attempting to defend the district court's sweeping injunction, Plaintiffs advance arguments that are both inconsistent with *Bruen* and historically inaccurate. If adopted here, Plaintiffs' theories would eviscerate the Supreme Court's express guidance that firearms may be restricted in sensitive places and that courts may analogize to historical laws in upholding modern sensitive place restrictions.

First, Plaintiffs contend that sensitive places are limited to locations with government-provided security and strict entry and exit requirements. But many unquestionably sensitive places lacked such features historically, and many still do not have them today. Adopting Plaintiffs' flawed test would turn *Bruen* on its head by defining the scope of the Second Amendment based on security and building access as it exists today rather than the nation's history and tradition.

Second, Plaintiffs erroneously insist that the Supreme Court has not recognized schools and government buildings as sensitive places. Neither the district court in this case nor the vast majority of other courts have adopted Plaintiffs' position, and courts have rightly rejected entreaties to dismiss *Heller*, *McDonald*, and *Bruen*'s discussion of sensitive places restrictions as mere dicta. Because Plaintiffs are wrong about schools and government buildings, they are

wrong to discount the Attorney General's analogizing of those locations to the sensitive places at issue here.

Third, Plaintiffs ignore *Bruen*'s specific application of its history and tradition test to sensitive places. *Bruen* shows that (a) the State need not identify a multitude of historical analogues to justify a modern regulation, and (b) the absence of dispute as to the constitutionality of a sensitive places restriction is indicative of its validity.

Fourth, Plaintiffs improperly divine from *Bruen*'s case-specific historical analysis per se rules limiting what types of historical laws courts can consider as relevant analogues. Thus, Plaintiffs err in urging this Court to disregard or give little weight to (a) territorial laws, local ordinances, and laws from the Reconstruction South, or (b) laws from time periods other than the Founding era. Nothing in *Bruen* supports this narrow view of the relevant historical record. Moreover, the Ninth Circuit has twice noted the relevance of 19th century laws in conducting the *Bruen* analysis, and other courts considering sensitive places challenges have relied on a wide range of historical laws.

Beyond these overarching analytical errors, Plaintiffs have failed to rebut the Attorney General's showing that each of the challenged provisions is constitutional. This Court should reject Plaintiffs' unfounded arguments and reverse the preliminary injunction in its entirety.

2

# ARGUMENT

## I. PLAINTIFFS' PROPOSED SECOND AMENDMENT FRAMEWORK SUFFERS FROM SEVERAL PERVASIVE ANALYTICAL ERRORS

### A. Plaintiffs' Proposed Rule that Sensitive Places Must Have Government-Provided Security Is Inconsistent with *Bruen* and History

Plaintiffs wrongly contend that the government cannot restrict firearms in a location unless (a) that location historically had government-provided security and strict access restrictions, or (b) that location currently has such restrictions. The former argument is not consistent with *Bruen* and the historical record, and the latter argument would flip the *Bruen* analysis on its head.

As a historical matter, Plaintiffs are incorrect that the sensitive places already identified by the Supreme Court all had security provided by the government and strict entry and exit controls. *See, e.g.*, *Carralero* AB at 20. As to legislative assemblies, for example, "throughout the mid-nineteenth century, U.S. Congresspeople were regularly armed when they attended Congress." *Goldstein v. Hochul*, 2023 WL 4236164, at *11 (S.D.N.Y. June 28, 2023). Although Plaintiffs cite historical laws which purport to have compensated law enforcement "to attend and provide security at . . . legislatures" (*Carralero* AB at 21), they provide no evidence that those individuals carried firearms or that armed security was posted at all access points. *Cf.* Congressional Institute, Protecting the Congress: A Look at Capitol Hill Security (Sept. 27, 2013), available at http://tinyurl.com/mr4d8u68

(until 1827, the U.S. Capitol was guarded by a lone watchman who "was essentially a groundskeeper").[1]

Similarly, polling places were not historically places of comprehensive security and strict controls. Rather, "[a]pproaching the polling place" in the 19th century "was akin to entering an open auction place," where "[s]ham battles were frequently engaged in to keep away elderly and timid voters." *Burson v. Freeman*, 504 U.S. 191, 202 (1992); *see* Rebecca M. Baibak, *Taking Selfies with Uncle Sam*, 85 U. Cin. L. Rev. 1207, 1209 (2018) (19th-century voters often passed their ballots through a "voting window," and "the street or square outside the voting window frequently became a kind of alcoholic festival in which . . . insults quickly escalated into physical conflicts") (internal quotation marks omitted).

Plaintiffs make no claim that schools and government buildings historically had comprehensive security and strict controls—and no such historical evidence exists. Even today, many such buildings do not have heightened security, let alone armed guards at every access point. *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) ("Many 'schools' and 'government buildings'—the paradigmatic

---

[1] Moreover, none of the laws Plaintiffs cite to purportedly show that "comprehensive security" at legislatures, polling places, and legislatures "abound[ed]" (*Carralero* AB at 21) are properly before this Court because none are in the appellate record. *See Bruen*, 597 U.S. at 25 n.6, 38 (analysis properly focuses on historical record compiled by the parties).

'sensitive places' identified in [*Heller*]—are open to the public, without any form of special security or screening.").

Even more inconsistent with *Bruen* is Plaintiffs' suggestion that modern governments can define the contours of the Second Amendment solely through their decision to provide armed security or access controls at a certain type of location. *See May* AB at 12; *Carralero* AB at 24. Under *Bruen*, the relevant inquiry is the "text, history, and tradition test that *Heller* and *McDonald*" first announced. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 71 (Kavanaugh, J., concurring). That test turns on the "historical understanding" of the Second Amendment, *id*. at 26, not the policy choices of governments today.[2] Plaintiffs' discussion of airports and schools reveals the deeply flawed nature of their argument.

According to Plaintiffs, the sensitivity of a location is "demonstrated through the government's provision of comprehensive security," *Carralero* AB at 23, and thus they suggest that airports are sensitive places because modern governments provide "[c]omprehensive security . . . measures such as the guards and metal detectors guarding entry into . . . the secured area of airports." *Id*. But airports are

---

[2] For similar reasons, Plaintiffs are wrong to imply that the challenged locations are not sensitive places simply because California did not impose location-based restrictions in those places in the years leading up to SB 2. *See May* AB at 4; *Carralero* AB at 5–6.

not sensitive places merely because modern governments have installed metal detectors staffed by TSA agents. Instead, California's restrictions in airports—which Plaintiffs have not challenged—comport with the *Bruen* standard. Similarly, California's restrictions on carrying firearms in schools are constitutional not because the State currently requires "fencing and other security features in the construction of public schools," *May* AB at 39 (citing Cal. Code Regs., tit. 5, § 14030(f)(6) (2024)), but because such restrictions fit with the nation's history and tradition, as recognized in *Bruen*. 597 U.S. at 30.

Stripped of historically inaccurate conclusions about polling places, legislative assemblies, and courthouses, and the flatly erroneous suggestion that modern governments can designate any place as sensitive as long as they provide sufficient security, Plaintiffs articulate no coherent explanation for the locations the Supreme Court has already recognized as sensitive places.

## B. Plaintiffs Erroneously Attempt to Read Out Schools and Government Buildings from *Bruen*'s Plain Language

Plaintiffs wrongly contend that the Supreme Court has only recognized polling places, legislative assemblies, and courthouses as sensitive places. *Carralero* AB at 19–20; *May* AB at 18–19. *Heller* clearly stated that its reading of the Second Amendment did not "cast doubt" on "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The Supreme Court "repeat[ed]

those assurances" in *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010), and *Bruen* approvingly cited "*Heller*'s discussion of longstanding laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 597 U.S. at 30 (internal quotation marks omitted); *id.* at 81 (Kavanaugh, J., concurring) ("[N]othing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.") (quoting *Heller* and *McDonald*). Plaintiffs nonetheless argue that *Heller*'s discussion of schools was "dictum," *Carralero* AB at 26, ignore the Supreme Court's references to government buildings as a general category, *see id.* at 19–20, and question the Attorney General's "insistence that schools are an established sensitive place," *May* AB at 18.

As an initial matter, no court post-*Bruen* has adopted the argument that schools are not a recognized sensitive place. In fact, courts have held the opposite. *See, e.g.*, *United States v. Metcalf*, 2024 WL 358154, at *6 (D. Mont. Jan. 31, 2024) ("Supreme Court jurisprudence allows governments to prohibit the possession of firearms in school buildings."); *United States v. Walter*, 2023 WL 3020321, at *6 (D.V.I. Apr. 20, 2023) (similar).

This makes sense, because *Heller*, *McDonald*, and *Bruen*'s pronouncements regarding schools and government buildings are not dicta. Statements from courts which "limit the scope of their holdings," and thus "are integral to those holdings,"

are not dicta because dictum is a statement that is "'unnecessary to the decision in the case and therefore not precedential.'" *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010). The Supreme Court's pronouncement on longstanding laws (including those which restrict firearms in sensitive places) serves as a limitation on the scope of its holdings in *Heller*, *McDonald*, and *Bruen*. *See United States v. Roberts*, 2024 WL 50889, at *10 (D. Alaska Jan. 4, 2024) (rejecting effort to "cast[] *Bruen*'s references to law-abiding persons as dicta" because those limited "the scope of its holding") (cleaned up).[3]

Even if the Supreme Court's thrice-repeated assurance about sensitive places was not binding, it would still be entitled to great weight from this Court, which typically "treat[s] Supreme Court dicta with due deference." *United States v. Baird*, 85 F.3d 450, 453 (9th Cir. 1996). Here, the Supreme Court's pronouncements on sensitive places are recent and repeated, and thus should be followed. *See United States v. Robertson*, 2023 WL 131051, at *4 (D. Md. Jan. 9, 2023) ("[T]he 'sensitive places' passage in *Bruen* is more than unreasoned dicta,"

---

[3] *United States v. Ayala*, 2024 WL 132624 (M.D. Fla. Jan. 12, 2024) adopts the same flawed reasoning the Plaintiffs urge here, i.e., that the Supreme Court's statement regarding the constitutionality of restrictions on the carriage of firearms was "pure dicta." *Id.* at *11. In any event, *Ayala* is an outlier. *See Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1128 (10th Cir. 2015) (post office is a sensitive place); *United States v. Dorosan*, 350 F. App'x 874, 875 (5th Cir. 2009) (same).

because "the language pertaining to sensitive places appears as reinforcement for a longstanding principle.").

Plaintiffs nonetheless argue that restrictions on carrying firearms in schools are "a historical foundation [for SB 2] that does not exist." *May* AB at 19 n. 8. But even setting aside the unequivocal language of *Bruen*, that is not the case—"in our Nation's history there is a tradition of prohibiting firearms in schools." *United States v. Allam*, 2023 WL 5846534, at *22 (E.D. Tex. June 14, 2023).

Additionally, Plaintiffs claim restrictions on firearms in schools are based on the notion that schools traditionally "exercised *in loco parentis* authority" over students, *Carralero* AB at 27, and on that basis challenge SB 2's restrictions on firearms in other places where children congregate. But they cite to the dissenting opinion in *Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122, 144–145 (3d Cir. 2024), for that proposition, *Carralero* AB at 27. That dissenting opinion did not address the numerous 19th century laws restricting the carriage of firearms by anyone, not just students. *See, e.g.*, 5-ER-754–758; 5-ER-829–830; 5-ER-917–918; 6-ER-965–967. Plaintiffs also cite *United States v. Metcalf* for the proposition that "early university firearm bans . . . [only] 'banned certain persons—students—from carrying weapons'" (*May* AB at 19), ignoring that the same opinion found there were "several late 19th-century state restrictions on carrying weapons *inside* school

9

buildings . . . support[ing] restricting possession of guns in school buildings." 2024 WL 358154, at *8.

*Heller*, *McDonald*, and *Bruen* leave no doubt that schools and government buildings are sensitive places where carrying firearms can be restricted. Those locations remain important points of reference in analyzing SB 2's sensitive places restrictions.

### C. Plaintiffs Ignore the Supreme Court's Specific Guidance for Determining the Constitutionality of Sensitive Place Restrictions

Contrary to Plaintiffs' assertion, *Bruen* did not "simply assume[] that carry could be restricted at certain places, in accordance with a yet-untested historical tradition." *Carralero* AB at 19 (cleaned up). Rather, *Bruen* applied its history and tradition framework to sensitive place restrictions to show how courts should perform the required analysis. *See United States v. Endsley*, 2023 WL 6476389, at *3 n.35 (D. Alaska Oct. 5, 2023) (*Bruen* offers "guidance with respect to how courts should evaluate modern-day firearm regulations that resemble the other types of 'longstanding' regulations first mentioned in *Heller*").

First, *Bruen*'s sensitive places discussion indicates that the government is not required to identify numerous historical analogues to justify a modern sensitive place regulation. *Bruen* reaffirmed that firearms may be prohibited in legislative assemblies and polling places even though few historical analogues exist for such

10

restrictions. 597 U.S. at 30 (citing D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018)).

Plaintiffs argue that "laws existing in only a few jurisdictions . . . should be disregarded" because they are "historical '"outlier[s].'" *Carralero* AB at 18; *see also May* AB at 7. But that narrow reading cannot be squared with *Bruen*'s recognition that regulation in legislative assemblies and polling places is constitutional. *Allam*, 2023 WL 5846534, at \*25 (a "lack of numerous precursors prohibiting firearms around sensitive places is not dispositive" because "'the historical record yields relatively few' of these historical precursors," yet "*Bruen* seemed to view these few precursors to be compelling"); *Goldstein*, 2023 WL 4236164, at \*11 ("[F]ew states had laws restricting firearms from legislative assemblies, polling places, and courthouses.").

Where there are relatively few historical analogues, the absence of historical "disputes regarding the lawfulness" of a category of sensitive places restrictions will tend to show that the restriction is constitutional. *Bruen*, 597 U.S. at 30; *see Antonyuk v. Chiumento*, 89 F.4th 271, 359 (2d Cir. 2023) (crediting historical laws because they "were apparently accepted without any constitutional objection by anyone," given that none "were invalidated by any court," "indeed, we have not located any constitutional challenges to any of them"); *United States v. Tallion*, 2022 WL 17619254, at \*7 (D. Md. Dec. 13, 2022) ("Because there were no

11

disputes regarding the lawfulness of prohibitions on carrying weapons in sensitive places like schools and government buildings, the Court concluded that these locations were sensitive places.") (internal quotations omitted).[4]

Plaintiffs' description of a national tradition "permitting carry in *all* manner of places where people gathered" (*Carralero* AB at 2, emphasis added), cannot be squared with the *Bruen*'s recognition of numerous sensitive places. 597 U.S. at 30. The Supreme Court made clear that lower courts could recognize "*new* and analogous" sensitive place restrictions, *id.*, a "clear invitation for lower courts to conduct their own analogues analysis under the sensitive places doctrine." *We the Patriots, Inc. v. Grisham*, 2023 WL 6622042, at \*10 (D.N.M. Oct. 11, 2023).

### D. This Court Can Consider a Broader Historical Record than the One Advanced by Plaintiffs

Plaintiffs erroneously argue that *Bruen* limits the relevant historical period to the Founding era. As explained in the Opening Brief, *Bruen* conducted a review of the "historical record . . . [of both] 18th- and 19th century 'sensitive places'" in determining the contours of the Second Amendment, OB at 32 (quoting *Bruen*, 597

---

[4] Plaintiffs mischaracterize *Bruen* as holding that "'sensitive places' must remain 'few.'" *Carralero* AB at 20. But while *Bruen* notes that there were "relatively few 18th- and 19th-century sensitive places," it makes clear that courts may uphold analogous modern regulations addressing other sensitive places, 597 U.S. at 30. "Few" thus refers to the historical places where "weapons were altogether prohibited," not the quantum of sensitive places where firearms can be restricted in the modern era.

U.S. at 30). And the Ninth Circuit has twice noted the relevance of 19th century laws. *See United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023); *Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023). Plaintiffs do not attempt to distinguish *Baird* and portray *Alaniz* as expressly declining to reach this question. *Carralero* OB at 17 (quoting 69 F.4th at 1129 n. 2). But *Alaniz*, like *Bruen*, recognized that the historical tradition at issue "began in the 1700s" and "persisted through the Second Founding," i.e., Reconstruction. 69 F.4th at 1129 n.2. Because SB 2 "is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis." *Antonyuk*, 89 F.4th at 304.

Plaintiffs also incorrectly argue that *Bruen* requires the discounting of "evidence that long pre- or post-dates 1791." *Carralero* AB at 13. In concluding that legislatures could be classified as sensitive, the Supreme Court relied on an article citing laws from 1647 and 1650, Kopel & Greenlee, *The "Sensitive Places" Doctrine*, *supra*, at pp. 229–236, 244–247, further in time from the Founding than the Reconstruction era laws cited by the Attorney General.

Plaintiffs also misunderstand the jurisdictions from which the Attorney General can identify historical laws.

First, Plaintiffs argue that *Bruen* provided guidance that "virtually no weight [should be given] to territorial restrictions." *May* AB at 23; *Carralero* AB at 46 (similar). But courts should not discount territorial or municipal laws where those

13

laws fit within a "line of . . . English, Founding-era, and Reconstruction state statutes," because such laws are "exactly the opposite of the 'few late-19th-century outlier jurisdictions' offered and discounted in *Bruen*." *Antonyuk*, 89 F.4th 360–361; *see also Maryland Shall Issue, Inc.*, 2023 WL 4373260, at \*16 (D. Md. July 6, 2023) (crediting territorial laws because they "merely reinforce and supplement the historical tradition based on laws from the states").

Second, Plaintiffs wrongly contend that this Court "may also summarily dismiss . . . local ordinances" because "*Bruen* rejected reliance on 'localized' restrictions." *Carralero* AB at 49. While *Bruen* "warns against allowing 'the bare existence of . . . localized restrictions' to 'overcome the overwhelming evidence of an otherwise enduring American tradition,'" it "does not suggest that local laws are not persuasive in illuminating part of the nation's tradition of firearm regulation." *Antonyuk*, 89 F.4th at 321; *Maryland Shall Issue, Inc.*, 2023 WL 4373260, at \*11 (crediting historical evidence that "numerous local governments . . . prohibited firearms in parks").

Finally, Plaintiffs question whether courts can look to laws from Southern states in undertaking the *Bruen* analysis. *See May* AB at 19. As explained above, the Reconstruction era is a permissible source of historical analogues, and nothing in *Bruen* suggests that courts cannot look to Southern states. *See* Jacob D. Charles, *On Sordid Sources in Second Amendment Litigation*, 76 Stan. L. Rev. Online 30,

14

42 (2023) ("If the past determines the scope of legislative authority to regulate guns today, slicing off portions of that history diminishes the regulatory power the founding generation understood the state to possess.").[5]

## II. EACH OF THE CHALLENGED PROVISIONS OF SB 2 IS CONSTITUTIONAL

### A. Places of Worship Without the Operator's Consent

In attempting to dispel the numerous historical laws restricting firearms in places of worship—many of which are "dead ringers" and "historical twins" to SB 2's restrictions on firearms in places of worship without the operator's consent—Plaintiffs rely almost entirely on Founding-era statutes that purported to require colonists to carry firearms in churches. *See May* AB at 26 (historical laws "encouraged armed parishioners to confront the problem" of "hostile tribes"); *see also Carralero* AB at 29; 1-ER-38.[6] But these laws related to militia service, not

---

[5] To the extent laws from this period reflect efforts to restrict constitutional rights based on race, they are morally repugnant. They are provided only as evidence of a regulatory tradition that courts have already recognized as relevant in defining the Second Amendment's scope, even if they would be understood today as inconsistent with other constitutional guarantees. *See Bruen*, 597 U.S. at 60 (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)).

[6] Plaintiffs incorrectly suggest that the district court's conclusions at *Bruen*'s stage two are factual findings reviewed for clear error. *May* AB at 20–21. The application of law to fact (even if a district court correctly identifies the legal standard) is reviewed de novo where, as here, the question is one that requires the court to "'exercise judgment about the values that animate legal principles,'" including "questions that implicate constitutional rights." *United States v. Hinkson*, 585 F.3d 1247, 1259–1260 (9th Cir. 2009) (en banc); *see Bruen,* 597 U.S. at 25 n.6 (Second Amendment historical analysis requires courts "to resolve *legal* questions").

the individual right to bear arms. *See* OB at 23–24 (citing *Heller*, 554 U.S. at 582–583). Plaintiffs attempt to equate "Colonial era . . . tribes" with modern "racists and antisemites" as both being "hostile," *May* AB at 26, but what matters under *Bruen* is how lawmakers responded to these threats (i.e., encouraging collective militia action as opposed to individual self-defense).

Plaintiffs are wrong to dismiss the numerous "historical twins" prohibiting carry in places of worship as too late or as mere outliers, *see* section I.D, *supra*. Indeed, the historical tradition of restricting firearms in places of worship begins at least as early as the 15th century, when English law specifically prohibited the carrying of arms in churches and religious congregations, 4-ER-552–553, and continues through the Reconstruction Era when prohibitions on guns in churches were commonplace and uncontroversial, OB at 21 (collecting laws). Moreover, Plaintiffs entirely disregard that 19th century courts routinely upheld firearm prohibitions in places of worship, OB at 22–23 (collecting cases).

### B. Financial Institutions

Financial institutions as they exist today did not exist in the Founding or Reconstruction eras. 8-ER-1587. Citing a source not before the district court, Plaintiffs focus on the creation of a central bank, not private banks with branches as they exist today. *May* AB at 26–27. Based on this historically flawed premise, Plaintiffs vaguely assert that the "problem existed in the past but there was no

16

'distinctly similar' law addressing that problem." *Id.* at 27. But the "problem" that SB 2 addresses is not the existence of banks. Rather, SB 2 regulates carriage of firearms in banks because of the increased role they play in holding money and other valuables that make them attractive targets to bank robbers, terrorists, and those who wish to engage in political violence, OB at 24.

Plaintiffs also contend that the State must "provide a constitutional justification for why banks cannot decide for themselves how to secure their premises." *May* AB at 28. But the Supreme Court has never suggested the government lacks constitutional authority to declare non-governmental places sensitive.

Plaintiffs fault the State for not providing evidence of "a single bank robbery or other crime at a bank committed by a CCW permit holder." *May* AB at 28. Yet the Supreme Court has never suggested that sensitive places restrictions must be limited to those locations where there have been crimes committed by a concealed carry license holder.[7] Indeed, Plaintiffs appear to believe that sensitive places

---

[7] While the *Carralero* Plaintiffs contend that the "district court's statements about licensed individuals in no way drove its analysis," AB at 7, the *May* Plaintiffs argue that the "district court rightly acknowledged this consideration," AB at 14. The *May* Plaintiffs' defense of the district court's theory appears to be based on invocation of *Bruen*'s more nuanced approach. *May* AB at 14 (if "a modern library is meaningfully different from a library of two centuries ago," so are the "extensive vetting requirements" that CCW permit holders undergo). But *Bruen*'s more

17

restrictions can be justified only by a contemporary crime-prevention rationale—again, a theory not suggested by *Heller*, *Bruen*, or *McDonald*.

### C. Public Transit

In light of the "dramatic technological changes" that public transportation has undergone since the Founding and Reconstruction eras, a "more nuanced" analytical approach must be employed when evaluating firearms regulations related to modern public transit systems. *See Kipke v. Moore,* 2023 WL 6381503, at *10 (D. Md. Sept. 29, 2023). A proper application of this "more nuanced" approach reveals that public transit systems are sensitive places, including because they are "analogous to both schools and government buildings." *Id.*; OB at 28–29.

Contrary to the expert opinions of the State's historians and Plaintiffs' own expert, OB at 27, Plaintiffs assert that "public transportation undoubtedly existed in the Colonial and Founding eras," *Carralero* AB at 38. Plaintiffs appear to conflate transit services that provided "shared transportation to passengers," *id*. at 39, with transit services owned and operated by state and local governments. While Founding-era transit services may have transported multiple customers at the same time, this does not change the fact that they were "typically operated by private companies vested with the authority to fashion their own rules and regulations"

---

nuanced approach calls for more, not less, "flexib[i]l[ity]" in identifying historical analogues where, as in this case, there have been historical and societal changes such as the emergence of public parks. *See Antonyuk*, 89 F.4th at 359 n.78.

18

until the 20th century. 9-ER-1657-1658. And even if a small number of government-operated transit services did exist near the Founding era, such services are materially different from the transit systems that exist in California today. 9-ER-1846-1847; *Carralero* AB at 38 ("[T]he Founding generation may not have imagined today's myriad modes of public transportation.").

Plaintiffs' reliance on Founding-era laws that purportedly "*exempted* travelers from then-existing firearms regulations," *Carralero* AB at 42–43, is also misplaced. As explained by the State's historical expert, such "travelers' exceptions" were "narrowly defined" and did not include "everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern transportation." 9-ER-1654.

Plaintiffs fail to rebut the significance of historical firearms regulations implemented by private railroad companies. "[L]awmakers are not moved to forbid behavior that is governed by custom, universal practice, or private warning," *Antonyuk*, 89 F.4th at 301–302, and thus the existence of "private warning[s]" issued by railroad companies against carrying firearms on trains explains why "the historical record may not evince statutory prohibitions" on this specific practice. *See id.*; *Jones v. Bonta,* 2023 WL 8530834, at *10 (S.D. Cal. Dec. 8, 2023) (such private rules may "demonstrate the general understanding during the historically relevant era"). And Plaintiffs make no headway arguing that rules restricting

19

firearms on privately owned trains were not sufficiently widespread: the Union Pacific Railroad and the Central Pacific Railroad—which stretched nearly 2,000 miles across the country—both prohibited the carrying of loaded firearms. 2-ER-213-214.

### D.  Places Where Liquor Is Sold for Consumption on Site

Plaintiffs fail to meaningfully address the wealth of historical analogues the Attorney General identified in support of California's restriction on carrying firearms in places where liquor is sold for on-site consumption. OB at 30–32. That includes several "dead ringers" and "historical twins": the 1853 New Mexico law (4-ER-719–722), the 1870 San Antonio ordinance (5-ER-788–789), the 1882 New Orleans ordinance (5-ER-898–907), and the 1890 Oklahoma law (6-ER-995–998), all of which flatly prohibited carry in various places where alcohol was sold, regardless whether the individual was intoxicated. Plaintiffs dismiss them as outliers or too recent, but that approach merely underscores their misunderstanding of the range of permissible historical sources. *See* section I.D, *supra*.

Furthermore, these laws—which were not viewed as controversial or unconstitutional at the time—fit within the unbroken tradition of state, local, and territorial laws stretching back to and beyond the Founding, including laws barring the sale of alcohol to militiamen and laws restricting the carry of firearms by intoxicated people. Plaintiffs discount the militia laws by arguing that they only

20

applied to a "select group of people (militiamen)," *Carralero* AB at 45, but that does not disprove the fact that these laws show Founding-era governments restricted the use of firearms by those in the presence of alcohol, even if those people were not personally drinking, OB at 32. And laws banning carry by intoxicated persons also confirm this tradition of separating firearms from alcohol. *Antonyuk*, 89 F.4th at 368. Indeed, viewing these historical laws in totality, their justifications are comparable to California's (i.e., reducing the long-recognized danger of mixing guns with alcohol) as are their burdens (i.e., restricting the carry of firearms in the presence of alcohol).

### E.   Permitted Gatherings and Special Events

Plaintiffs dismiss the numerous historical laws barring firearms in large public gatherings as either too old or too recent. *See Carralero* AB at 47–49. But California's restrictions on carry at large, permitted public gatherings are part of a continuing history and tradition that extends as far back as the 14th century Statute of Northampton, through colonial- and Founding-era versions of that law, antebellum laws prohibiting carry in large assemblies, and Reconstruction-era equivalents. OB 32–34.

The constitutionality of these laws is buttressed by the numerous 19th century cases upholding convictions under them. OB at 34–35. Plaintiffs describe these as a mere "smattering" of decisions. *Carralero* AB at 49. But given that Plaintiffs fail

to identify any 19th century cases striking down sensitive places provisions, the Supreme Court's admonition that "antebellum state-court decisions" are relevant in the *Bruen* analysis if they "evince a consensus view," 597 U.S. at 55, applies with full force in this case.

Plaintiffs argue that *State v. Shelby* is irrelevant because it only involved a conviction for carrying while intoxicated, but the conviction there was both for carrying while intoxicated *and* for carrying in a large public gathering regardless of the defendant's state of intoxication. 2 S.W. 468, 469 (Mo. 1886). And while Plaintiffs argue that *Hill v. State* is irrelevant because it upheld a conviction for carrying in a courthouse, the court opined on sensitive place restrictions more generally and explained the common understanding of the time that large public gatherings were no place for dangerous weapons. 53 Ga. 472, 475 (1874) (describing the carrying of arms in public places as "a thing so improper in itself, so shocking to all sense of propriety, [and] so wholly useless and full of evil").

### F.    Casinos, Stadiums, and Amusement Parks

These locations did not exist in their modern form during the Founding or Reconstruction era in significant ways, OB at 36 (collecting expert evidence), thus requiring a more nuanced approach. And for each of these locations, there exist relevantly similar historical analogues. *Id*. at 37 (collecting laws).

As to casinos, Plaintiffs argue that gambling has existed since colonial times, and "Founding-era Americans frequently bet on horse races." *Carralero* AB at 50. But the modern circumstance requiring a "more nuanced approach" is not the existence of gambling, but rather the development of casinos and other gambling establishments. And while Plaintiffs assert that "[v]enues resembling stadiums, arenas, and amusement parks also existed at the Founding," *id.*, they identify no record evidence supporting this assertion. Moreover, unlike casinos, where the risk of violence and crime is heightened by the amount of cash within the building, earlier gambling sites would not have had large amounts of cash because "[s]pecie was extremely rare," T.H. Breen, *Horses and Gentlemen: The Cultural Significance of Gambling Among the Gentry of Virginia*, 34 Wm. & Mary Q. 239, 252 (1977), and thus bets were made with contracts to be enforced later, *id.* at 253– 254.

Plaintiffs disregard the "dead ringer" historical analogues offered by the Attorney General because they are local or territorial restrictions, *Carralero* AB at 51, but *Bruen* does not command such a result, *see* section I.D, *supra*. Plaintiffs also discount the Reconstruction-era laws because of "the political turmoil present in the post-Civil-War South," *Carralero* AB at 48, but this argument makes little sense given that the Founding era was also an era of great "political turmoil."

Plaintiffs also challenge the notion that a place's sensitivity can derive from who congregates there (*May* AB at 15–16; *Carralero* AB at 25–26), but courts have properly recognized that there is "a tradition of prohibiting firearms in locations congregated by vulnerable populations," such as amusement parks, where children routinely gather. *See Antonyuk*, 89 F.4th at 341; *see also Kipke*, 2023 WL 6381503, at *8, *15 (where a location "serve[s] a vulnerable population," regulation of firearms therein "is justified by the protection of that population," and declining to enjoin amusement park restriction); *We the Patriots, Inc.*, 2023 WL 6622042, at *11 (similar).

Moreover, a multitude of historical laws restricted firearms in places where large groups of people congregated. OB at 32–34; *Antonyuk*, 89 F.4th at 356 (recognizing "a well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places"). Contrary to Plaintiffs' suggestions, this appeal does not require the Court to decide whether any modern space can be considered per se sensitive merely because it is crowded. The Attorney General is not relying solely on that general categorization to defend this provision. But the historical evidence shows that governments have traditionally chosen to regulate guns in crowded spaces, especially when—as here—those locations also include *other* features that have historically warranted heightened

24

regulation, such as "serv[ing] vulnerable populations like children and disabled people." OB at 28.

### G. Health Care Facilities

In attempting to discount the extensive historical record supporting SB 2's restriction on carrying firearms in health care facilities, Plaintiffs disregard the fact that "hospitals did not exist in their modern form at the time of the ratification of the Second or Fourteenth Amendments," *Maryland Shall Issue, Inc.*, 2023 WL 4373260, at *14. Hospitals instead were primarily charitable institutions whose patients could not afford—and therefore did not carry—firearms. 7-ER-1392-93. Plaintiffs in effect demand "dead ringers" for firearms laws and hospitals. But this is not required. *Antonyuk*, 89 F.4th at 341 (the "State was not required to show that firearms were traditionally banned in places such as 'almshouses,' hospitals, or physician's offices" to justify restrictions at behavioral health centers).

Plaintiffs do not meaningfully respond to the numerous, relevantly similar historical analogues that demonstrate a tradition of banning firearms in places that serve "scientific" and "educational" purposes. *See, e.g.*, 5-ER-799-802; 6-ER-977-978; 6-ER-990-992; 6-ER-1143-1145. Plaintiffs make the conclusory assertion that these historical laws are "dissimilar" to SB 2's restrictions at health care facilities, *May* AB at 37, but make no attempt to explain how they are purportedly different in any material way. Nor could they, because hospitals and medical centers

inarguably serve the "scientific" and "educational" purposes of providing medical treatment, conducting clinical research, and training resident physicians. And Plaintiffs' argument that the Court should disregard these analogues because "most of [them] originate long after the Founding era," *Carralero* AB 52, is equally unpersuasive, *see* section I.D, *supra*.

Finally, health care facilities, like schools and transit system, serve vulnerable populations, supporting their designation as sensitive places. *See Antonyuk,* 89 F.4th at 339 (recognizing "this Nation's tradition of firearm regulation in places where vulnerable populations are present"); *Kipke,* 2023 WL 6381503, at *8 (similar).

### H.   Playgrounds and Youth Centers

Plaintiffs admit that the district court's conclusion that playgrounds are not sensitive places was unprecedented, *May* AB at 38, but argue that they were "the first to sufficiently distinguish playgrounds from schools" by invoking the *in loco parentis* doctrine and the lack of metal detectors, police officers, and access controls at playgrounds. *Id*. As explained in sections I.A and I.B, *supra*, however, the *in loco parentis* doctrine is not reflected in the numerous relevantly similar historical laws restricting all persons (not just students) from carrying firearms in schools, and the government-security theory is not reflected in the historical record (much less in the present day).

26

Plaintiffs also contend that playgrounds do not hold "any special historic significance," *May* AB at 39, but the record establishes playgrounds did not exist in their modern form at either the Founding or Reconstruction. 7-ER-1208–1211; 7-ER-1437–1438. Moreover, applying *Bruen* in this context turns on whether there is a relevantly similar historical analogue, 597 U.S. at 30, not whether the location at issue has "special historical significance." And, for the reasons stated previously, *see* section I.A., *supra*, Plaintiffs miss the mark when they suggest that California cannot restrict the carriage of firearms because it has not "provide[d] security fencing like it requires at schools," *May* AB at 39.

## I.    Parks and Athletic Facilities

The record on appeal firmly establishes that "[p]ublic parks that resemble modern parks only began to emerge in the middle of the 19th century," OB at 43 (citing 10-ER-1957, 1962–1963; 7-ER-1414), and that many of these public parks quickly instituted regulations restricting the carrying of firearms, *id.* (citing 10-ER-1966–1970). A similar trend exists for state parks (*id.* at 44, citing 7-ER-1431–1432) and the national parks system (*id.* at 43, citing 6-ER-1178–1179).

Plaintiffs argue that "[m]any parks existed before 1800." *Carralero* AB at 53. But they provided no expert testimony on the issue and their assertion on appeal rests on numerous secondary sources that were not before the district court. *See Bruen*, 597 U.S. at 25 n.6 (courts should "decide a case based on the historical

record compiled by the parties"). In any event, Plaintiffs' contention that "parks," as the term is understood today, existed at the Founding is factually inaccurate and should be rejected. *See Antonyuk*, 89 F.4th at 361 (rejecting comparison of Boston Common and similar spaces to modern parks). Plaintiffs also argue that these historical parks restrictions were about "game preservation" because some of them prohibit hunting in addition to prohibiting firearms, *May* AB at 42, but both were threats to parks' existence as places of sanctuary and repose. 10-ER-1963.

Plaintiffs rely heavily on *Koons v. Platkin*, 2023 WL 3478604 (D.N.J. May 16, 2023), but the injunction as to parks issued in that case has been stayed by the Third Circuit. OB at 45 n.7. In any event, *Koons* erroneously considered evidence only from the Founding, *see* section I.D, *supra*, and improperly imposed a requirement that historical analogues must govern a certain percentage of the American population to establish a tradition of firearms regulation, *Koons*, 2023 WL 3478604, at *78, a requirement rejected by other courts. *See, e.g.*, *Antonyuk*, 89 F.4th at 339 ("Disqualifying proffered analogues based only on strict quantitative measures such as population size . . . would turn *Bruen*" into a "regulatory straightjacket").

### J. Public Libraries, Zoos, and Museums

Plaintiffs claim that the lack of "Founding era history concerning banning carry in libraries" is dispositive. *May* AB at 43; *Carralero* AB at 56. This

argument fails for at least two reasons: it improperly requires a "dead ringer" historical analogue, *Bruen*, 597 U.S. at 30, and it ignores the fact that no public libraries existed at the Founding, 8-ER-1483. Additionally, Plaintiffs fail to persuasively rebut the State's robust historical evidence showing a tradition of regulating firearms in places that serve "literary," "educational," or "scientific purposes." *See, e.g.*, 5-ER-790–793; 5-ER-857–860; 5-ER-867–868. These statutes are not "vague outliers" that "come too late." *See* section I.D, *supra*. And Plaintiffs' unsupported claim that these historical analogues "are not relevantly similar in 'how' they burden the right to carry," *Carralero* AB at 56, is also untrue, as both the analogues and the modern regulation impose precisely the same burden—a ban on carry in the places in question. OB at 47–48. Finally, Plaintiffs' attempt to distinguish libraries from schools fails (*May* AB at 43), because children frequent both locations and libraries provide similar educational and literary purposes. *Maryland Shall Issue, Inc.*, 2023 WL 4373260, at *12.

Plaintiffs' arguments regarding museums fail for the same reasons. By ignoring the State's Reconstruction-era analogues pertaining to places that serve "scientific" and "educational" purposes on the ground that they "come too late," *Carralero* AB at 56, Plaintiffs take an improperly narrow view of *Bruen*'s required historical analysis. *See* section I.D, *supra*. And again, Plaintiffs' claim that these

historical analogues impose a different burden than SB 2's restrictions on museum is wrong—both ban carrying firearms in sensitive places.

As to zoos, despite conceding that they "were not widespread during the Founding era," *Carralero* AB at 55, Plaintiffs criticize the State for not identifying historical analogues that specifically ban carry at zoos, *id*. Again, this argument contravenes *Bruen*'s holding that the State need not identify a "dead ringer." Moreover, Plaintiffs' claim that "there is no historical tradition that would justify banning carry at zoos" is false. To the contrary, banning carry at zoos is consistent with at least three well-established historical traditions of firearm regulation: (1) in places "of educational and scientific opportunity," (2) in places "heavily trafficked by children," and (3) in places "that are densely crowded." OB at 47–48; *Antonyuk*, 89 F.4th at 364.

### K.   Parking Lots

The Opening Brief identified historical analogues for SB 2's parking lot provisions, 4-ER-623–626 and 5-ER-782–787, and cited numerous cases which have upheld the constitutionality of buffer zone restrictions. OB at 49–50 (collecting cases). Plaintiffs thus err in asserting that the Attorney General fails to justify "how the parking lot of a place it declares as sensitive . . . is as sensitive as the business it serves" or how "a neighboring business . . . that merely shares a parking lot with" a sensitive place can be subject to a restriction on carrying

firearms, *May* AB at 43–44, because the sensitivity of a buffer zone derives from the sensitive place which is buffered, not the other places that happen to be nearby. *See Allam*, 2023 WL 5846534, at *24 (buffer zones "provid[e] an additional layer of protection around a sensitive place, due to an increased risk of harm to the people required to be in such a location"); *see also Metcalf*, 2024 WL 358154, at *9 (similar).

Plaintiffs attempt to distinguish the historical analogues identified by the Attorney General because those laws "deal with *temporary* surrounding area restrictions for polling places on election days." *May* AB at 45. But no court has rejected an analogy to buffer zones around polling places based on the temporary nature of those laws, and in fact numerous courts have relied on the same historical laws in upholding buffer zones around schools (which, of course, are not temporary in nature). *See Allam*, 2023 WL 5846534, at *22 (relying, *inter alia*, on the same Louisiana and Delaware polling place buffer zones to support constitutionality of buffer zone around schools); *Metcalf*, 2024 WL 358154, at *8 (same); *Walter*, 2023 WL 3020321, at *7 (same).

### L.   Private Commercial Property Without the Owner's Consent

Plaintiffs' challenge to SB 2's restriction on carrying firearms on private commercial property without the owner's consent fails at both stages of the *Bruen*

31

analysis. At the first stage, Plaintiffs fail to show that their proposed course of conduct is covered by the plain text of the Second Amendment.[8]

Plaintiffs do not argue that they have a right to carry on private property without the owner's consent. Instead, they argue that there was Second Amendment presumption they could do so without the owner's express disapproval before SB 2, and SB 2 "may not alter the status quo" on that presumption. *May* AB at 47. But Plaintiffs confuse the term "presumption"—in the sense of a default state-law rule about what conduct is permissible—with *Bruen*'s statement that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," 597 U.S. at 17. *See Carralero* AB at 12 (asserting that the "'Constitution presumptively protects' Plaintiffs' licensed carry in private businesses open to the public") (quoting *Bruen*, 597 U.S. at 17). Despite the superficial overlap in language, a state-law presumption about how business owners manifest their consent does not implicate the Second Amendment rights of those who wish to carry on private property.

---

[8] Plaintiffs are wrong that Plaintiff Hough, and others who operate businesses, are prohibited by SB 2 from carrying firearms in their businesses. *May* AB at 46. SB 2 does not restrict an individual from carrying a handgun within their "place of business, or on private property owned or lawfully possessed by" that individual, because "[n]o permit or license" is required to do so. Cal. Pen. Code § 25605(b).

Plaintiffs also err in their insistence that SB 2's private property rule involves "state action." *May* AB at 46; *Carralero* AB at 12. To qualify as "state action," "the challenged conduct that caused the alleged constitutional deprivation [must be] 'fairly attributabl[e]' to the state." *Belgau v. Inslee*, 975 F.3d 940, 946 (9th Cir. 2020). But in this case, the "source of the alleged constitutional harm is not a state statute or policy but the particular private" property owner who does not grant consent. *See id*. at 947. Nor does the mere passage of SB 2 constitute state action, as Plaintiffs argue, *Carralero* AB at 11. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 53–54 (1999) (rejecting state action argument where a newly-enacted state statute changed existing insurance law by "shift[ing] one facet from favoring the employees to favoring the employer," because "[t]his sort of decision occurs regularly in legislative review of such systems," and "it cannot be said that such a change 'encourages' or 'authorizes' the insurer's actions as those terms are used in our state-action jurisprudence").

Even if this Court were to proceed to stage two of the *Bruen* analysis, there are numerous relevantly similar historical analogues. OB 54–55 (collecting laws). Plaintiffs argue that (a) these laws only restricted "private property not open to the public" because they "refer primarily to 'inclosed' lands and plantations," *May* AB at 46–47, and (b) these laws were "concerned with illegal hunting," "not the right to carry for self-defense," *id*. at 47; *Carralero* AB at 19. As to (a), the three 19th-

33

century historical laws identified by the Attorney General refer not just to "plantations" and "lands" but also premises, and none of the seven historical laws identified by the Attorney General draw a distinction between private property open to the public and that which was not. *See* OB at 54–55. Thus, it cannot be concluded that these statutes did not apply to commercial enterprises or that they applied only to private property not open to the public.

As to (b), the text of these statutes makes clear that they cannot be cabined as merely hunting restrictions. While these statutes may have included language restricting hunting, they also expressly restricted carrying of firearms. This Court "presume[s] that a legislature does not employ redundant language in crafting a statute." *United States v. Vidal*, 504 F.3d 1072, 1081 (9th Cir. 2007), *abrogated on other grounds by United States v. Bautista,* 989 F.3d 698, 704 (9th Cir. 2021). Thus, Plaintiffs' request that this Court read these historical laws' restrictions on the carrying of firearms as redundant surplusage should be denied.

And even assuming that these historical laws prohibited carrying firearms on private property only for the purposes of hunting and poaching, those historical laws are still "relevantly similar" to SB 2 because they have a "comparable burden" and "comparable justification." *Bruen*, 597 U.S. at 29. The burden (i.e., a prohibition on carrying firearms onto another's private property without their permission) is the same for SB 2 and the historical laws, and the justification is

34

comparable (i.e., a private property owner's enjoyment of their property without the concern that another may bring firearms onto it without their permission). Lower courts applying *Bruen*'s "relevantly similar" test have not required the identical burden and justification that Plaintiffs seek here. *See Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 618 F. Supp. 3d 901, 917 (N.D. Cal. 2022) (concluding that there is "certainly a fair distinction between surety laws and the [challenged modern] Insurance Requirement but ultimately one that does not bear upon the metrics identified in *Bruen*").

## III. The Other Preliminary Injunction Factors Favor Reversal

In his Opening Brief, the Attorney General explained that crime prevention was not the sole purpose of SB 2's sensitive places provisions. OB at 59. Plaintiffs nonetheless suggest that crime prevention is the only possible justification for a firearms restriction and that evidence about crime rates among CCW permit holders should weigh in favor of affirming the injunction. *May* AB at 49. The district court committed the same error when it concluded that "CCW permitholders are not the gun wielders legislators should fear." 1-ER-48. And while Plaintiffs cite *Wolford* and *Koons* for that same proposition, those decisions only addressed whether permitting requirements led to decreased crime, *not* whether expanded sensitive places restrictions did so or whether guns in sensitive places deter the exercise of other constitutional rights there. *Wolford v. Lopez*,

35

2023 WL 5043805, at *32 (D. Haw. Aug. 8, 2023); *Koons*, 2023 WL 3478604, at *107.

In fact, restrictions on firearms at polling places, legislatures, and courthouses suggest that historical sensitive places laws were enacted to prevent the suppression of other constitutional rights, not solely as crime prevention measures. *See Hill*, 53 Ga. at 478 ("[I]f the temple of justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts" would be restricted); *Koons*, 2023 WL 3478604, at *78 (polling places were considered sensitive because they "involved a citizen's fundamental right to participate in the political process").

## CONCLUSION

The district court's injunction should be reversed.

Dated:  March 8, 2024

Respectfully submitted,

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
R. MATTHEW WISE
MARK R. BECKINGTON
*Supervising Deputy Attorneys General*

s/ Robert L. Meyerhoff
ROBERT L. MEYERHOFF
*Deputy Attorney General*
*Attorneys for Defendant-Appellant*

36

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** 23-4354 and 23-4356

I am the attorney or self-represented party.

**This brief contains <u>8,354 words,</u>** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ x ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ x ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/ Robert L. Meyerhoff_____ **Date** _March 8, 2024_____