Case Nos. 23-4354 and 23-4356

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

RENO MAY, ET AL.,
*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF CALIFORNIA,
*Defendant-Appellant*.

**On Appeal from the United States District Court
for the Central District of California**
No. 8:23-cv-01696-CJC-ADSx
The Honorable Cormac J. Carney, Judge

**APPELLEES' SUPPLEMENTAL BRIEFING IN LIGHT OF
*UNITED STATES V. RAHIMI***

C. D. Michel
Joshua Robert Dale
Alexander A. Frank
Konstadinos T. Moros
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com

Donald Kilmer
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Rd.
Caldwell, Idaho 83607
(408) 264-8489
don@dklawoffice.com

*Counsel for Plaintiffs-Appellees*

(*Additional caption appears on next page*)

July 12, 2024

Case No. 23-4354

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARCO ANTONIO CARRALERO, ET AL.,
*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF CALIFORNIA,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Central District of California
No. 8:23-cv-01798-CJC-ADSx
The Honorable Cormac J. Carney, Judge

ii

# TABLE OF CONTENTS

**Page**

Table of Contents ........................................................................................... iii

Table of Authorities ....................................................................................... iv

Introduction .................................................................................................... 1

    I.    *Rahimi* Further Confirms and Clarifies the *Bruen* Methodology and Demonstrates the Weakness in the State's Claimed Historical Analogues .... 2

        A.  The relevant historical tradition must be anchored in the Founding Era ............................................................................................. 3

        B.  Numerosity of historical laws is necessary for an analogue to be valid ............................................................................................ 6

        C.  Modern regulations cannot deviate from the principles underlying historical precursors .................................................................. 8

        D.  *Rahimi* assumes a broad Second Amendment right ............................ 12

        E.  *Rahimi* focuses on dangerousness as the only legitimate justification for disarmament, undermining the State's effort to disarm people it has already vetted .................................................................. 14

    II.   Conclusion ................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Antonyuk v. Chiumento*,
  89 F.4th 271 (2d Cir. 2023) .................................................................. 5, 12

*Antonyuk v. James*,
  2024 WL 3259671 (U.S. July 2, 2024) ...................................................... 6

*Carralero v. Bonta*,
  (9th Cir. April 11, 2024) (No. 24-4354) .................................................. 13

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ........................................................................... 4, 11

*Hardaway v. Nigrelli*,
  639 F. Supp. 3d 422 (W.D.N.Y. 2022) ..................................................... 5

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ........................................................................... passim

*United States v. Rahimi*,
  No. 22-915, 2024 WL 3074728 (U.S. June 21, 2024) ........................... passim

## Statutes

18 U.S.C. § 922 ........................................................................................ 8, 9

Cal. Penal Code § 26202 ............................................................................. 14

Cal. Penal Code § 26150 ............................................................................. 14

Cal. Penal Code § 26165 ............................................................................. 14

Cal. Penal Code § 26190 ............................................................................. 14

Cal. Penal Code § 26230 ........................................................................ passim

## Other Authorities

SB 2 Press Conference, YouTube.com (Feb. 1, 2023), https://www.youtube.
  com/watch?v=Kpxpj6yvFIo (at 36:10) (last visited July 1, 2024) ..................... 15

iv

## INTRODUCTION

*Rahimi* makes the State's already precarious position in this case weaker. In *Rahimi*, the Supreme Court reiterated that *Bruen* does not require dead-ringers or "a law trapped in amber." *United States v. Rahimi*, No. 22-915, 2024 WL 3074728, at *6 (U.S. June 21, 2024). Instead, courts should look to "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* Critically, "[e]ven when a law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.* That's because courts "must be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* at *30 (Barrett, J., concurring).

The relevant tradition here is that "the Second Amendment guarantees a general right to public carry" (*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 33 (2022)), and while there may be a few truly "sensitive places" where that right to carry can be restricted, a broad notion of "sensitivity" is unconstitutional because gun-free zones were generally unknown to the Founders. Thus, declaring many areas of the public sphere "sensitive places" would "eviscerate the general right to publicly carry arms for self-defense." *Id.* at 31. Here, the challenged portions of Penal Code section 26230—by the State's own admission—effectively limit the "general right to public carry" to just some streets and sidewalks, as well as the few private businesses willing to post signs affirmatively allowing concealed carry. *See* Appellant's Mot. for Stay Pending Appeal at 22, ECF No. 4.1. Worse, the statute limits the right of people *already vetted* by the State in receiving their CCW permits and for whom Appellees

1

presented undisputed data demonstrating that such permit holders are a demographic with an extremely low crime rate.

Rahimi poses several significant problems for the State's prior arguments, in that the Supreme Court: (1) required historical analogue laws anchored in the Founding Era; (2) justified its analysis in part based on the numerosity of laws that comprise the underlying historical tradition; (3) demanded a degree of fit the State cannot meet here; (4) presumed a broad Second Amendment right with very narrow limits; and (5) justified disarmament only on the grounds of proven, individualized dangerousness. All of these leave the State's arguments in shambles.

## I.    *RAHIMI* FURTHER CONFIRMS AND CLARIFIES THE *BRUEN* METHODOLOGY AND DEMONSTRATES THE WEAKNESS IN THE STATE'S CLAIMED HISTORICAL ANALOGUES.

With *Rahimi*, the Supreme Court reiterated the one-step historical test that *Bruen* demands: "In *Bruen*, we explained that when a firearm regulation is challenged under the Second Amendment, the Government must show that the restriction 'is consistent with the Nation's historical tradition of firearm regulation.' " *Rahimi*, 2024 WL 3074728, at *6 (citing *Bruen*, 597 U.S. at 24). While government defendants need not hunt for identical historical laws, "why and how the [challenged] regulation burdens the right are central to this inquiry." *Id.* Moreover, when assessing historical enactments to determine if they substantiate a historical tradition, courts must be vigilant to not give the government the blank check *Bruen* forbade. Indeed, "green trucks" and "green hats" are analogous only when the relevant metric is "things that are green." *Bruen*, 597 U.S. at 29. As Justice Gorsuch put it, "[c]ourts must proceed with care in making comparisons to historic firearms regulations, or else they risk

2

gaming away an individual right the people expressly preserved for themselves in the Constitution's text." *Rahimi*, 2024 WL 3074728, at *15 (Gorsuch, J., concurring).[1]

In reaching its ruling in *Rahimi*, the Supreme Court observed several analytical principles that Appellees discuss here in turn, applying each to this case.

### A. The relevant historical tradition must be anchored in the Founding Era.

In *Rahimi*, the Court again declined, at least ostensibly, to definitively settle the "ongoing scholarly debate" regarding whether post-Founding historical laws, particularly from the Reconstruction Era, were relevant to the historical analysis. *Rahimi*, 2024 WL 3074728, at *6 n.1 (citing *Bruen*, 597 U.S. at 37). But make no mistake, the majority's analysis all but settled this debate. The Court relied on two types of laws, sureties and prohibitions on "going armed in terror of the people," that had at least some substantial anchor in the Founding Era. *See id.* at *8-9 (citing a 1795 Massachusetts surety law, laws from four states and colonies prohibiting "going armed" and affrays (in 1741, 1761, 1786, and 1795), the common law, and Blackstone).

Pre-Founding and post-Founding history of similar laws can further support the historical tradition that existed in the Founding Era, and indeed in *Rahimi,* the Court noted that this additional history was *consistent with* Founding-Era tradition. *See id.* (noting that besides the 1795 Massachusetts surety law, nine other jurisdictions

---

[1] Justice Gorsuch also expressly criticized this Court's prior rulings as not sufficiently deferential to the Second Amendment, noting that the Ninth Circuit has never once ruled a gun law unconstitutional under the Second Amendment (not counting reversed three-judge panel rulings). *Rahimi*, 2024 WL 3074728, at *16 (Gorsuch, J., concurring).

enacted the same, including several in the 19th century). But that Founding-Era basis was critical, as the Court and several concurrences indicate repeatedly (bold added throughout):

"Since **the founding**, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Rahimi*, 2024 WL 3074728, at *5 (emphasis added). "[I]f laws **at the founding** regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* at *6 (emphasis added). "[W]e seek to honor the fact that the Second Amendment 'codified a *pre-existing* right' belonging to the American people, one that carries the same 'scope' today that it was 'understood to have **when the people adopted' it**." *Id.* at *15 (emphasis added) (Gorsuch, J., concurring) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)). "[P]re-ratification English law and practices may supply background for some constitutional provisions. But the Constitution, including the Bill of Rights, did not purport to take English law or history wholesale and silently download it into the U. S. Constitution.") *Rahimi*, 2024 WL 3074728, at *21 n.3 (Kavanaugh, J., concurring). "[T]he history that matters most is the **history surrounding the ratification of the text**; that backdrop illuminates the meaning of the enacted law. History (or tradition) that long postdates ratification does not serve that function . . . evidence of 'tradition' **unmoored from original meaning** is not binding law." *Id.* at *29 (emphasis added) (Barrett, J., concurring)

The *Rahimi* Court's demand for a significant Founding-Era basis for any

claimed historical tradition leaves the State's claimed analogues on sensitive places adrift without a paddle. The State has marshaled only a few Founding-Era laws in support of various "sensitive place" restrictions of Penal Code section 26230 that Appellees challenge, and, for most categories, none at all. Instead, the State relies heavily on late-19th-century laws and local ordinances, disproportionately from one region (the South, with its own dubious motivations and atypical status as recent readmittees to the Union) and some western territories.

Take, for example, the restriction on carry in places of worship. Appellees cited Founding-Era laws that *required* bringing guns into churches, because of the risk of attacks by Native Americans. *See* Appellees' Answering Brief at 25, ECF No. 58.1. A similar concern motivates a member of Appellee CRPA, Mr. Davidovitz. He is Jewish and wishes to continue carrying at his synagogue in case of a horrific attack like what happened at the Tree of Life synagogue in Pittsburgh. 1-SER-59-60.

Through Senate Bill 2's enactment of section 26230(2)(22), the State would effectively disarm good people like Mr. Davidovitz, leaving them vulnerable. Thankfully, historical tradition authorizes no such disarmament, because the State has cited no Founding-Era history to justify such a stunning restriction on the general right to publicly carry arms for self-defense. Instead, like New York before it, the State cites "a handful of seemingly spasmodic enactments involving a small minority of jurisdictions governing a small minority of [the] population. And they were passed nearly a century after the Second Amendment's ratification in 1791." *Hardaway v. Nigrelli*, 639 F. Supp. 3d 422, 442 (W.D.N.Y. 2022), *aff'd in part, vacated in part, remanded sub nom. Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *cert. granted and judgment*

5

*vacated sub nom. Antonyuk v. James*, 2024 WL 3259671, (U.S. July 2, 2024)).[2] Thus, even if the State's cited 19th-century laws were not outliers, they would not save the State's arguments because they regulate carry "to an extent beyond what was done at the founding." *Rahimi*, 2024 WL 3074728, at *6.[3]

The State's prior briefing is markedly absent citations to Founding-Era regulations anchoring its claimed historical traditions. Therefore, this Court should have no trouble recognizing that the State consistently fails to cite any of "the history that matters most." *Id.* at *29 (Barrett, J., concurring).

## B. Numerosity of historical laws is necessary for an analogue to be valid.

*Bruen* instructed that numerosity of historical laws is critical to demonstrating "a well-established and representative historical *analogue*." *Bruen*, 597 U.S. at 65. In doing so, the *Bruen* court rejected two state laws as insufficient outliers. *Id.* ("But the Texas statute, and the rationales set forth in *English* and *Duke*, are outliers. In fact, only one other State, West Virginia, adopted a similar public-carry statute before 1900."). *Rahimi* further entrenched this principle, as both categories of laws it cited, surety regimes and "going armed" laws, were very well-represented.

For sureties, the Court cited a pre-Colonial, Founding-Era, and post-Founding tradition consisting of many laws. It referenced nine total state surety laws from at or

---

[2] That *Antonyuk* has been vacated and remanded further supports Appellees' prior argument that this Court should not consider that ruling persuasive.

[3] Additionally, the Court's reliance on the surety and "going armed" laws makes clear the Founders dealt with the issue of armed individuals much differently than adopting an overexpansive view that "sensitive places" were wholly off-limits to carry. *Rahimi*, 2024 WL 3074728, at *6.

after the Founding Era in addition to extensive pre-Founding history. *Rahimi*, 2024 WL 3074728, at \*8. For the "going armed" and "affrays" laws, the Court referenced a similarly lengthy history consisting of Blackstone, four state or colonial 18th-century laws, and the common law extending into the 19th century in several states. *Id.* at \*9.

The State can point to no similar numerosity in support of its claimed analogues. As perhaps the most extreme example, Penal Code section 26230 bans carry on public transportation, effectively eliminating the general right to carry for anyone who relies on it. For this astounding limitation on an enumerated right, the State cited *not one law* from either the Founding Era or the 19th century, even though carriages, trains, ferries, and other modes of transportation existed before 1900. *See* Appellant's Opening Br. at 26-30, , ECF No. 25.1. Instead, aside from its weakly cobbled-together "principles" (discussed *infra*), it cited only *private company rules*. Even assuming such rules could qualify as a governmental regulatory tradition, which they obviously do not, the State cited only six U.S. railroads between 1835 and 1900 that restricted carry by passengers, a miniscule fraction of the total that existed; not a representative example. And of those mere six, not all even banned carry, as Appellees' answering brief made clear. *See* Appellees' Answering Br. at 31-32.

For this and many of the other location restrictions it tries to uphold, the State cites either no historical laws at all, or very few historical laws that are outliers and came well after the Founding Era. *See, e.g.*, Appellant's Opening Br. at 31(citing only two 19th-century territorial restrictions and one local ordinance pertaining to barring

7

carry in some (not all) locations that serve alcohol).[4] If the State's burden was just to find one or two laws from any time before 1900 that were of mild similarity to the modern regulation it seeks to justify, then it would effectively have the very "blank check" *Bruen* forbade, turning an enumerated right into a nullity. 597 U.S. at 30.

### C. Modern regulations cannot deviate from the principles underlying historical precursors.

In *Rahimi*, the Court noted that historical regulations often evince an overarching "principle" with which modern regulations must comport. *Rahimi*, 2024 U.S. LEXIS 2714, at *16. But the Court recognized that the guiding "principles that underpin our regulatory tradition," *id.*, cannot be described so amorphously (*e.g.*, "preventing gun violence") as to countenance disparate modern regulations. Thus, the Court expounded the "level of generality" applicable to comparisons between modern laws and purported historical precursors. *Rahimi*, 2024 WL 3074728, at *31 (Barrett, J., concurring). In other words, there must be a strong degree of fit between the analogues establishing the principle and the modern law implementing it.

To briefly recap, 18 U.S.C. § 922(g)(8)(c)(i) allows disarmament of alleged domestic abusers after a hearing if there was a finding of dangerousness. The Court upheld the law because historical surety laws allowed anyone, including abused spouses, to appear before a judge or magistrate and demand the person threatening violence (or who committed violence) pay a bond and, if they were violent again, to

---

[4] As briefed below, none of the individual Appellees state that they frequent bars or nightclubs. Some do not even drink at all. 1-SER-47, 64, 86. But the scope of section 26230(a)(9)'s restriction is so broad as to encompass *everywhere* alcohol is served, including places like restaurants that offer liquor with meals. At minimum, the law is unconstitutional as applied to the Appellees in those locations.

forfeit that bond. If the accused failed to post the bond, they could be jailed for up to six months. *Rahimi*, 2024 WL 3074728, at *8. Meanwhile, the "going armed" and affray laws applied to those who carried arms in a way intentionally meant to terrify people, even if no actual violence came to pass. *Id.* at *9.

The Court went on to illustrate the many ways those laws are similar to § 922(g)(8): "Like the surety and going armed laws, Section 922(g)(8)(C)(i) applies to individuals found to threaten the physical safety of another." *Rahimi*, 2024 WL 3074728, at *9. Also important was that the historical laws, as well as the modern law, did "not broadly restrict arms use by the public generally." *Id.* Instead, they applied to individuals, and even then, both the historical laws and the modern law involve "judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* The surety bonds were also of limited duration, just like the 922(g)(8) restriction. *Id.* at 10. "Finally, the penalty—another relevant aspect of the burden—also fits within the regulatory tradition. The going armed laws provided for imprisonment . . . and if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.*

And while the Court used two sets of historical analogue laws with the surety and affray regimes, they comprised the same "genre" of regulation aimed at dealing with armed people, on an individual basis, who have demonstrated their dangerousness. The Court did not combine completely unrelated analogues that have nothing in common besides being related to firearms. That would have been

comparing "things that are green" like the Court had previously warned against. *Bruen*, 597 U.S. at 29. Indeed, the *Rahimi* majority ignored the United States' offer of laws regulating the "unsafe storage of guns or gunpowder" altogether, declining to suggest that such disparate regulations bore any resemblance to § 922(g)(8). Br. for the United States at 23, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023).

The *Rahimi* concurrences also cautioned lower courts to avoid drifting into too high a level of generality, lest they render the Second Amendment right meaningless. "Courts must proceed with care in making comparisons to historic firearms regulations, or else they risk gaming away an individual right the people expressly preserved for themselves in the Constitution's text." *Id.* at *15 (Gorsuch, J., concurring). Judges must not "let constitutional analysis morph into policy preferences under the guise of a balancing test that churns out the judge's own policy beliefs." *Id.* at 28 (Kavanaugh, J., concurring). "To be sure, a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* at 30 (Barrett, J., concurring).

The challenged sections of section 26230 bear no resemblance to the State's proffered historical laws, and, if this Court accepts the State's arguments, the general right to carry will be "watered down" such that it may only be exercised on some streets and sidewalks, as the State desires. *See* Appellant's Mot. for Stay Pending Appeal at 22.

Take, for example, the State's argument that certain locations are sensitive "because of the activities that take place there," such as the exercise of constitutional rights. Appellant's Opening Br. at 13-14. The State claims that, because some

10

historical laws may have banned carry in legislative assemblies, polling places, and courthouses, it now may ban carry in churches and commercial banks because "important activities" also occur there. *Id.* at 21-26. But that would define the historical laws' regulatory "principle" with a level of generality that *Rahimi* rejected, and the State's unrestrained argument would capture all places where people exercise First Amendment rights, i.e., everywhere.

Rather, the "principle that underpin[s] our regulatory tradition" (*Rahimi*, 2024 WL 3074728, at *6) that historical restrictions in legislative assemblies, polling places, and courthouses would reflect would be a limitation on arms *where the deliberative business of governance is conducted*. That is what legislative assemblies, polling places, and courthouses all have in common under *Rahimi*'s approach, and what churches and commercial banks do not.

The much broader principle the State tries to draw of it being able to declare places off limits "because of the activities that take place there" is, in the *Rahimi* context, akin to the State disarming anyone it merely accuses of being dangerous, without any due process or judicial finding of dangerousness. Yet the Court rejected precisely that in *Rahimi*, emphasizing that the challenged law and its historical precursors required judicial findings of dangerousness and were temporary. 2024 WL 3074728, at *9-10. Lots of places have activities that take place in them that some will consider important, but that fact alone is not grounds to expansively ban carry within them. *Heller* already rejected precisely these sorts of subjective, "importance"-based judgment calls. *Heller*, 554 U.S. at 634; *Bruen*, 597 U.S. at 22 (repudiating consideration of purportedly "important governmental interests").

Elsewhere, the State cites even more dramatically different historical laws to attempt to justify its regulation. For example, in support of the vampire rule, the State cited a handful of restrictions meant to stop *poaching*, not interpersonal violence. *See, e.g.*, 6-ER-1050 (Oregon law restricting anyone with a gun to permit a dog to "enter upon any enclosed premises" unless already in pursuit of "deer or varmints"). That is nothing like the State attempting to block carry in private businesses open to the public by default. The State's vampire rule therefore has a very different "why" to the purported historical regulation.

It also has a different "how," as it applies to carry on enclosed private property, not businesses otherwise open to the public. The "enclosed property" laws were thus a completely different genre of restriction than the modern vampire rule. Even the Second Circuit's flawed and now vacated ruling could not justify New York's vampire rule based on a similar record as the one here. "No matter how expansively we analogize, we do not see how a tradition of prohibiting illegal hunting on private lands supports prohibiting the lawful carriage of firearms for self-defense on private property open the public." *Antonyuk*, 89 F.4th at 385.

In sum, *Rahimi* precludes the State from fabricating a "historical tradition" from disparate laws boasting nothing more than the most general subject-matter similarity to a modern regulation. The "level of generality" which *Rahimi* endorsed is far more stringent than that.

### D. *Rahimi* assumes a broad Second Amendment right.

At oral argument in this matter, Judge Schroeder cut to the very heart of the State's arguments when she asked the State's counsel "what *isn't* sensitive? I take it

12

that the street isn't sensitive?" Repeating its prior briefing, the State responded that only public streets, sidewalks, federal lands, and a few private businesses willing to post signs are not sensitive. *See* Oral Argument at 7:30, *Carralero v. Bonta* (9th Cir. April 11, 2024) (No. 24-4354), https://www.youtube.com/watch?v=k-1Hh0nufxo&t. Under that interpretation, the supposed "right" becomes the exception rather than the rule. Californians would essentially be allowed to carry only while out for a walk, and only if they are going nowhere in particular. But otherwise, the right (and the permit they had to obtain to exercise that right) would be all but useless to them, like a right to free speech that was limited to typewritten documents and did not apply on the internet or other mediums. Every public place save for a few businesses would be off limits to carry, including all public transportation, all businesses that serve alcohol, banks, libraries, hospitals, parks (including even the wilderness of state parks), many parking lots, and more. The sheer majority of places where people actually are most of the time would be off limits.

This is not what the Supreme Court had in mind in *Rahimi*. There, the Supreme Court presumed a broad right that could only be limited in rare circumstances, as it distinguished between "focused" regulations like the surety laws from the "broad prohibitory regime" like New York's prior may-issue law at issue in *Bruen*. *Rahimi*, 2024 WL 3074728, at *10. While it applies to *where* someone may carry and not *whether* someone may carry like the New York law in *Bruen*, SB 2 implemented the exact same sort of "broad prohibitory regime" by making most public places off limits for the "general right to public carry." *Bruen*, 597 U.S. at 34. As SB 2 regulates carry "to an extent beyond what was done at the founding," it is thus unconstitutional. *Rahimi*,

13

2024 WL 3074728, at *6.

### E. *Rahimi* focuses on dangerousness as the only legitimate justification for disarmament, undermining the State's effort to disarm people it has already vetted.

*Rahimi* explained that "our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not." 2024 WL 3074728, at *10. This is a significant blow to the State's arguments because, with section 26230, the State effectively punishes citizens who not only are not a credible threat, but who have also gone through the extensive vetting process to get a CCW permit, i.e., a police interview, extensive background check, 16-hour training course, and sometimes a psychological exam. *See* Cal. Penal Code § 26202, 26150, 26165 & 26190 (West 2024).

CCW permit holders rarely commit crimes. Appellees presented extensive government data from other states demonstrating that fact in the district court, and the State has not ever attempted to rebut it. Nor has it pointed to any data of its own, or even anecdotes, of Californians with CCW permits committing violent crimes, because, as the district court found, few, if any, exist. 1-ER-48. That is also why SB 2 received extensive law enforcement opposition. 11-ER-2196-97; *see also* Amicus Br. of Peace Officers Rsch. Ass'n of Cal. in Supp. of Appellees, ECF No. 57.1.

Given this reality, *Rahimi*'s focus on dangerousness destroys the State's "why" comparison for <u>every</u> claimed historical analogue, because SB 2 targets people whom the government has already confirmed are *not* dangerous. This is the final, fatal difference between SB 2's challenged provisions and all the historical laws the State cites. SB 2 was not enacted to address a problem of gun-related crime with CCW

14

permit holders, because there is no evidence that such a problem exists.

Instead, the real "why" for SB 2 is that politicians like Governor Newsom wanted to punish a disfavored group – gun owners – for the *Bruen* ruling, as their press conference announcing the bill made clear. *See* SB 2 Press Conference, YouTube.com (Feb. 1, 2023), https://www.youtube. com/watch?v=Kpxpj6yvFIo (at 36:10) (last visited July 1, 2024). And that "why" of course will not find an ounce of historical support anywhere other than British rule.

## II. CONCLUSION

For all of these reasons, *Rahimi* only strengthens Appellees' case. This Court should affirm the district court's preliminary injunction.[5]

Date: July 12, 2024                    **MICHEL & ASSOCIATES, P.C.**

                                        *s/ C.D. Michel*
                                        C.D. Michel
                                        *Counsel for Plaintiffs-Appellees*

---

[5] At oral argument, there was discussion about whether this case needs further factual development. But there is no significant factual development to be had in "sensitive places" cases. The facts about which places are prohibited by SB 2 are not in dispute, and whether restrictions on those places are analogous to historical laws are pure legal questions unaided by any further factual development.

15

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-4354 and 23-4356

I am the attorney or self-represented party.

**This brief contains** | 15 | **pages,** including | 0 | pages

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

⦿ complies with the length limit designated by court order dated | June 21, 2024 |.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ C.D. Michel | **Date** | July 12, 2024

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2024, an electronic PDF of APPELLEES'

SUPPLEMENTAL BRIEFING IN LIGHT OF *UNITED STATES V. RAHIMI*

was uploaded to the Court's CM/ECF system, which will automatically generate and

send by electronic mail a Notice of Docket Activity to all registered attorneys

participating in the case. Such notice constitutes service on those registered attorneys.

Date: July 12, 2024                    **MICHEL & ASSOCIATES, P.C.**

*s/ C.D. Michel*

C.D. Michel
*Counsel for Plaintiffs-Appellees*