**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARCO ANTONIO CARRALERO; GARRISON HAM; MICHAEL SCHWARTZ; ORANGE COUNTY GUN OWNERS PAC; SAN DIEGO COUNTY GUN OWNERS PAC; CALIFORNIA GUN RIGHTS FOUNDATION; FIREARMS POLICY COALITION, INC., *Plaintiffs - Appellees*, <br><br> v. <br><br> ROB BONTA, in his official capacity as Attorney General of California, *Defendant – Appellant*. | No. 23-4354 <br><br> D.C. No. 8:23-cv-01798-CJC-ADS <br><br><br> ORDER |
| RENO MAY, an individual; ANTHONY MIRANDA, an individual; ERIC HANS, an individual; GARY BRENNAN, an individual; OSCAR A. BARRETTO, Jr., an individual; ISABELLE R. BARRETTO, an individual; BARRY BAHRAMI, an individual; PETE STEPHENSON, an | No. 23-4356 <br><br> D.C. No. 8:23-cv-01696-CJC-ADS |

2                CARRALERO V. BONTA

individual; ANDREW HARMS, an
individual; JOSE FLORES, an
individual; Dr. SHELDON HOUGH,
DDS, an individual; SECOND
AMENDMENT
FOUNDATION; GUN OWNERS
OF AMERICA, INC.; GUN
OWNERS FOUNDATION; GUN
OWNERS OF CALIFORNIA,
INC.; LIBERAL GUN OWNERS
ASSOCIATION; CALIFORNIA
RIFLE & PISTOL ASSOCIATION,
          *Plaintiffs - Appellees*,

  v.

ROBERT BONTA, in his official
capacity as Attorney General of the
State of California,
          *Defendant - Appellant*,

DOES, 1-10,
          *Defendant*.

Filed January 15, 2025

Before: Mary M. Schroeder, Susan P. Graber, and Jennifer
Sung, Circuit Judges.

Order;
Dissent by Judge Collins;
Dissent by Judge VanDyke

## SUMMARY[*]

### Second Amendment

The panel denied appellees' petition for panel rehearing and petition for rehearing en banc in a case in which the panel affirmed in part and reversed in large part district court orders preliminarily enjoining the implementation or enforcement of several provisions of a California law that prohibits the carry of firearms at sensitive places.

Dissenting from the denial of rehearing en banc, Judge Collins, joined by Judge Bress, stated that, for many of the same reasons set forth by Judge VanDyke, he agreed that the panel failed to apply the proper standards for evaluating Second Amendment challenges, and that, in doing so, the panel largely vitiated "the right to bear commonly used arms in public" that the Supreme Court recognized in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1 (2022).

Dissenting from the denial of rehearing en banc, Judge VanDyke, joined by Judges Callahan, Ikuta, R. Nelson, Lee and Bumatay, wrote that the panel's opinion is contrary to Supreme Court precedent and results in a circuit split with the Second Circuit. Attempts to declare almost all cities and public locations as either prohibited "sensitive places" or presumptive gun-free zones cannot be squared with *Bruen*.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## ORDER

The panel has voted to deny Appellees' petition for panel rehearing. Judge Sung has voted to deny Appellees' petition for rehearing en banc, and Judges Schroeder and Graber have so recommended.

The full court was advised of Appellees' petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35

Appellees' petition for panel rehearing and petition for rehearing en banc, Docket No. 80, is DENIED.

---

COLLINS, Circuit Judge, joined by BRESS, Circuit Judge, dissenting from the denial of rehearing en banc:

For many of the same reasons set forth by Judge VanDyke, I agree that the panel in these cases failed to apply the proper standards for evaluating Second Amendment challenges, as set forth in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), and that, in doing so, the panel largely vitiated the "the right to bear commonly used arms in public" that the Supreme Court recognized in *Bruen*. *See Bruen*, 597 U.S. at 70. We therefore should have reheard these important cases en banc.

VANDYKE, Circuit Judge, joined by CALLAHAN, IKUTA, R. NELSON, LEE, and BUMATAY, Circuit Judges, dissenting from the denial of rehearing en banc:

Just a few years ago in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10 (2022), the Supreme Court made clear that the Second Amendment includes the right to bear firearms in public. With its decision in these cases our court allows governments in our circuit to practically eliminate most of that right. In response to *Bruen*, both Hawaii and California declared a broad and unprecedented number of locations to be prohibited "sensitive places," and on top of that imposed novel criminal sanctions for concealed carry onto private property absent express permission received in advance. With this court's blessing, law-abiding and licensed citizens in this circuit can now be banned from carrying firearms in most public and private spaces. Apparently, notwithstanding *Bruen*'s instruction that the Second Amendment protects a right to carry a firearm in public, what it really protects is the right to carry only while taking your dog out for a walk on a city sidewalk. If only New York City had been as creative as California and Hawaii, it too could have avoided *Bruen* and succeeded in banning firearms throughout most of Manhattan.

I don't think that's right. Hawaii's and California's creative attempts to declare almost all cities and public locations as either prohibited "sensitive places" or presumptive gun-free zones cannot be squared with *Bruen*. There, the Supreme Court concluded that designating entire cities "sensitive places" and prohibiting the carrying of firearms in those locations would effectively "exempt cities from the Second Amendment" and "eviscerate the general

right to publicly carry arms for self-defense." *Id.* at 31.  Yet California's and Hawaii's bans practically accomplish close to the same thing rejected in *Bruen*.

In upholding most of these new laws, the panel distorted *Bruen*'s text-history-and-tradition analysis.  It failed to identify any Founding-era tradition justifying laws that flip the presumption like California and Hawaii have attempted. Instead, it justified its conclusion by pointing to just two outlier laws—one an anti-poaching colonial law and the other a discriminatory Reconstruction era Black Code. Some of the sensitive place restrictions allowed by the panel ban carry in locations that have existed since the Founding, with no comparable prohibition in those locations at that time.   The panel upheld those and other provisions of Hawaii's and California's bans by extracting overbroad principles from strained analogies to unrelated laws and by looking to late-19th and early-20th-century laws enacted long after the proper historical time period.

Among other things, our court's decision in these cases results in a split with the Second Circuit, which ruled that the application of New York's similar private-property law was unconstitutional.  We should have taken these cases en banc to rectify this, and I respectfully dissent from our failure to do so.

## I.

First, some background.  In *Bruen*, the Supreme Court recognized the Second Amendment protects the "right to carry a handgun for self-defense outside the home." *Id.* at 10.  The Court thus held that New York's proper-cause requirement for its licensing and permitting regime was unconstitutional, *id.* at 71, and threw constitutional doubt on California's       and       Hawaii's       similarly       aggressive

licensed-carry bans. *See id.* at 57 (rejecting our en banc court's holding in *Young v. Hawaii*, 992 F.3d 765, 813 (9th Cir. 2021) (en banc), that "the government may regulate, and even prohibit, in public places" the carrying of firearms). California appropriately responded by "remov[ing] the good character and good cause requirements from the issuance criteria" for its concealed carry permits. 2023 Cal. Legis. Serv. Ch. 249. But that's not all California did. It also enacted new laws that prohibit the concealed carrying of firearms in many new locations—what *Bruen* referred to as "sensitive places" prohibitions. Hawaii did the same. It amended its carry permit statute—which before *Bruen* restricted the right to obtain a carry permit outside the home to only "an exceptional case," 2023 Haw. Sess. Laws 113 (Act 52)—to now make it possible for the ordinary, law-abiding citizen to obtain a carry permit, again as required by *Bruen*, HRS § 134-9. But like California, Hawaii took away with its other hand what it purported to grant, imposing its own broad new restrictions on *where* such permit holders may carry. *See* HRS §§ 134-9.1, 134-9.5.

California's new law makes it a criminal offense to carry in 26 different places—even with a permit—including locations where liquor is sold for consumption on the premises (whether the permit-holder is drinking or not), parks and athletic facilities, and casinos. Cal. Pen. Code § 26230(a)(9), (12), (15). And Hawaii's law makes it a criminal offense to carry a firearm onto 15 different types of property—again, even with a permit—including government buildings, bars and restaurants serving alcohol, and parks and beaches. HRS § 134-9.1(a)(1), (4), (9).

Perhaps most far-reaching, both states also flipped the default rule for carrying on private property. Under traditional property law principles, a person with a carry

permit is allowed to bring firearms onto private property unless the owner prohibits it. *See, e.g.*, *Christian v. Nigrelli*, 642 F. Supp. 3d 393, 407 (W.D.N.Y. 2022) (observing that at the Founding "private property owners" were principally responsible for "exclud[ing] others from their property"); I. Ayres & S. Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, 184 (2020). Hawaii's and California's statutes invert that longstanding principle. By statute, both states now prohibit carrying firearms onto private property unless the proprietor affirmatively gives advance permission. *See* Cal. Pen. Code § 26230(a)(26); HRS § 134-9.5. California's law allows for permission to be granted only if "the operator of the establishment clearly and conspicuously posts a sign" stating that carry is allowed, Cal. Pen. Code § 26230(a)(26), while Hawaii's law allows permission to be granted through any "[u]nambiguous written or verbal authorization" or by the "posting of clear and conspicuous signage." HRS § 134-9.5(b).

Both laws dramatically restrict the practical ability to carry in public in their states. For example, Hawaii's law prohibits, presumptively or outright, the carrying of a handgun on 96.4% of the publicly accessible land in Maui County. And California's law "turns nearly every public place in California into a 'sensitive place,'" *May v. Bonta*, 709 F. Supp. 3d 940, 947 (C.D. Cal. 2023), effectively limiting carrying—in one plaintiff's apt characterization— "to just streets, sidewalks, and the few standalone private business willing to post signs affirmatively allowing carry."

Plaintiffs challenged the laws in both California and Hawaii. In California, the *Carralero* and *May* plaintiffs sought preliminary injunctions. They requested that the district court enjoin enforcement of the statute with respect

to only some of the "sensitive places" created by California's law.  They did not challenge, for example, the statute's application to locations such as schools, certain government buildings, or places of higher education.  *See Wolford*, 116 F.4th at 973, 975–76.

The district court granted in full the plaintiffs' requested injunctive relief, enjoining enforcement of the law with respect to California's ban in hospitals, playgrounds, public transit facilities, parks and athletic facilities, property controlled by the Parks and Recreation Department, bars and restaurants that serve alcohol, gatherings that require a permit, libraries, casinos, zoos, stadiums and arenas, amusement parks, museums, places of worship, banks, and all parking lots adjacent to sensitive places.  *May*, 709 F. Supp. 3d at 947.    The district court also enjoined enforcement of California's new default rule flipping the presumption for private property held open to the public.  *Id.* at 967.

In Hawaii, the *Wolford* plaintiffs also sought injunctive relief.  *Wolford v. Lopez*, 686 F. Supp. 3d 1034, 1042 (D. Haw. 2023).  As with the California plaintiffs, the Hawaii plaintiffs "did not challenge the prohibitions in all areas under the Act.  Instead, they challenged only a limited subset that impose particularly egregious restrictions on their Second Amendment right to bear arms."  *Id.* (cleaned up).

The district court granted in part and denied in part a temporary restraining order, which was then converted into a preliminary injunction.  *Id.* at 1077.  Specifically, the district court enjoined enforcement of Hawaii's prohibition on carrying firearms in parking lots shared by government buildings and nongovernment buildings, banks, financial institutions and their adjacent parking areas, public beaches,

public parks and their adjacent parking areas, bars, and restaurants that serve alcohol and their adjacent parking areas. *Id.* The district court also enjoined enforcement of the new default rule for private property, but limited the injunction to private property held open to the public. *Id.*

Both Hawaii and California appealed. The two California cases were consolidated, and a panel of this court issued a single opinion for all three cases. *Wolford*, 116 F.4th at 976. With respect to the California law, the panel upheld the district court's injunction as to medical facilities, public transportation facilities, public gatherings, places of worship, financial institutions, parking areas connected to those places, and the new private property default rule. *Id.* at 1003. The panel otherwise reversed the injunction, allowing California's restrictions to go into effect with respect to bars and restaurants that serve alcohol, playgrounds, youth centers, parks, athletic areas, athletic facilities, most real property under the control of the Department of Parks and Recreation or Department of Fish and Wildlife, casinos and similar gambling establishments, stadiums, arenas, public libraries, amusement parks, zoos and museums, parking areas and similar areas connected to those places, and all parking areas connected to other sensitive places listed in the statute. *Id.* at 1003.

With respect to Hawaii's law, the panel upheld the preliminary injunction as applied to financial institutions and certain parking lots. *Id.* at 1002. The panel otherwise reversed the injunction, allowing Hawaii's restrictions to go into effect with respect to bars and restaurants that serve alcohol, beaches, parks, and similar areas, parking areas adjacent to all those places, and Hawaii's new private property default rule. *Id.* at 1002–03.

Given the procedural posture of these cases—appeals from grants of preliminary injunctions—the panel applied the *Winter* factors, which require that a movant show: (1) a likelihood of success on the merits, (2) the presence of irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in the movant's favor, and (4) the public interest tips in favor of an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). But the panel and both district courts appropriately focused their analyses on the first factor, which "is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020); *see also Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (noting that a "court need not consider the other factors" if a movant fails to show a likelihood of success on the merits).

The *Wolford*, *Carralero*, and *May* plaintiffs each sought en banc review, which a majority of our court has now declined to grant. In refusing to correct the panel's opinion, our court left in place a decision directly contrary to Supreme Court precedent and locked in an unnecessary circuit split of our own creation.

## II.

A good starting place to analyze how the panel in these cases went wrong is with the Supreme Court's discussion of sensitive places laws, and to compare that discussion with what our court has allowed California and Hawaii to do in these cases. In *Bruen* the Court explained that "relatively few" public locations can be properly classified as "sensitive places" "where arms carrying c[an] be prohibited consistent with the Second Amendment." 597 U.S. at 30. The few locations *Bruen* identified include schools, government buildings, "legislative assemblies, polling places, and

courthouses." *Id.*  Apart from these locations, "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." *Id.*  The Court rejected New York's attempted characterization of its proper-cause licensing requirement as an appropriate "sensitive places" law, after the government attempted to label as sensitive places public places "where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id.* at 30–31.  The Court reasoned that while people often congregate in sensitive places and law enforcement professionals are presumptively available in those locations, applying the tradition associated with sensitive places to all locations that fit those two characteristics expanded it "far too broadly." *Id.* at 31.  Such a reading would "in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Id.*  The Court ultimately concluded that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.*

Hawaii's response to *Bruen*—which practically renders nearly all the publicly accessible areas of the entire island of Maui a "sensitive place"—seeks to accomplish by other means most of what the Supreme Court rejected in *Bruen*. As noted, Hawaii's law completely or presumptively restricts the licensed carrying of a handgun in 96.4% of the publicly accessible land in Maui County.  While New York sought to ban most public carry of firearms by sharply curtailing *who* may carry, Hawaii accomplishes the same feat by banning most places *where* someone may carry. Hawaii's law is the same sort of "broad prohibit[ory]"

regime that the Court already rejected, as it still makes most public places off limits notwithstanding the "general right to public carry." *Id.* at 33, 50.

The panel's opinion addressed the obvious tension between its conclusions in this case and those reached by the Supreme Court in *Bruen* in a mere footnote:

> because Plaintiffs may take their firearms onto the public streets and sidewalks throughout Maui County (and elsewhere in Hawaii), as well as into many commercial establishments and other locations, the situation in this case is unlike the argument that *Bruen* rejected, which would have meant, effectively, that firearms could be banned from the entire island of Manhattan.

*Wolford*, 116 F.4th at 984 n.4 (citing *Bruen*, 597 U.S. at 31). The panel's assertion that licensed individuals may still carry in "many commercial establishments" is belied by the record, which, as the panel acknowledged, evinces what common sense suggests: that "many property owners will not post signs of any sort or give specialized permission, regardless of the default rule." *Id.* at 993. Indeed, the panel recognized that there would be little reason for Hawaii to have flipped the presumption unless it reasonably anticipated that many—indeed, most—private property owners will simply let the default rule govern. *See id.* ("if that group were small or did not exist, Hawaii's law would accomplish little or nothing"). So what we're left with is a law mostly limiting the Second Amendment's right to publicly carry to just the "public streets and sidewalks," *id.* at 984 n.4, which obviously dramatically curtails an

individual's practical ability to be prepared in public to defend themselves—"the *central component* of the [Second Amendment] right." *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008). Realistically, only those who aimlessly wander streets and sidewalks without ever planning to enter a store, park, or other private or public establishment will be able to carry a firearm in Hawaii. Is that really what the Supreme Court meant when it recognized a historically grounded "general right to public carry" in *Bruen*?**[1]**

The panel's self-proclaimed "arbitrary" and "[il]logical" outcome—allowing Hawaii to presumptively prohibit all firearms on all private property—called for en banc review. *Wolford*, 116 F.4th at 1003. It effectively nullified the Second Amendment rights of millions of Hawaiians and Californians to bear firearms as they go about their daily

---

[1] It is no solace that the panel found fault with California's private property default law while blessing Hawaii's. *Wolford*, 116 F.4th at 995–96. The panel concluded that California's law, which allows someone to avoid its new private property carry ban only if they receive permission in *written* form, was too restrictive for the Second Amendment. By contrast, Hawaii's law, which requires the same advance permission but allows it to be granted in multiple ways (including orally), passed the panel's Second Amendment scrutiny. But the novelty of the two states' attempts to flip the presumption has little to do with nuances of how someone might go about restoring permission to bear a firearm on their property. The overwhelming impact of California's and Hawaii's innovation is the reversal in the presumption itself. The panel's distinction between the two states' presumption-flipping rules may give the illusion of analytical precision, but it strains the proverbial gnat while swallowing the camel. And practically, it just means California and other governments that desire to flip the presumption will now follow the approach sanctioned by the panel: Hawaii's, not California's.

lives in public. Except, of course, for those who aimlessly wander the streets.

## III.

The panel's decision is not just generally in tension with the Supreme Court's recent holding in *Bruen*, however. The nuts-and-bolts of the panel's analysis is also inconsistent with how the Court has instructed lower courts to conduct our text-history-and-tradition analysis. The panel discerned a historical tradition supporting Hawaii's novel private property law, even though there is no such tradition. The panel added to the Supreme Court's guidance on *when* lower courts should turn to analogies to draw constitutional principles from the historical record. It drew principles from unrelated laws regulating some aspect of firearm use, even when the historical record reveals no examples of comparable locational restrictions at the same types of places that existed at the Founding. And the panel broadly redefined what it means to be a historically unprecedented location permitting very loose analogizing. Finally, the panel continued our court's troubling trend of drawing analogies at such a high level of generality that any challenged ban could pass constitutional muster.

## A.

Hawaii's private property default law cannot survive *Bruen*'s two-step framework. Under that framework, if the Second Amendment's plain text covers regulated conduct, the regulation will stand only if the government can "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" in the United States. *Bruen*, 597 U.S. at 19, 24. While the government need not identify a "dead ringer" to show a historical tradition supporting its modern

regulation, it must locate a "well-established and representative historical *analogue*." *Id.* at 30. Not any loose analogue will suffice: the historical regulation must have been "relevantly similar" to the challenged regulation in "how and why" it "burden[ed] a law-abiding citizen's right to armed self-defense." *Id.* at 29. As the Supreme Court has cautioned, upholding a modern regulation that only "remotely resembles a historical analogue" would entail "endorsing outliers that our ancestors would never have accepted" and thus be inconsistent with the historical inquiry required by *Bruen*. *Id.* at 30 (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)). Only when applied in this manner is "analogical reasoning under the Second Amendment" done correctly, as "neither a regulatory straightjacket nor a regulatory blank check." *Id.*

*Bruen*'s first step asks whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. The Supreme Court has already told us that the text of the Second Amendment protects the right to bear arms outside of the home. *Id.* at 33. And that right makes no distinction between public property or private property held open to the public, as lower courts have consistently recognized. *Antonyuk v. James*, 120 F.4th 941, 1044–45 (2d Cir. 2024); *Christian v. James*, No. 22-CV-695 (JLS), 2024 WL 4458385, at *11 (W.D.N.Y. Oct. 10, 2024); *Kipke v. Moore*, 695 F. Supp. 3d 638, 658 n.9 (D. Md. 2023); *Koons v. Platkin*, 673 F. Supp. 3d 515, 607–15 (D.N.J. 2023). So *Bruen*'s first step is easily met by Hawaii's law, and the law is presumptively unconstitutional. *Bruen*, 597 U.S. at 19.

Hawaii's use of a new statutory presumption—rather than an outright prohibition—does not change the analysis. "[A] constitutional prohibition cannot be transgressed

indirectly by the creation of a statutory presumption any more than it can be violated by direct enactment.  The power to create presumptions is not a means of escape from constitutional restrictions." *Speiser v. Randall*, 357 U.S. 513, 526 (1958) (quoting *Bailey v. Alabama*, 219 U.S. 219, 239 (1911)).  The Second Amendment's text protects against a presumptive ban on carrying firearms on publicly accessible private property no less than it protects from attempts to directly ban the same conduct.

To be sure, the Second Amendment does not restrict private-property owners' ability to decide whether to exclude firearms, or certain people for that matter, from their property.  *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021).  "[T]he right to exclude is 'universally held to be a fundamental element of the property right,' and is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'"  *Id.* (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 179–80 (1979)).  But that is the property owner's right, not the government's.  Nothing about a property owner's authority to exclude would extend to the government a correlative power to make new presumptions that control the exclusion of firearms from private property without any decision by the property owner.

So we reach *Bruen*'s second step.  To overcome the presumption of unconstitutionality, Hawaii must show that its law "is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 24.  The panel concluded that Hawaii's private property default rule is consistent with one abstract principle derived from the historical tradition: "the Nation has an established tradition of arranging the default rules that apply specifically to the carrying of firearms onto private property."  *Wolford*, 116

F.4th at 995.  Setting aside the staggering generality of the principle the panel extracted (more on that in a minute), the historical record the panel relied on simply does not support it even in the capacious form articulated by the panel.

The panel pointed to two sets of laws as supporting its principle.  The first set includes laws that "prohibited the carry of firearms onto subsets of private land, such as plantations or enclosed lands." *Id.* at 994.  But the panel itself acknowledged that these laws bear little resemblance to Hawaii's and California's new laws.  The historical laws the panel relied on were "limited to only a subset of private property; those laws likely did not apply to property that was generally open to the public"; and their aim was to prevent poaching, not the dangerous use of firearms. *Id.*  The "how" (prohibiting carrying on a narrow subset of all enclosed private property) and the "why" (preventing poaching) of these historical regulations bear no resemblance to Hawaii's and California's laws presumptively outlawing carrying on *all* private property, ostensibly to reduce gun violence (not poaching). *See* 2023 Cal. Legis. Serv. Ch. 249 § 1(c).  Given the lack of a tenable analogy, the panel rightly discounted reliance on these anti-poaching laws.

But the second set of laws—in fact just *two* laws—that the panel and the states relied upon to justify the states' presumptive bans fares no better.  A 1771 New Jersey law and an 1865 Louisiana law purportedly "bann[ed] the carrying of firearms onto *any* private property without the owner's consent." *Wolford*, 116 F.4th at 994.  But as an initial matter, two state laws—nearly a century apart—cannot establish a historical tradition at odds with the text of the Second Amendment. *Bruen*, 597 U.S. at 46 ("[W]e doubt that three colonial regulations could suffice to show a tradition of public-carry regulation.").  And even if such

scarcity was not alone fatal, there is no consistent record of enforcement of these laws to the breadth that the states rely upon them. *Id.* at 58 & n.25 (noting that a "barren record of enforcement" is an "additional reason to discount [laws'] relevance"). The two laws simply fail to provide analogical support for the broad presumptive rule of disarmament the panel found.

Even if two laws alone were enough to establish a historical tradition, these particular two laws are far different than California's and Hawaii's novel bans. The first claimed analogy, New Jersey's 1771 law, made it unlawful for someone "to carry any Gun on any Lands not his own … unless he hath License or Permission in Writing from the Owner or Owners or legal Posessor." 1771 N.J. Laws 343–347, ch. 540, § 1. This law was an antipoaching and antitrespassing ordinance—not a broad disarmament statute. Indeed, the Act's title was "An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns." *Id.* The "why" behind New Jersey's law was to stop people from trespassing on private land with firearms for the purpose of poaching. The "why" of New Jersey's law is thus not remotely comparable to the "why" of Hawaii's law. In effect New Jersey's law imposed strict liability restrictions on trespassing with guns, presumably because proving the intent behind poaching can be particularly burdensome. Picture Elmer Fudd creeping across your property, who, when caught, says: "Um … I was just out for a weisurely strowl across your pwoperty with my twusty musket. I certainwy was *not* pwanning to shoot anything …." New Jersey's law made it easier to prosecute ol' Elmer for poaching, even if you couldn't catch him in the act of blasting a wabbit.

And even if the "why" of New Jersey's anti-poaching law was more akin to Hawaii's, New Jersey's solitary colonial law is an "outlier" and thus an inappropriate analogue. *Bruen*, 597 U.S. at 30. As the panel acknowledged, other colonial laws that purported to adjust the default presumption for carrying firearms onto private property were "limited to only a subset of private property; th[e]se laws likely did not apply to property that was generally open to the public." *Wolford*, 116 F.4th at 994. Maryland's 1715 law, Pennsylvania's 1721 law, and New Jersey's 1722 law were all limited to "seated plantations" or "improved or inclosed lands." 1715 Md. Laws 88–91, ch. 26, § VII; 1721 Pa. Laws, ch. 246, § III, *reprinted in* 3 James T. Mitchell & Henry Flanders, The Statutes at Large of Pennsylvania from 1682 to 1801, at 254–57 (Pa., Clarence M. Busch, 1896); 1722 N.J. Laws 141–42. And New York's 1763 statute covered just "Orchard[s], Garden[s], Corn-Field[s], or other inclosed Land." 1763 N.Y. Laws, ch. 1233, § 1, *reprinted in* 1 Laws of New-York from the Year 1691 to 1773 Inclusive, at 441–42 (N.Y., Hugh Gaine 1774). Allowing Hawaii to presumptively outlaw carrying firearms on *all* private property on the basis of an idiosyncratic anti-poaching law amounts to "endorsing [an] outlier[] that our ancestors would never have accepted"—precisely what the Supreme Court has instructed lower courts not to do. *Bruen*, 597 U.S. at 30 (quoting *Drummond*, 9 F.4th at 226).

The second supposed analogue relied on by the panel is an 1865 Louisiana law. Louisiana's law prohibited "carry[ing] fire-arms on the premises or plantation of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order." 1865 La. Acts 14–16, no. 10, § 1. It was enacted as part of Louisiana's notorious Black Codes that sought to deprive

African Americans of their rights, including the right to keep and bear arms otherwise protected by state law. *See McDonald v. City of Chicago*, 561 U.S. 742, 771, 779 (2010); *id.* at 845–47 (Thomas, J., concurring) (detailing the sordid history of these laws, which were part of the "systematic efforts in the old Confederacy to disarm the more than 180,000 freedmen who had served in the Union Army, as well as other free blacks" (internal quotation marks omitted)); *Heller*, 554 U.S. at 614; *Koons*, 673 F. Supp. 3d at 568–69. The law was enacted right after the Civil War, by a former Confederate State, *before* Louisiana was even readmitted to the Union. Courts have correctly observed that "[t]he Supreme Court has cautioned against relying on such laws." *Kipke*, 695 F. Supp. 3d at 659. In *Bruen*, the Court explained that two discriminatory statutes were "too slender a reed on which to hang a historical tradition of restricting the right to public carry." 597 U.S. at 58. Nor should our court "infer a historical tradition of regulation consistent" with Hawaii's novel private property presumption from a Black Code *that was invidiously designed to undermine civil rights*. *Kipke*, 695 F. Supp. 3d at 659; *see also Koons*, 673 F. Supp. 3d at 568–69.

Applying the analytical framework provided by the Supreme Court, it should be easy to see that the "why" behind Louisiana's law does not map onto Hawaii's purported "why." Louisiana's "intent was to discriminate, rather than to advance public safety." *Kipke*, 695 F. Supp. 3d at 659. This discriminatory animus is not part of the history baked into our legitimate constitutional tradition, and we "must exercise care to rely only on the history that the Constitution actually incorporated and not on the history that the Constitution left behind." *United States v. Rahimi*, 602 U.S. 680, 723 (2024) (Kavanaugh, J., concurring). Southern

legislatures and their political supporters during Reconstruction made efforts "to deprive colored citizens of the right to bear arms ... and to reduce the colored people to a condition closely akin to that of slavery." H. Journal, 42nd Cong., 2d Sess. 716 (1872) (statement of President Grant). Louisiana's 1865 law is part of *that* invidious tradition and, far from being indicative of the Constitution's meaning, is "probative of what the Constitution does *not* mean." *Rahimi*, 602 U.S. at 720 (Kavanaugh, J., concurring).

And just as New Jersey's 1771 law is an outlier, Louisiana's law too is a one-of-a-kind law, even in comparison to other Reconstruction era laws. Only two other states purported to adjust the default private property presumption in this era—Texas in 1866 and Oregon in 1893. *See* 1866 Tex. Gen. Laws 90, ch. 91, § 1; 1893 Or. Laws 79, § 1. But those states' laws applied to only "enclosed premises or plantation[s]," 1866 Tex. Gen. Laws 90, ch. 91, § 1, or "enclosed premises or lands," 1893 Or. Laws 79, § 1. Just as in the colonial era, only one law, on its face, applied to properties generally held open to the public. The breadth of Louisiana's discriminatory law is a clear "outlier" in its era and so for that reason too cannot form the basis of a constitutional tradition. *Bruen*, 597 U.S. at 29.

In sum, the panel's broad principle—"that the Nation has an established tradition of arranging the default rules that apply specifically to the carrying of firearms onto private property," *Wolford*, 116 F.4th at 995—has no grounding in the historical record. The panel abstracts from an anti-poaching ordinance and a discriminatory Black Code—both of which fail to share the same "why" as Hawaii's law, and both of which were clear outliers in their times in any event. Since there is no historical tradition that supports Hawaii's private property default law, we should have taken this case

en banc to fix the panel's error in upholding Hawaii's novel law.

### B.

The panel also erred in its approach for other locational restrictions it upheld, and we should have taken these cases en banc to correct those multiple departures from *Bruen*'s and *Rahimi*'s framework for analogizing. *See Bruen*, 597 U.S. at 29–30; *Rahimi*, 602 U.S. at 692. First, even in instances where the same or similar properties existed at the Founding and the government pointed to no historical prohibitions for those locations, the panel nonetheless upheld the states' modern bans by broadly analogizing to unrelated historical laws. Second and relatedly, the panel discounted the non-regulation of the same or similar historical properties by pointing to purported changes in how society now perceives those properties. And third, the panel abstracted at too high a level of generality, pulling principles out of historical precedent with little to no correlation between "how and why" these historical regulations affected the right to bear arms in self-defense and "how and why" the Hawaii and California laws seek to ban the public carry of firearms.

### 1.

The panel's first methodological departure from the analogical approach of *Bruen* and *Rahimi* is drawing analogies to unrelated laws even where the same or similar locations existed at the Founding, and the historical record shows no historical tradition of regulating those locations. *Bruen* instructs against that approach: "[w]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is

relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 597 U.S. at 26–27.

Take one example from the panel's opinion: its analysis of California's and Hawaii's carry prohibitions in bars and restaurants that serve alcohol. Cal. Pen. Code § 26230(a)(9); HRS § 134-9.1(a)(4). The panel acknowledged that "[e]stablishments serving alcohol have existed since the Founding." *Wolford*, 116 F.4th at 986. Nor could it dispute that "[c]onsuming alcohol was one of the most widespread practices in the American colonies" and "[t]averns served as the most common drinking and gathering place for colonists." Baylen J. Linnekin, *"Tavern Talk" and the Origins of the Assembly Clause: Tracing the First Amendment's Assembly Clause Back to Its Roots in Colonial Taverns*, 39 Hastings Const. L.Q. 593, 595 (2012). Because the panel could point to *no* laws from that era outlawing the carrying of firearms in those locations, the panel's analysis should have stopped there.

Instead, the panel looked to a panoply of laws separating the storage of gunpowder from bars, limiting the carrying of firearms while intoxicated, and restricting militiamen from alcohol. *Wolford*, 116 F.4th at 985–86. From this broader hodgepodge, the panel then abstracted a general principle: "governments have regulated in order to mitigate the dangers of mixing alcohol and firearms." *Id.* at 986. And from laws prohibiting carrying firearms at ballrooms and social gatherings, the panel drew the principle of "prohibiting firearms at crowded places, which included, at times, bars and restaurants." *Id.*

On the flimsy framework of these over-generalized principles and four localized mid- to late-19th-century

ordinances and territorial laws, the panel produced the conclusion that "Hawaii's and California's modern laws are 'consistent with the principles that underpin our regulatory tradition.'" *Id.* at 986 (quoting *Rahimi*, 602 U.S. at 692). Once again, the panel failed to heed *Bruen*'s instructions. "[H]istorical analogues inconsistent with the 'overwhelming weight of other evidence' are undeserving of much weight, especially those laws that governed only a few colonies or territories, affected a small population, or were enacted in the late 19th century or later." *Id.* at 978 (quoting *Bruen*, 597 U.S. at 66). The only colonial or Founding era laws that the panel points to are those that separated the militia and alcohol. *Wolford*, 116 F.4th at 985. Otherwise, the panel primarily relies on later territorial laws (New Mexico in 1853), local ordinances (New Orleans in 1817 and 1879, Chicago in 1851, and St. Paul in 1858), and late-19th-century ordinances. While the panel does rely on three Reconstruction era laws that prohibited carrying a firearm while intoxicated—Kansas in 1867, Missouri in 1883, and Wisconsin in 1883—our sister circuit has correctly concluded that those same laws, even assuming they are relevant, would "support, at most, a ban on carrying firearms while an individual is *presently* under the influence." *United States v. Connelly*, 117 F.4th 269, 282 (5th Cir. 2024). Moreover, the panel's principle of banning firearms in "crowded places"—which the panel drew from one local ordinance (New Orleans in 1817) and several late-19th-century laws banning carrying firearms in ballrooms and assemblies—runs squarely into *Bruen*'s rejection of Manhattan's designation as a sensitive place "simply because it is crowded and protected generally by the New York City Police Department." 597 U.S. at 30–31. In short,

the panel stretched to draw principles from unrelated laws that simply do not support its stated regulatory principle.

But I repeat: the panel should not have felt licensed to extract principles from these unrelated laws in the first place. When the same locations that existed at the Founding still exist today, and there is *no* historical tradition of banning carry in those locations at the Founding, that lack of historical regulations must count for something. Indeed, in most instances it should be dispositive. *Bruen*, 597 U.S. at 26–27.

**2.**

The panel used another feint to ignore the lack of historical regulations of locations that have existed since the Founding. The panel looked instead at how those types of locations might have changed in the intervening years and asked whether those Founding-era categories are sufficiently similar to their "modern" equivalents. By adding this step, the panel introduced yet one more path permitting our court to broadly analogize from historical laws that on first blush seem far afield from the modern law, especially as compared to the glaring lack of historical regulation of the same locations now being banned.

This is well-illustrated by the panel's analysis of California's and Hawaii's laws prohibiting carrying firearms in "park[s]." *Wolford*, 116 F.4th at 982–85; HRS § 134-9.1(a)(9); Cal. Pen. Code § 26230(a)(12). Even though public parks existed well before the Founding and the states provide no evidence of firearm bans from that time period, the panel divined a historical tradition by redefining the inquiry to search for more recent regulations of "modern" parks. *Wolford*, 116 F.4th at 983.

To be clear, the starting point for the panel's historical detour seems itself suspect. The panel concluded that modern parks were too dissimilar to Founding-era parks because today we use parks differently. *Wolford*, 116 F.4th at 982. While I suppose it's certainly true that the Founders didn't ride ten-speeds or talk on cell phones in public parks, there is ample historical evidence of public parks used for recreational purposes in the colonial and Founding eras. In Massachusetts, Boston Common—established in 1634— was used for drilling militiamen, but it "also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 4–6 (2021); *see also Steele v. City of Boston*, 128 Mass. 583, 583 (1880) (describing the Common "as a place of public resort for the recreation of the people" "from time immemorial"). In New York, City Hall Park began as a "public commons" in the 17th century, and Bowling Green was established as a place for the "Recreation & Delight of the Inhabitants of this City" in 1733. *The Earliest New York City Parks*, N.Y. City Dep't of Parks and Recreation, available at https://perma.cc/MBM5-FWRZ (last visited Jan. 2, 2025). In Pennsylvania, Philadelphia was described by 1830 as a city with many "public squares, and gardens" for "general resort" and "promenade." E.L. Carey & A. Hart, *Philadelphia in 1830– 1*, at 145–46 (1830). In New Jersey, Newark's Washington Park functioned as "a space for recreation." *See* Washington Park Newark, *History*, https://perma.cc/UC8K-5L8N (last visited Jan. 2, 2025). And in Georgia, Savannah was planned around open public squares, which were turned into

landscaped parks around 1800. *See* Turpin Bannister, *Oglethorpe's Sources for the Savannah Plan*, 20 J. of Soc'y of Arch. Hist. 47, 48 (1961).

Despite the undeniable presence of recreational-use parks at the Founding, the panel—and California and Hawaii—fail to provide any Founding-era laws prohibiting firearms in those places. Again, their failure to do so should be dispositive. Given that parks have "persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26–27.

But the panel did not stop there. To compensate for the lack of any historical bans in public parks, the panel reconceptualized parks at the Founding as merely "public green spaces," as opposed to the "outdoor gathering places" that "modern" parks serve as today. *Wolford*, 116 F.4th at 982. The panel then redefined its inquiry—rather than looking at the historical precedent at the time of the Founding, the panel looked to precedent from the mid- to late-19th century, when, according to the panel, "green spaces began to take the shape of a modern park." *Id.* After reframing the inquiry in this way, the panel then cited a panoply of laws restricting firearms in public parks, only one of which—New York City's—was dated prior to 1868, when the Fourteenth Amendment was ratified. *Id.* at 982–83. But apparently because similar public parks didn't exist at the Founding (per the panel), the panel felt authorized to derive its historical tradition from whatever time period the panel concluded that such spaces started to exist in their "modern" form.

As was always the case when the panel turned to analogizing, once it concluded that a "modern" place is meaningfully different from its Founding-era precursors, the outcome was predetermined. Each time the panel determined that a type of location did not exist at the Founding (or was too changed), the panel was able to find a historical tradition broad enough to support banning firearms in those locations. *E.g.*, *Wolford*, 116 F.4th at 983 (parks and similar areas); *id.* at 985 (playgrounds and youth centers); *id.* at 987 (places of amusement). Apparently the original understanding of the Second Amendment was that it would not apply to any new types of public spaces that would develop in the future.

But that is not how the Supreme Court has treated changes between then and now. Under the panel's approach, the Second Amendment protects new "modern" firearms, but not new "modern" places? *Bruen* confirmed—as did *Heller*—that the Second Amendment applies to modern arms: "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28; *see also Heller*, 554 U.S. at 582 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the [F]ounding."). But our court's approach in these cases allows judges to rule away Second Amendment rights from modern places to the extent those locations differ at all from their historical precursors—which, of course, they always will. So even while an individual might have the right to carry a modern firearm "in common use" today, *see Heller*, 554 U.S. at 627, under the panel's reasoning that person may only have the right to carry her modern firearm in primitive

locations indistinguishable from those that existed at the Founding.

**3.**

The panel's approach in these cases also further entrenched our court's practice of analogizing at too high a level of generality. The panel extracted very broad principles from the historical record that could support the constitutionality of almost any firearms restriction. Whenever the panel analogized to historical regulations, it found Hawaii's or California's laws constitutional. *See Wolford*, 116 F.4th at 982–83 (parks and beaches); *id.* at 986 (bars and restaurants); *id.* at 987 (places of amusement); *id.* at 993 (private property). This appearance of foreordained outcomes is a strong hint that something is wrong with how the panel analogized. Such predetermined results happen because the panel inevitably extracted analogies at too high a level of generality, precisely what the Supreme Court in *Bruen* and *Rahimi* instructed lower courts *not* to do. *Bruen*, 597 U.S. at 30; *Rahimi*, 602 U.S. at 692.

To guard against this tendency, the Supreme Court has instructed that to confirm whether historical laws are "relevantly similar" we must look carefully at the "how and why" of the regulations; that is, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [the 'how'] and whether that burden is comparably justified [the 'why'] are '*central*' considerations when engaging in an analogical inquiry." *Bruen*, 597 U.S. at 29 (quoting *McDonald*, 561 U.S. at 767); *see also Rahimi*, 602 U.S. at 692. The panel repeated these instructions but failed to apply them.

The "regulatory principles" that the panel extracted from the historical traditions bear little resemblance to the "why"

behind the historical regulations to which the panel analogized.  For example, from laws limiting poaching and hunting on private property, the panel drew the broad principle "that the Nation has an established tradition of arranging the default rules that apply specifically to the carrying of firearms onto private property." *Wolford*, 116 F.4th at 995.  From, among others, laws segregating the militia from alcohol, the panel drew the untethered principle that governments can regulate "to mitigate the dangers of mixing alcohol and firearms." *Id.* at 986.  And from laws prohibiting the carrying of firearms at ballrooms and social gatherings, the panel drew the exceedingly broad principle of "prohibiting firearms at crowded places." *Id.*  With each capacious "principle" the panel extracted from the historical laws, it disregarded the narrow reason "why" those laws were enacted.

And in reaching its overbroad analogies, the panel also failed to consider "how" the historical regulations were effectuated—that is whether the modern regulations "impose a comparable burden on the right of armed self-defense." *Bruen*, 597 U.S. at 29.  For example, as discussed above, from laws prohibiting the carrying of firearms without consent on a small subset of private property—enclosed lands—the panel concluded that *all* private property can be presumptively excluded, effectively rendering almost entire cities "no-carry" zones by default. *Wolford*, 116 F.4th at 996.  And from laws prohibiting firearms at balls and other isolated social gatherings, the panel concluded that firearms can be prohibited at all bars and any restaurant that serves alcohol. *Id.* at 985–86.  Put simply, the breadth of California's and Hawaii's laws bears no resemblance to the limited impact of the historical laws the panel pointed to for historical support.

By ignoring the "why" and the "how," the panel ran afoul of the Supreme Court's warnings not to over-generalize when drawing a historical analogy. Three Justices have explained that the Court's decisions in *Bruen* and *Rahimi* do not license lower courts to abstract to such high levels of generality. "[A] court must be careful not to read a principle at such a high level of generality that it waters down the right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). "Courts must proceed with care in making comparisons to historic firearms regulations, or else they risk gaming away an individual right the people expressly preserved for themselves in the Constitution's text." *Id.* at 711 (Gorsuch, J., concurring). And judges must not "let constitutional analysis morph into policy preferences under the guise of a balancing test that churns out the judge's own policy beliefs." *Id.* at 736 (Kavanaugh, J., concurring). By employing such broad analogizing, the panel turned the Second Amendment into a Rorschach inkblot—permitting judges to reason from abstract, broad constitutional principles whatever image of the right to bear arms that their personal preferences compel. And in doing so, states are given the very "regulatory blank check" that *Bruen* instructed against. 597 U.S. at 30.

\*     \*     \*

The panel's acknowledgment that the results of its analysis are both "arbitrary" and "[il]logical" should have been a wake-up call that something was wrong and merited correction by our court. *Wolford*, 116 F.4th at 1003. Not all Second Amendment questions are straightforward, but these cases presented one of the easier ones for our en banc court to fix. It is unfortunate we failed to do so.

### IV.

There is one more reason we should have taken these cases en banc. The panel unnecessarily created a circuit split. By upholding Hawaii's default private property rule, the panel departed from the holding of every other court to have considered similar private property default rules.

In *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), the Second Circuit held that New York's enactment of a similarly novel private property default rule violated the Second Amendment as applied to private property open to the public. *Id.* at 1048. The court concluded that "the State's analogues fail to establish a national tradition motivated by a similar 'how' or 'why' of regulating firearms in property open to the public in the manner attempted by [New York's private property default rule]. Accordingly, the State has not carried its burden under *Bruen*." *Id.* at 1047. The Second Circuit reviewed a set of historical materials nearly identical to those presented by Hawaii and California in these cases, including both the 1771 New Jersey poaching law and the 1865 Louisiana Black Code relied on by the panel. *Compare id.* at 1046–47, *with Wolford*, 116 F.4th at 994–96. The Second Circuit concluded that "*none* of the State's proffered analogues burdened Second Amendment rights in the same way as [New York's private property default rule]." *Antonyuk*, 120 F.4th at 1046. Instead, it observed that "[a]ll of the State's analogues appear to, by their own terms, have created a default presumption against carriage only on private lands *not open to the public*." *Id.*

Each district court that has addressed similar laws has also reached a conclusion at odds with this court's. *E.g.*, *Kipke*, 695 F. Supp. 3d at 659 ("[T]he Court finds that Plaintiffs are clearly likely to succeed in their challenge of

SB 1's private building consent rule."); *Koons*, 673 F. Supp. 3d at 607 ("[T]he Court concludes that the Default Rule impermissibly burdens Plaintiffs' Second Amendment right to carry for self-defense in public as applied to private property that is held open to the public and for which an implied invitation to enter is extended ...."); *Christian*, 2024 WL 4458385, at \*11 ("The State's criminal enactment barring carrying of arms on private property open to the public violates the Constitution.").

With this panel decision upholding Hawaii's default private property law, our court once again becomes a Second Amendment outlier among the circuits. We should have corrected it en banc.

## V.

With their new public carry bans, Hawaii and California have effectively disarmed law-abiding Hawaiians and Californians from publicly carrying during most of their daily lives. *Bruen* said the Second Amendment protects a "general right to publicly carry arms for self-defense." 597 U.S. at 31. It is hard to see how any such right "generally" applies in Hawaii and California after our court has sanctioned laws that flip the default rule into a "general right" *not* to carry on private property or most public property other than streets and sidewalks. If rigorously applying the mode of analysis mandated by *Bruen* led us to that shocking conclusion, perhaps we would be forced to conclude that the Supreme Court simply misspoke in characterizing the right to publicly carry as the "general" rule. But as explained, the panel's analysis fails to follow the Supreme Court's text-history-and-tradition guidance at almost every turn. Because I believe the Second

Amendment does not countenance that approach, I respectfully dissent from the denial of rehearing en banc.